IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SHANNON A. LAYMON,             *        C.A. No. 07-129-MPT
                               *
          Plaintiff,           *
                               *
v.                             *
                               *
LOBBY HOUSE, INC.,             *
a Delaware Corporation,        *
                               *
          Defendant.           *

**DEFENDANT'S OPENING BRIEF IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT**

**YOUNG, MALMBERG & HOWARD, P.A.**


/s/ Ronald G. Poliquin
Ronald G. Poliquin, Esquire
I.D. No. 4447
30 The Green
Dover, DE  19901
(302) 672-5600
*Attorney for Defendant*

DATED:  January 31, 2008

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES..................................................................ii

NATURE AND STAGE OF PROCEEDINGS..................................................1

SUMMARY OF ARGUMENT................................................................2

STATEMENT OF FACTS...............................................................3-10

ARGUMENT.......................................................................11-21

   I.     The Court Should Grant Lobby House Summary Judgment With Respect to
        Plaintiff's Title VII Sexual Harassment Claim.............................10-18

   A.    Standard of Review.................................................................10
   B.    Plaintiff Cannot Establish a Prima Facie Case of Sexual Harassment.......10-18

   II.    The Court Should Grant Lobby House Summary Judgment With Respect to
       Plaintiff's Title VII and 19. Del. C. §52365 Retaliation Claim............18-19

   III.   The Court Should Grant Lobby House Summary Judgment With Respect to
       Plaintiff's Breach of Good Faith and Fair Dealing Claim...................19-21

   IV.   The Court Should Grant Lobby House Summary Judgment With Respect to
       Plaintiff's Slander Claim..............................................................21

CONCLUSION.........................................................................22

# **TABLE OF AUTHORITIES**

Page

CASES

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986)....................................10

Bouton v. BMW of North America, Inc. 29 F.3d 103 C.A.3 (N.J.), 1994..................12

Burkhart v. Davies, 602 A.2d 56, 59 (Del.1991)................................................10

Burlington Industries, Inc. v. Ellerth, 118 S.Ct. 2257 (1998)............................12, 17

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ..................................................10

Faragher v. City of Boca Raton, 524 U.S. 775 (1998)......................................11,12

Knabe v. Boury Corp. 114 F.3d 407 C.A.3 (PA.) 1997.......................................13

Meritor Sav. Bank v. Vinson, 477 U.S. 57 (1986). ...........................................11,12

Mongelli v. Red Clay Consolidated School Dist. Bd. of Educ.
491 F.Supp.2d 467. D.Del., 2007...............................................................11,18

Smith v. Acme Spinning Co., No. C-C-85-066-M, 1986 U.S. Dist. LEXIS 27059, at *5
(W.D.N.C. Apr. 8, 1986.)........................................................................12, 15

Spence v. Funk, 396 A.2d 967, 970 (Del. 1978) ...............................................21

Tomka v. Seiler Corp., 66 F.3d 1295, 1305 (2d Cir. 1995)..................................11

Weston v. Pennsylvania. 251 F.3d 420 (3d Cir. 2001)...................................Passim

Wilcoxon v. Red Clay Consolidated School Dist. Bd. of Educ.
437 F.Supp.2d 235 D.Del., 2006..................................................................21

STATUTES

Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq...............Passim

RULES

Fed.R.Civ.P. 56(c) .................................................................................10

## NATURE AND STAGE OF PROCEEDINGS

Shannon Laymon ("plaintiff") commenced this action on March 1, 2007. The action contains claims for sexual harassment, retaliation, breach of good faith and fair dealing, and slander. Defendant the Lobby House, Inc. ("defendant") answered the complaint on April 16, 2007. On January 31, 2008, the defendant filed this motion for summary judgment and accompanying opening brief in support thereof.

## **SUMMARY OF THE ARGUMENT**

I.      The plaintiff did not subjectively find the work place hostile. The plaintiff continually and voluntarily socialized at the very hostile work environment that she complains about.

II.     The plaintiff claims the first incident occurred around September 2005, yet she doesn't report any sexual harassment until March 3, 2006.

III.    Similar to <u>Bouton</u>, the Lobby House had an "open-door" policy to address employee complaints.

IV.     The plaintiff unreasonably failed to take advantage of the defendant's "open-door" policy.

V.      After reporting the sexual harassment, the plaintiff never encountered any more incidents.

VI.     The defendant was not aware that the plaintiff filed a charge of discrimination with the Department of Labor at the time she was terminated.

VII.    The plaintiff was terminated because she was criticizing the Lobby House to employees and customers.

VIII.   Delaware statute provides the sole and exclusive remedy for employment discrimination claims and bars at-will employee's common law claim for breach of covenant of good faith and fair dealing.

IX.     The plaintiff presents no evidence of slander.

## STATEMENT OF FACTS

The plaintiff Shannon Laymon ("Laymon") was employed from September 2005 through March 17, 2006 by the defendant Lobby House ("Lobby House"). On March 17, 2006, she was terminated.

### A. The Lobby House's "Open Door" Policy

Throughout Laymon's employment, the Lobby House had an established "open door" policy concerning employee complaints. (Laymon Deposition at 75 attached as Exhibit A) The "open door" policy was stated in the server training manual that Laymon received. (Laymon Deposition at 74 attached as Exhibit B) (Server training manual attached as Exhibit C). The manual explicitly states that guests are the Lobby House's number one (1) priority. (Exhibit C) The manual also emphasizes the need for teamwork between the staff. The manual speaks about attitude:

> **"You may have noticed from your training that a positive attitude is our number one priority"**

The "open-door" policy states:

> **"The management team has an "open door policy" for all our employees and welcomes anyone to confront an issue early on so that it may not impact our "team" in a negative manner....If at any point there are any problems concerning another employee/manager please bring it to the general manager's attention. A harmonious working environment is the key to a prosperous business."** (Exhibit C)

### B. Laymon's Employment

Plaintiff was originally hired by manager Rick Anibal. (Laymon Deposition at 46 attached as Exhibit D) Rather than first go through the usual training as a server, Laymon was "fast-tracked" to be a bartender. (Laymon Deposition at 48 thru 49 attached as Exhibit E) While working, Laymon had fun being in the restaurant/bar's social

3

environment. (Laymon Deposition at 114 attached as Exhibit F) Laymon enjoyed the

money she earned while at the Lobby House. (Exhibit F) She had fun while working

there. (Laymon Deposition at 115 attached as Exhibit G) In addition, Laymon would get

intoxicated while working at the Lobby House. (Plaintiff's response to Request for

Admission #6 attached as Exhibit H) (Laymon Deposition at 117 attached as Exhibit I)

Laymon would drink after her shift. (Laymon Deposition at 57 attached as Exhibit J)

Laymon's boyfriend Richard Sinegar was present at the Lobby House on most

nights she worked. (Plaintiff's response to Request for Admission #1 attached as Exhibit

K). Her boyfriend was protective of her. (Laymon Deposition at 62 attached as Exhibit L)

He was there during and after her shift. (Laymon Deposition at 63 attached as Exhibit M)

Despite being there every night, Sinegar never witnessed any sexual harassment or a

hostile work environment-taking place at the Lobby House during Laymon's

employment. (11-22-07 Richard Sinegar Statement attached as Exhibit N)

On her off-days, Laymon hung out socially at the Lobby House. (Laymon

Deposition at 56 attached as Exhibit O) In October 2005, she came to the Lobby House

after a Halloween party. (Exhibit J) On Christmas Eve, December 24, 2005, the plaintiff

chose to hang out at the Lobby House after her shift rather than go home. (Laymon

Deposition at 58 attached as Exhibit P)  Laymon came to the Lobby House and socialized

for the Superbowl in February 2006. During that time, the plaintiff had three drinks

within a half an hour.  (Laymon Deposition at 60 attached as Exhibit Q)

Laymon received a written warning about wearing the wrong belt to work on

December 23, 2005. (Laymon Deposition at 93 and 12-23-05 Written Warning attached

4

as Exhibit R) In addition, Laymon was also blamed for an incident concerning how the bartenders collected money. (Laymon Deposition at 94 and 95 attached as Exhibit S)

## C. Laymon's accident

Laymon was injured on the job in October 23, 2005. (Laymon Deposition at 128 attached as Exhibit T) The accident occurred a little over a month after Laymon started working at the Lobby House. (Laymon Deposition at 129 attached as Exhibit U) Laymon continued to work at the Lobby House until March 17, 2006. (Laymon Deposition at 130 attached as Exhibit V) After the accident, Laymon brought in medical bills so that the Lobby House would pay them. (Exhibit V) She brought them in twice and apparently nothing was done about it. (Exhibit V) On March 3, 2005, Ken Caudill alerted Laymon that he had faxed her medical bills to his insurance company (Laymon Diary attached as Exhibit W) Laymon alerted Caudill that she retained legal counsel for her worker's compensation claim. (Exhibit W)

## D. Laymon's Allegations of a Hostile Work Environment

### 1. Allegations against Donald Wilmont

During the beginning of her employment, Laymon alleges that Don Wilmont pulled her into the men's bathroom and asked to see her breasts. (Laymon Deposition at 123 attached as Exhibit X) Laymon never reported the incident.

On September 28, 2005, Laymon alleges that Don Wilmont was drunk. He sat on the floor with a dollar in his mouth and told a waitress Tessa to "feed the kitty". She told him "No" and he kept it. (Exhibit G)

5

Laymon alleges that there was another incident when Wilmont was groping a customer. (Exhibit I) He was sticking his fingers in the girl's vagina in the back room. (Exhibit I)) Laymon never reported it to any managers or the police. (Exhibit I)

### 2. Laymon displays her "vertical hood piercing" to other employees

During one shift, Laymon displayed her vertical hood piercing[1] to two other employees during her work shift at the Lobby House. Bartenders Brian Ducette and Mary Anderson requested to see the piercing. (Laymon Deposition at 81 attached as Exhibit Y) Mary Anderson was Laymon's friend. (Exhibit K) Laymon never reported the incident to anyone. (Laymon Deposition at 78 attached as Exhibit Y) On that night, Laymon had a few drinks. (Exhibit Z) After showing her vertical hood piercing, Laymon went about cleaning. (Laymon Deposition at 82 attached as Exhibit A-2) She assisted Brian Ducette in closing the bar. (Laymon Deposition at 83 attached as Exhibit A-3) Afterward, Laymon and Anderson continued to be friends and hung out socially. (Laymon Deposition at 84 attached as Exhibit A-4) After filing her charge of discrimination, Laymon spoke to Brian Ducette as a potential witness for her charges. (Laymon Deposition at 89 attached as Exhibit A-5) Mary Anderson states that Laymon willingly revealed the piercing between her legs. (5-8-06 Mary Anderson Statement attached as Exhibit A-6) Anderson would have never allowed a man to force a woman to do something like that. (Exhibit A-6)

### 3. New Year's Eve Party

On New Year's Eve, December 31, 2005, Laymon worked at the Lobby House. After hours, employees at the Lobby House socialized to celebrate the evening. Laymon

---

[1] The jewelry is inserted into the hood tissue just above the clitoris. The jewelry rests on the clitoris, and runs parallel with the natural contour of the woman's shape. Source: http://tattoo.about.com/library/blvertclithood.htm

6

had a good time at the party. (Laymon Deposition at 113 attached as Exhibit A-7)

(Pictures of Shannon Laymon sticking tongue out at New Year's Eve Party attached as

A-1) After the facility closed, Mary Anderson and Kristina Sells flashed their breasts for

beer. (Laymon Deposition at 121 attached as Exhibit A-8). That night, it is alleged that

Rick Anibal was dancing and grinding against Amanda Potts. (Laymon Deposition at 112

attached as Exhibit A-9) Other than that, Anibal never engaged in any other acts of sexual

harassment. (Exhibit G) Laymon was mainly upset about being the only one cleaning and

that she was there really late. (Laymon Diary Entry attached as Exhibit A-10)

Laymon never complained about any sexual harassment until March 3, 2006.

(Laymon Deposition at 124 attached as Exhibit A-11) As of February 2006, Laymon was

coming in the Lobby House to socialize. (Laymon Deposition at 125 attached as Exhibit

A-12)

### 4. Allegations against Ken Caudill

On February 23, 2006, owner Ken Caudill was conversing with an individual

named "DJ". Laymon asked Caudill if he was putting cabinets in the girls' bathroom.

Laymon alleges that Caudill proceeded to call her stupid and say that girls would be too

lazy to refill the toilet paper for customers. He then said, "Girls are just good for sex."

Also, Ken Caudill grabbed waitress Amanda Potts' butt. (Exhibit A-9)

### E. Laymon complains to Manager Rick Anibel

As of February 2006, Laymon and manager Rick Anibal didn't have any

problems between each other. (Laymon Deposition at 66 attached as Exhibit A-13) Rick

Anibal never refused to speak with Laymon about anything. (Exhibit B) Laymon never

brought any allegations of sexual harassment to management. (Exhibit A) On March 3,

2006, Laymon was called into Rick Anibal's office because she was telling employees that the Lobby House was paying for her medical bills by stealing it out of her check. (Laymon Deposition at 69 and 70 attached as Exhibit A-14) Pursuant to that meeting, Laymon was written up for telling employees that the Lobby House was stealing money out of her check to pay her medical bills. (Laymon Deposition at 72 attached as Exhibit A-15) In response to the allegations against her, Laymon mentioned that Ken Caudill had grabbed Amanda Potts' butt on numerous occasions. (Laymon Deposition at 73 attached as Exhibit A-16) She also mentioned that after asking Caudill if they were going to build a cabinet to put toilet paper in the newly remodeled women's restroom, his response was that girls would be too lazy to ever change it anyways, the only thing they were good for was sex. (Exhibit A-16) This was the first and only time that Laymon reported issues relating to sexual harassment during her employment. (Exhibit H) Laymon never brought up the subject to any other supervisors. (A-14) After this meeting, Laymon experienced no further incidents of sexual harassment. (Exhibit H) (Exhibit B) Anibal told Laymon that he would make sure that Ken Caudill never told any offensive jokes around her. (Anibal Dep. at 55 attached as Exhibit 25)

### F. Laymon's termination

The plaintiff was terminated because she was criticizing the Lobby House to employees and customers. (Anibal Dep. at 31 attached as Exhibit A-17) On March 17, 2006, more than five regular customers of the Lobby House jointly complained about the plaintiff's consistently bad attitude. (Anibal Dep. at 29 attached as Exhibit A-18) More specifically, the customers would complain that the plaintiff constantly "bad mouthed" the Lobby House. (Anibal Dep. at 32 attached as A-19) (Affidavit of James Satterfield

attached as Exhibit A-26 and Affidavit of Robert Reed attached as Exhibit A-27) The

customers stated that they would not return to the Lobby House if the plaintiff continued

to work on Friday nights. (Exhibit A-19) Just prior to the incident, the plaintiff received a

written warning because she had complained about the Lobby House to other employees.

(Written Warning attached as A-20) Anibal specifically instructed the plaintiff to utilize

the defendant's "open-door" policy if she had any complaints. In addition, Anibal told the

plaintiff that he would not tolerate any more "bad-mouthing" of the company. (Anibal

Dep. at 56 attached as A-21)  In addition, other bartenders did not want to work with the

plaintiff. (Anibal Dep. at 33 attached as Exhibit A-22)

Laymon was terminated on March 17, 2006. Laymon filed a charge of

discrimination on April 5, 2006. On March 17, 2006 Anibal called Laymon at home

during her day off. (3-16-06 Laymon Diary Entry attached as Exhibit A-23) The Lobby

House did not know that Laymon contacted the Department of Labor about sexual

harassment. (Exhibit A-23) Anibal asked her about the "situation". (Exhibit A-23)

Laymon said she filed a Complaint with the Department of Labor concerning Worker's

Compensation. (Exhibit A-23) She didn't give too many details to Anibal. (Exhibit A-23)

Anibal told Laymon that she was no longer employed. (Exhibit A-23) At that point in

time, Laymon said "that's retaliation". (Exhibit A-23) Anibal responded that he fired

Laymon because she was a rude and an incompetent bartender. (Exhibit A-23) Anibal

stated that customers had complained about Laymon as a server. (Exhibit A-23) Laymon

thought that the claims about customers complaining about her were false. In addition,

she thought that him saying she dropped her pants at work was slander. (Exhibit A-23)

Laymon admits that customers did complain about her. (Laymon Deposition at 133

through 137 attached as Exhibit A-24) (Robert E. Reed Affidavit attached as Exhibit A-27) (James Satterfield Affidavit attached as Exhibit A-26) She could not claim any other false statements that the Lobby House made against her. (Exhibit A-24)

## ARGUMENT

**I. The Court Should Grant Lobby House Summary Judgment With Respect to Plaintiff's Title VII Sexual Harassment Claim**

### A. Standard of Review

Federal Rule of Civil Procedure 56 states that summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The plain language of Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317 (1986) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986)); see also Burkhart v. Davies, 602 A.2d 56, 59 (Del.1991).

### B. Plaintiff Cannot Establish a Prima Facie Case of Sexual Harassment

To bring a successful claim for a sexually hostile work environment under Title VII, the employee must establish that: (1) she suffered intentional discrimination because of her sex; (2) discrimination was pervasive and regular; (3) discrimination detrimentally affected the employee; (4) discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) existence of respondeat superior liability. Weston v. Pennsylvania. 251 F.3d 420 (3d Cir. 2001).

The harassment must be so severe or pervasive that it alters the conditions of the victim's employment and creates an abusive environment. Id. The conduct in question must be severe and pervasive enough to create an objectively hostile or abusive work

11

environment, such that a reasonable person would find hostile and that the victim-employee subjectively perceives as abusive or hostile. Id.

A mere utterance of an epithet, joke, or inappropriate taunt in the workplace that may cause offense does not sufficiently affect the conditions of employment. See Weston. "Simple teasing, offhand comments, and isolated incidents will not amount to discriminatory changes in the 'terms and conditions of employment'. Faragher v. City of Boca Raton, 118 S.Ct. 2275 (1998) To be deemed pervasive and therefore actionable, on the other hand, the allegedly harassing incidents must be repeated, continuous and concerted and concerted; isolated incidents or occasional episodes will not merit relief. Tomka v. Seller Corp., 66 F.3d 1295, 1305 (2d Cir. 1995).

In determining whether a work environment is hostile or abusive, for purposes of a Title VII hostile work environment claim, Courts look at numerous factors, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. Mongelli v. Red Clay Consolidated School Dist. Bd. of Educ. 491 F.Supp.2d 467. D.Del., 2007. Pervasive and regular discrimination occurs when incidents of harassment occur "either in concert or with regularity."

The alleged acts of harassment must be unwelcome by the plaintiff. No matter how offensive the sexual conduct in the workplace may be, an employer is not liable if the conduct is consented to or welcomed. Meritor Sav. Bank v. Vinson, 477 U.S. 57 (1986). It is not enough that the plaintiff believed the conduct to be distasteful; it must be demonstrated by a preponderance of the evidence that the plaintiff by her own conduct

indicated that the complained of behavior was in fact unwelcome. Id at 68.To determine whether the conduct was unwelcome, a court may consider the following: whether the plaintiff willingly participated in the very conduct about which she now complains, whether the plaintiff clearly made her supervisors aware that in the future such conduct would be considered unwelcome, and the period of time that elapsed between the occurrence of the conduct and the plaintiff's complaint about it. Id. "Welcomeness" may be demonstrated by showing that the plaintiff participated in or encouraged the complained of conduct. Smith v. Acme Spinning Co., No. C-C-85-066-M, 1986 U.S. Dist. LEXIS 27059, at *5 (W.D.N.C. Apr. 8, 1986.)

An employer is always liable for a supervisor's harassment if it culminates in a tangible employment action. Burlington Industries, Inc. v. Ellerth, 118 S.Ct. 2257 (1998) and Faragher v. City of Boca Raton, 118 S.Ct. 2275 (1998). When there is no tangible employment action, the employer will avoid liability or limit damages by establishing:

(a) the employer exercised reasonable care to prevent and correct promptly any harassing behavior and;

(b) the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. Id.

A company's effective grievance procedure known to the victim which timely stops harassment shields the employer from Title VII liability for hostile work environments. Bouton v. BMW of North America, Inc. 29 F.3d 103 C.A.3 (N.J.), 1994. In Bouton, the defendant had an "open-door policy" for reporting grievances. BMW was not liable for a supervisor's sexual harassment because BMW investigated upon her first contemporaneous complaint of harassment.

13

An employer cannot be held liable for harassment where action taken by the employer was reasonably calculated to stop the harassment. Knabe v. Boury Corp. 114 F.3d 407 C.A.3 (PA.) 1997. When an employer's response to an employee's complaints of harassment by a coworker stops the harassment, there can be no employer liability for an hostile work environment harassment under Title VII. See Weston. In Knabe, the court decided that giving a warning to an employee was reasonably calculated to prevent future harassment.

The plaintiff's alleged incidents of harassment did not alter the conditions of her employment. The harassment must be so severe or pervasive that it alters the conditions of the victim's employment and creates an abusive environment. See Weston. Plaintiff began her employment in September 2005. The plaintiff claims that she was first sexually harassed in the beginning of her employment. Yet, she does not complain about any harassment until March 3, 2006.

During the period in between, Plaintiff enjoyed the restaurant's social environment. She was satisfied with the money she earned. She had fun working there. Just one month prior to her first and only complaint, the plaintiff did not have any issues with the manager Rick Anibal. Ultimately, plaintiff presents no evidence that the harassment affected her conditions of employment.

Even during the sporadic incidents of the alleged sexual harassment, the plaintiff's work was not affected. For instance, after the plaintiff displayed her vertical hood piercing around her vagina to two other employees, the plaintiff simply went back to cleaning the restaurant. She also helped the alleged harasser (bartender) Brian Ducette close the bar while never reporting the incident to anyone. Plaintiff makes no allegations

that the alleged incident affected her work performance. Quite the contrary, the plaintiff enjoyed being a employee of the Lobby House and was satisfied with the money she made.

The plaintiff did not subjectively find the work place hostile. The plaintiff continually and voluntarily socialized at the very hostile work environment that she complains about. The plaintiff would often hang out and relax after work. She had fun drinking at the Lobby House. Further demonstrating that it was not a hostile work environment, the plaintiff's boyfriend was there every night that she worked. He was also there after her shift ended.

Around the beginning of her employment, on October 31, 2005, the plaintiff came to the Lobby House after a Halloween Party to socialize. On Christmas Eve, December 24, 2005, the plaintiff chose to hang out at the Lobby House after her shift rather than go home. Laymon got intoxicated while working at the Lobby House.

At the New Year's Eve party that the plaintiff now complains about, she admits to having a good time. Plaintiff's primary problem with the night was the fact that she had to stay late and clean.

In February 2006, the plaintiff partied at the Lobby House when she was not working. This is just one month prior to her first and only complaint of sexual harassment on March 3, 2006. In February 2006, the plaintiff came to the Lobby House off the clock to celebrate the Super Bowl. She had no animosity with manager Rick Anibal at the time. During that time, the plaintiff had three drinks within a half an hour.

The plaintiff never complains to anyone of any sexual harassment until March 3, 2006. In determining whether the conduct is unwelcome, the court should look at whether

15

the plaintiff clearly made her supervisors aware that in the future such conduct would be considered unwelcome. See <u>Smith</u>. Quite the opposite, she was socializing at the Lobby House during the very same period when the allegations of sexual harassment occurred. As of February 2006, just one month before her only complaint, the plaintiff is partying at the Lobby House with manager Rick Anibal. The plaintiff reports the first incident occurred around September 2005, yet she doesn't report any sexual harassment until March 3, 2006. In addition, her complaint is almost exclusively directed at Ken Caudill's off hand remarks. She does not mention the other incidents alleged in her complaint. Plaintiff's report of sexual harassment was only made when the plaintiff faced discipline for violating company policy. Once the report was made, no further incidents of sexual harassment occured.

Most of plaintiff's complaints constitute isolated incidents or occasional episodes. Plaintiff makes two allegations against Don Wilmont. Plaintiff alleges that when she began working at the Lobby House, Wilmont pulled her into the men's bathroom and asked to see her breasts. Laymon never reported the incident to management. In addition, plaintiff does not mention it to the Department of Labor when filing her complaint. The other incidents involving Wilmont do not involve the plaintiff. She complains that on September 28, 2005, a drunken Wilmont sat on the floor with a dollar in his mouth and told a waitress Tessa to "feed the kitty". Plaintiff never reports the incident to management. Plaintiff also alleges that Wilmont groped a passed out customer. Again, Laymon never reported the incident to any managers or the police. Laymon never reports any of the allegations against Wilmont and presents no evidence that these incidents affected her at work.

The plaintiff's other complaint is about waitresses flashing their breasts during a New Year's Eve Party. On that night, employees at the Lobby House socialized to celebrate the evening. Laymon had a good time at the party. Laymon never reports the incident nor gives any evidence that it affected her work.

The plaintiff also alleges that owner Ken Caudill said, "Girls are just good for sex" on February 23, 2006. She also alleges that he grabs waitress Amanda Potts' butt. These are the only allegations that the Plaintiff reports to Rick Anibal on March 3, 2006. After the plaintiff spoke with manager Rick Anibal about the incident, she experienced no additional incidents.

These incidents complained of by the plaintiff represent isolated incidents rather than repeated, continuous, and concerted incidents qualifying as a hostile work environment. Plaintiff only reported the incidents with Ken Caudill to Rick Anibal. These incidents qualify as "off hand comments" and crude behavior not actionable under a hostile work environment claim. Only one of the incidents even involved the plaintiff.

The undisputed record establishes that the Plaintiff's harassment claim fails as a matter of law because she cannot prove that under the totality of the circumstances that she was subject to harassment, which was pervasive and regular. Rather, plaintiff points to disjointed incidents that do not have any correlation with each other. The incidents complained of did not occur with regular frequency.

Here, the alleged sexual acts did not culminate in a tangible employment action. Therefore, the Lobby House may avoid liability if: a) the employer exercised reasonable care to prevent and promptly correct any harassing behavior and; (b) the employee unreasonably failed to take advantage of any preventive or corrective opportunities

provided by the employer or to avoid harm otherwise. See <u>Burlington Industries, Inc.</u>

Similar to <u>Bouton</u>, the Lobby House had an "open-door" policy to address employee complaints. The "open-door" policy is highlighted in the employee manual which plaintiff received during her employment. In addition, the plaintiff was aware of the "open-door" policy but chose not to utilize it. As of February 2006 (one month prior to plaintiff's termination), plaintiff and manager Rick Anibal didn't have any problems between them. Plaintiff only complained about two of the incidents concerning the alleged harassment in response to being disciplined for insubordination.

Here, there is no dispute that the plaintiff did not complain of any harassment prior to March 3, 2006. The plaintiff only broached the subject when manager Rick Anibal disciplined her for complaining to other employees that the Lobby House was stealing money from her paycheck to pay for her medical bills. During that conversation, Anibal emphasized that the plaintiff should utilize the Lobby House's "open door" policy to handle problems and that plaintiff should not discuss problems with other co-workers. In that conversation, the plaintiff complained that members of management are very "disrespectful". She also complained that owner Ken Caudill said, "Girls are just good for sex." The plaintiff also complained about Caudill grabbing waitress Amanda Pott's butt. The plaintiff also told Anibal that Don Wilmont was "disrespectful" to her. In response, Anibal asked that the plaintiff utilize the "Open-Door" policy with any further complaints. Next, Anibal offered to only schedule the plaintiff on shifts when Caudill was not present. She felt that was unfair to her. Lastly, Anibal spoke with Caudill and no further incidents occurred.

18

The Lobby House exercised reasonable care and promptly corrected any harassing behavior that the plaintiff reported. In addition, the plaintiff unreasonably failed to take advantage of the defendant's "open-door" policy. The Lobby House properly responded to plaintiff's contemporaneous complaint. First, Anibal emphasized that the plaintiff utilize the company "open door" policy in addressing any complaints. Secondly, Anibal offered to schedule the plaintiff on days when owner Ken Caudill was not present. Lastly but most importantly, Anibal spoke with Caudill about refraining from any further offensive comments and plaintiff never encountered any more incidents.

## II. The Court Should Grant Lobby House Summary Judgment With Respect to Plaintiff's Title VII and 19. Del. C. §52365 Retaliation Claim

To survive summary judgment on her retaliation claim, Plaintiff must establish a prima facie case of retaliation, she must show that: (1) she engaged in a protected employee activity; (2) employer took an adverse employment action after or contemporaneous with the protected activity; and (3) causal link exists between the protected activity and the adverse action. See Weston.

Claims brought pursuant to Title VII are analyzed under the burden-shifting framework; if the employee makes a prima facie showing of discrimination or retaliation, then the burden shifts to the employer to establish a legitimate, nondiscriminatory reason for its action, and if the employer carries this burden, then the presumption of discrimination drops from the case, and the employee must cast sufficient doubt upon the employer's proffered reasons to permit a reasonable fact-finder to conclude that those reasons are fabricated. See Mongelli citing Civil Rights Act of 1964, § 704(a), 42 U.S.C.A. § 2000e-3(a).

19

First, the defendant was not aware that the plaintiff filed a charge of discrimination with the Department of Labor at the time she was terminated. In fact, during the phone call between the plaintiff and the Lobby House, she stated that she filed a worker's compensation claim with the Department of Labor. Therefore, any claim of retaliation in relations to sexual discrimination should be dismissed.

Here, the defendant offers a legitimate, nondiscriminatory reason for the plaintiff's termination. The plaintiff was terminated because she was criticizing the Lobby House to employees and customers. On March 17, 2006, more than five regular customers of the Lobby House jointly complained about the plaintiff's consistently bad attitude. More specifically, the customers would complain that the plaintiff constantly "bad mouthed" the Lobby House. The customers stated that they would not return to the Lobby House if the plaintiff continued to work on Friday nights. (Exhibits A-26 and Exhibit A-27) Just prior to the incident, the plaintiff received a written warning because she had complained about the Lobby House to other employees. The general manager Rick Anibal specifically instructed the plaintiff to utilize the defendant's "open-door" policy if she had any complaints. Anibal told the plaintiff that he would not tolerate any more "bad-mouthing" of the company. In addition, other bartenders did not want to work with the plaintiff.

### III. The Court Should Grant Lobby House Summary Judgment With Respect to Plaintiff's Breach of Good Faith and Fair Dealing Claim

The plaintiff is barred from bringing a claim for sexual harassment under a breach of good faith and fair dealing claim. Delaware statute provides the sole and exclusive remedy for employment discrimination claims and bars at-will employee's common law

claim for breach of covenant of good faith and fair dealing. <u>Wilcoxon v. Red Clay</u>

<u>Consolidated School Dist. Bd. of Educ.</u>437 F.Supp.2d 235 D.Del., 2006.

## IV. The Court Should Grant Lobby House Summary Judgment With Respect to Plaintiff's Slander Claim

Slander can be a statement that defames an individual in her trade, business, or

profession, or it can be a statement that impugn a crime or a loathsome disease to the

plaintiff or that impugn unchastity to a female plaintiff. But defamation occurs only when

the defamatory information is communicated to someone other than the person to whom

it refers.  In the law, this is known as "publication." <u>Spence v. Funk,</u> 396 A.2d 967, 970

(Del. 1978).

Here, the plaintiff presents no evidence of slander. The only basis for the claim

was that the customer complaints claimed by the defendant were false. However, the

plaintiff admits that she does not know in fact if the statements are false. In addition,

customers Jim Satterfield and Robert Reed have signed affidavits that they in fact did

complain about the plaintiff (Exhibits A-26 and Exhibit A-27). The only other statement

claimed by the plaintiff to be slander is that she "pulled down her pants" at work.

However, the plaintiff admits to showing her piercing on her clit or vagina area to other

employees after having drunk alcohol during her shift. Therefore there are no material

facts in dispute that could support the plaintiff's claim of slander.

21

## **CONCLUSION**

The Court should grant defendant's motion for summary judgment as to

plaintiff's claims for sexual discrimination, retaliation, breach of covenant of good faith

and fair dealing, and slander.

Respectfully submitted,

/s/ Ronald G. Poliquin
Ronald G. Poliquin, Esquire
I.D. No. 4447
30 The Green
Dover, DE 19901
302-672-5600
*Attorney for Defendant*

Dated: January 31, 2008

# EXHIBIT A

Shannon Laymon

75

1    A.    Yes.

2    Q.    So you refer to an open door policy?

3    A.    Supposedly there was an open door policy.

4    Q.    Did Rick ever refuse to speak with you about

5  anything?

6    A.    I never brought anything to him.  I just felt

7  like if I did, that nothing would be solved.  Either

8  that, or -- like whenever I did finally go through and I

9  actually did something about it, I was no longer there.

10    Q.    And did you bring it up with any other

11  supervisors at The Lobby House?

12    A.    No supervisors.

13    Q.    Did you ever bring it up to Allison Carroll?

14    A.    I said that I felt that I was treated unfairly

15  at times, and that certain people received certain

16  privileges.

17    Q.    That conversation did not involve any kind of

18  allegations of sexual harassment?

19    A.    I don't believe so.  I might have said -- the

20  one thing that could -- is that Amanda's tattoo was

21  allowed to show because it was on her boob.  Although the

22  policy in there says that no tattoos are allowed to be

23  showing.  I have tattoos and mine weren't allowed to

24  show.  But Amanda's tattoo was allowed.

# EXHIBIT B

Shannon Laymon

74

1    have any other problems with Ken afterwards?

2        A.    All -- no.  The problem -- I mean I might have

3    worked, max, four shifts, about, after the date of the

4    meeting.

5        Q.    And in those four shifts, did Ken Caudill do

6    anything inappropriate?

7        A.    I never seen him.  I saw him, I had a meeting

8    with him like maybe the week before, a couple days

9    before, something like that.  That was the last time I

10   had seen Ken.

11       Q.    So this was the first time you had brought up

12   any of these issues?

13       A.    Yes.  Because I did not feel like it was --

14   that it was something I could go to him about.  There is

15   supposedly an open door policy in the manual, but --

16       Q.    Okay.  Did you have a copy of the manual?

17       A.    I wasn't given that until -- I believe it was

18   composed a couple months after I had started working

19   there.

20       Q.    But you were given it before you were

21   terminated?

22       A.    I was given it before and never reviewed it

23   with a manager.

24       Q.    Did you ever review it yourself?

# EXHIBIT C

## WELCOME TO THE LOBBY HOUSE

On behalf of the owner, Ken Caudill, and the entire management staff we wish to say, "Congratulations, for joining our team!" You play an important role in the success and popularity of our restaurant. We wish you much success!

As a new team member, we would like to familiarize you with our philosophy and operating procedures, **SERVICE, ENTERTAINMENT,** and **FUN** IS OUR BUSINESS-Liquor and food just happen to be the products we sell.

Our "Goal" is **to provide our guest with the best service, the best quality food and beverage, in a clean and comfortable environment.** All served in a fun filled atmosphere at a fair price, thus creating a customer base that returns with their friends frequently.

There are several components to every successful restaurant; the two most important components are **HOSPITALITY** and **TEAMWORK**

**HOSPITALITY:** Patrons visiting our restaurant expect the BEST! They demand quality food, timely service and an enjoyable atmosphere. It is our job to meet and exceed the demand of the public.

**TEAMWORK:** By working together as a **TEAM** we will reap the profits of a flourishing business. Teamwork instills cooperation, unity and spirit. It is the mechanism to achieve our goal.

This handbook has been prepared for you because you are very important to The Lobby House Restaurant, not only as a team member, but also as a person. Your individual contribution and team spirit with which you perform your work are fundamentals of our success.

The purpose of this handbook is to explain to you just what you can expect from us, such as fair treatment, promotional opportunities and many other benefits our Company can offer. You will also learn what the company expects of you. We urge you to carefully read this booklet and be sure you understand **ALL OF ITS CONTENTS.**

WE are pleased to have you as a member of the Lobby House's team and look forward to a continued and mutually rewarding association.

Rick Anibal
General Manager

## POILICIES AND PROCEDURES

### ACCIDENTS

All accidents, regardless of whether or not the result in injury shall be immediately reported to the manager on duty.

Please follow these steps in the event of an injury to a guest:
1. Notify the manager on duty immediately:
2. Be courteous and professional
3. Make the injured person as comfortable as possible
4. Help the manager with whatever is needed
    ❑ Obtain names and addresses of witnesses, and complete Incident Report

### APPEARANCE

The lobby house dress code is designed to insure that all team members project a positive, well-groomed and professional image at all times. The following general grooming standards are intended to compliment the individual team member as well as the Lobby House Restaurant.

Team members are dressed with clean, pressed clothing and practice good personal hygiene.

Fingernail lengths should be appropriate and should not interfere with a team members' performance; any fingernail polish should be conservative in color. Kitchen staff are not allowed to wear fingernail polish of any kind.

Jewelry may be worn as long as it is in good taste. No large necklaces are to be worn. Earrings shall be no more than 1" below the earlobe.

Hair must be neat, combed and not appear unruly. Any staff member with long hair longer than the base of the neck must pull hair back in a hair tie as to not drape over the shoulders for food service sanitary reasons. Beards and goatees are permitted, but they both must be kept short and well groomed at all times.

Proper footwear and hosiery must be worn at all times.

Management has the final determination in settling grooming and appearance standards. Team members who do not adhere to the lobby house's standards are subject to disciplinary action.

## UNIFORMS

Team members, whose job classification requires it, may be issued special uniform requirements. (See uniform standards)  Team members are responsible for uniforms and replacement.  Uniforms must be worn while on duty and must be clean and worn in its entirety without personal items such as combs, keys, ect., being visible.  Undergarments that are visible when wearing your uniform must be black or white in color.

While in uniform, you represent the image of The Lobby House.  Your actions and appearance will be judged by those who view you as a representative of The Lobby House – thus, you should be mindful to display yourself properly and with pride.

Do not report to work with dirty or WRINKLED clothes.  Be pro-active and wash and iron your clothes the night before.  It may be helpful if you purchase multiple staff shirts to keep up with our standards of uniform condition.  You will be sent home and /or written up for failure to maintain uniform standards if management does not approve of your uniform and /or appearance.

## ATTENDANCE

You were hired to perform an important function as part of our team.  As with any group effort, it takes cooperation and commitment from everyone to operate effectively.  When you are not on the job, it creates an added burden to your fellow team members and affects the service to our guests.  Good attendance and punctuality are expected from all team members.  This is your responsibility – both to the company and to your fellow co-workers.

On occasion, absences and lateness is unavoidable.  Notify a manager no later than 4 hours before the start of your shift.  You must call in every day that you are scheduled and absent.  You are required to speak to a manager on the day you are not able to report to work.  Failure to speak to a manager on the day you are required to work constitutes a "NO SHOW" even though you may have spoken to someone else.  YOU HAVE TO SPEAK TO A MANAGER.  Unreported absences will be subject to disciplinary action, including immediate termination.

If you are absent due to illness, you may be required to bring in a doctor's note in order to resume your scheduled shifts.  NOTE: 90% of the workforce is sick daily, with some type of illness; just because you feel ill does not justify you calling out of work.  Responsibility to your work family should be very important to you.  A late night of drinking does not constitute as an illness and will not be accepted for calling out.

Request for days off must be submitted by Wednesday evening.  Write down your request clearly noting the day, date, and reason for asking off.  Post your note on the

office door and make sure that you include your name on the request. REMEMBER, a "request off" is just that, it is a request, not a guarantee, and time off will be granted at the discretion of the manager doing the schedule. We do everything possible to grant your request, however everyone obviously can't have off at the same time.

Team members are expected to work Holidays in which the company is open. This includes but is not limited to New Years Eve, New Years day, Thanksgiving Eve, Thanksgiving, Christmas Eve, and Mothers Day.

## EMPLOYEE COMMUNICATION/GRIEVANCES

The Lobby house Restaurant believes open communication between Team members is a vital part to insure success of its employees and the company

At the beginning of every evening shift there will be a brief "pre-shift" meeting. The manager will discuss all pertinent information for the shift.

The management team has an "open door policy" for all our employees and welcomes anyone to confront an issue early on so that it may not impact our "team" in a negative manner. We sincerely care about your well being both personally and professionally. Our goal is to develop a mutual respect with each employee regarding business philosophies as well as abilities. The key to our success is our people. Whatever reasons brought you here, remember 100% of our time goes to making a commitment to making your time well spent and successful. We expect the same in return. If at any point there are any problems concerning another employee/manager please bring it to the general manager's attention. A harmonious working environment is the key to a prosperous business.

## 60 DAY PROBATIONARY PERIOD

Every employee is hired on a 60- day probationary period. (This is a "feeling out" period to see If you as an employee fit our requirements and that we as a company fit yours). All new employees will be continually evaluated during this time and training issues, performance issues, and general team standards will be discussed. If for some unforeseen reason, termination is required it will happen within this probation period without prejudice to the employee.

## TERMINATION

If you are terminated either voluntarily or involuntarily, you will be instructed as to when to pick up your last paycheck. Any other questions regarding your termination and status will be answered by the general manager. You may be restricted from returning to the premises; the terminating manager will discuss this with you.

## TWO WEEK NOTICE FOR REHIRE & PATRONAGE

If you are voluntarily ending your employment with our company, we require a two-week notice. If you honor your two-week notice and have left on good terms, we will consider you for rehire status and as a PATRON. Please notify the general manager in writing. We sincerely hope that if you give proper notice that you will continue to honor all the previous commitments you made to us, we promise to honor ours to you.

## PAY PERIOD

All employees' hours are accrued from Monday to Sunday every two weeks. Paychecks are distributed on the following Friday at approximately 4:00 P.M. If you have any questions regarding your paycheck, please direct them to the general manager. This is subject to change without prior notice. NOTE: You are responsible for clocking in and out. Make sure that a manager clocks you out when your shift is over. If you are not clocked out of the computer system, you will not be paid for that shift.

## SMOKING POLICY

There is a designated smoking area that is to be used by all team members while on the clock. MANAGEMENT APPROVAL is required at all times. Please keep this area clean and do not throw butts on the ground.

## TIPPING

You as an employee of The Lobby House are obligated to report 100% of your tips to the I.R.S. If at any time we feel that you are not claiming all of your tips you may be subject to termination.

## GRATUITIES

Of course we assume that in the restaurant industry, hard work and good service are going to be recognized with a fair and generous gratuity. However, even under the best of conditions this is not always so. There will be times when you may feel you have been unjustly rewarded for your efforts. The guest, ultimately, has the right to make that final tipping decision. For this reason, it is strictly against Company Policy to criticize or in any way indicate to the guest or any other guest that you are dissatisfied with the gratuity you received. ANY EMPLOYEE WHO CRITICIZES OR DISCUSSES A GUESTS GRATUITY IS SUBJECT TO IMMEDIATE TERMINATION. Also, changing or closing credit card transactions with the incorrect tip amounts will lead to immediate termination.

PROTECTION OF COMPANY & EMPLOYEE PROPERTY

Respect and protection of company property and employee property is everyone's
concern.  If you find property missing or damaged, report it to the manager on duty
immediately.  Never bring valuables or money into the restaurant and leave them
unattended.  We will not be responsible for any lost or stolen articles.  Theft of any
Company property, food, or drinks will result in immediate termination.

SUBSTANCE ABUSE

We will not tolerate any substance abuse on the property, on or off the clock.  Any
employee reporting for work under the influence of alcohol or controlled substances will
be terminated immediately.

EMPLOYEE MEALS

Management will designate a place for you to eat while on the clock.  This is the only
place where food should be consumed while on the clock.  There is no eating in the
KITCHEN or at the BAR.  You must ask before you eat, if you are caught eating without
asking the manager on duty, you will no longer be able to eat while on the clock.  You
may also be written up for not asking first.  You must always ring your food into the
computer, do not just ask a cook to make your food without a ticket.  If any cook is
caught cooking for themselves or for someone else, without a ticket or manager
permission they will be terminated.  **PLEASE NOTE THAT BEING PREPARED
FOR YOUR SHIFT IS TO HAVE EATEN BEFORE YOU GET TO WORK, OR
BEFORE YOUR SHIFT STARTS.  DON'T COME TO WORK HUNGRY AND
EXPECTING TO EAT.**

CUSTOMER COMPLAINTS

All customer complaints should be directed to a manager immediately, NO
EXCEPTIONS.  You as a server/ bartender are empowered to do what is necessary,
within reason, to make our guests happy.  Our goal is **to provide the best food, great
drinks and the best service possible in a clean and comfortable environment.**  Our
job is to "serve" and "insure" that every guest's experience in our restaurant is
outstanding.

CELLULAR PHONES

While on duty, all personal cellular phones and pagers will be turned off and properly
stored in a secure place. Ideally, in your car.  **Cellular phones and pagers are not
allowed to be used while on the clock**.  If you fail to follow this policy, you will be
written up by the manager on Duty.  If you have an emergency, please check with the
manager if you need to use the restaurant phone.  NOTE: This does not apply to the
managers.

## EMPLOYEE PHONE NUMBERS

We do not give out employee phone numbers . If you wish to have someone cover a shift for you, it is your responsibility to get their phone numbers.

## EMPLOYEE MEETINGS

Employee meetings will be held occasionally. These meetings are usually on Sunday mornings and are mandatory for all employees. There will be atleast a two week notice, so that you can make arrangements to attend. If you "no show" to a meeting you will be terminated. Managers hold weekly meetings, if you have any concerns or would like to address an issue with the managers please speak to the general manager about attending the manager meeting.

## DELIVERIES

Only managers can sign for UPS, FEDEX, or CERTIFIED MAIL. All food and liquor deliveries must be checked completely, by matching invoice with product.

## OFFICE DOOR BOARD

This is where the schedule is posted each week. This is where you need to put your request up by Wednesday night. DO NOT PUT PHONE MESSAGES ON THE BOARD! Please, READ all posted notes, letters, or notices posted. This board is used as a communication tool to employees, always check for new things posted. Do not read other peoples schedule request.

## SEXUAL HARASSMENT

Sexual Harassment is defined as "unwelcomed sexual advances or conduct". The Lobby House does not tolerate any form of this by any supervisor or employee. If at any time you feel that you are being sexually harassed, you must discuss it with the general manager. This will be kept in confidence.

## <u>DISCIPLINARY ACTIONS</u>

**THE FOLLOWING WILL RESULT IN TERMINATION:**

1. Theft or destruction of property:
   - ❑ This includes employees, customers, and company property
   - ❑ Altering guests checks or forging tip amounts
   - ❑ Giving away free food or drinks to an employee or customer
2. Insubordination
   - ❑ Any act of insubordination toward a manager will result in termination.
   - ❑ Any negative comments about other employees, managers, or the company itself, to customers while on the clock will result in termination
3. Rudeness
   - ❑ Any act of rudeness to a guest may result in immediate termination of the employee. Be mindful not only of what you say, but also of your body language and facial expressions.
4. Alcohol and Drugs
   - ❑ Any consumption of alcoholic beverages by an employee that is on the clock will result in termination. (unless a manager makes an allowance under his supervision)
   - ❑ Any illegal substance abuse on the property will result in termination
   - ❑ Any selling or purchasing illegal drugs on the property, including the parking lot will result in termination
5. Application
   - ❑ Any misleading information given to us, will result in termination
6. Minors
   - ❑ Any employee who knowingly serves a minor will be terminated.
   - ❑ Any employee who brings in a minor friend and allows us to serve them with or without a fake I.D. will result in termination.
7. "NO SHOW"
   - ❑ Not calling out 4 hours before your shift starts (10:00 a.m. for morning shifts) or not showing up for a meeting will result in termination.

**THE FOLLOWING WILL RESULT IN A WRITTEN WARNING**

1. ~~Dress Code & appearance~~
   - ❑ Not following our dress code and appearance guidelines will result in a write up
2. Lateness
   - ❑ More than 5 minutes late by the main computer system, without calling with a legitimate excuse

3. Serving a minor unknowingly
   - ❑ We card everyone under 35. If you do not card an individual who looks under 35, you will be written up. This applies to regulars, just because you carded them last week does not mean you do not have to card this week.

4. Customer complaints
   - ❑ Excessive customer complaints about service or mistakes made by a server/bartender can result in a write up.

5. Cell phone
   - ❑ Anyone caught using a cell phone or having a cell phone turned on while on the clock will be written up.

6. Recipes
   - ❑ Any cook that makes a recipe without following the recipe book, will be written up. This includes bulk recipes and restaurant dishes. We also do not tolerate laziness and cutting corners on recipes.

7. Grouping
   - ❑ We do not tolerate grouping while on the clock. Do not congregate in groups, you are here to work not socialize. There are many things that can be done to insure our goal: **TO PROVIDE OUR GUESTS WITH THE BEST SERVICE, THE BEST QUALITY FOOD AND BEVERAGE, IN A CLEAN AND COMFORTABLE ENVIRONMENT.**

8. Eating
   - ❑ Not asking a manager first before you eat.

9. Cooks and bulk meats
   - ❑ Overcooking turkeys, primeribs, and Top rounds may result in a written warning. Not letting a manager know and/or not posting the appropriate sign about bulk meat cooking after you end your shift will result in a written warning.

**These are not the only disciplinary actions, and the Lobby House has the right to discipline at our discretion**

Written Warnings are all given to the General Manager by the manager on duty. They are all signed and dated by the individual who received them. They are kept in your employee folder. After you received 4 written warnings you will have a meeting with the general manager. After your 5th warning you will be suspended without pay for 1 week. YOU WILL BE TERMINATED AFTER YOUR 6TH WARNING.

The lobby house handbook employee acceptance.

I _____, on _____200_. Have read and understand all aspects of the lobby house employee handbook.  This includes disciplinary actions, grievances, sexual harassment, and what is expected of me. I also understand that The lobby house can change, rescind or add policies to this handbook at our discretion, with or without warning to me.

**This handbook is not a contract, express or implied, guaranteeing employment for any specific duration.  Either you or the lobby house may terminate this relationship/employment at any time, for any reason, with or without cause or notice.**

Employee signature:

Witness:

# EXHIBIT D

Shannon Laymon

46

```
 1        A.    No.   It was still real early in the morning.   I
 2   had to wait to go to the emergency room, because the
 3   person -- there's normally three people who work football
 4   Sundays because at the very beginning we were pretty
 5   busy.  And that third person wasn't there yet.  I had to
 6   wait for that third person to come before I could leave.
 7   Because I didn't want to mess them up.
 8        Q.    Is there a history of depression in your
 9   family?
10        A.    Not that I'm aware of.
11        Q.    Is there a history of mental illness in your
12   family?
13        A.    Not that I'm aware of.
14        Q.    Now, when did you first apply for your position
15   with The Lobby House?
16        A.    It would have been around August of -- this
17   August is 2007.  Not 2006 -- so 2005.
18        Q.    And how did you learn about the opening?
19        A.    I was just applying.  I had been working down
20   at the beach, and I was moving home.
21        Q.    Now, who hired you?
22        A.    Rick did.
23        Q.    And did you have an interview?
24        A.    Yes.  It was a short interview.
```

# EXHIBIT E

Shannon  Laymon

48

1        A.    He is a friend with one of -- an

2    acquaintance -- an ex-boyfriend.  I don't know what to

3    consider him.  There is no official title, but he's

4    friends with one of -- an ex.  I don't know.

5        Q.    So, you had a short interview with Rick Anibal?

6        A.    Yes.

7        Q.    And who is Rick Anibal?

8        A.    The general manager.

9        Q.    And then you immediately started working at The

10   Lobby House?

11       A.    Yes.  It might have been -- I think it was like

12   I had an interview on Tuesday.  It might have been a

13   couple days later.  It wasn't the next day, but it was --

14       Q.    And what you described previously as working

15   the floor, was that your orientation, or your work

16   training, or work orientation?

17       A.    We had kind of a training.  The first day, it

18   was pretty much I came in, it was a night shift, and it

19   was just to see what I knew.  And basically I think the

20   decision from there was are we going to put her on the

21   floor or behind the bar.  We need a bartender, but there

22   is a system, normally it's you're there for a certain

23   amount of time, and it's kind of like once you're there,

24   then you can move up.  I went through training on the

**W&F**

49

1    floor, I went through training on the bar, and they were

2    just intermingled with each other.

3         Q.   So is being a bartender preferable to being a

4    waiter or waitress?

5         A.   Yes.

6         Q.   And after you trained, you were immediately

7    placed as a bartender?

8         A.   Yes.

9         Q.   Was that preferable to being a server, to you?

10        A.   Yes.

11        Q.   And who made that decision?

12        A.   It would have been Rick.

13        Q.   And did he have any conversations with you

14   about you becoming a bartender, other than your --

15        A.   No.

16        Q.   -- initial interview?

17        A.   I had pretty much -- I looked at the schedule

18   where I was, and that's where I was.

19        Q.   And can you describe your job duties.

20        A.   We had to make the drinks, we had to ring up

21   food, and any customers over there, greet them, ask them

22   if they want any food.  Make their drinks, get their

23   drinks, clean up their dishes, stuff like that.  Make

24   sure their food was run out.  Just cater to whatever they

# EXHIBIT F

114

because I'm not having the social interaction with -- you

know, these are customers.  These are friends coming in

there.  You try to make the most of while you're at work.

Especially in a job like that, it's a very social job,

and you try to have a good time.  To me, being in that

social environment, that was my fun.

    Q.   Did you have a good time?

        MR. PRIMOS:  Objection; asked and

answered.

    A.  While I was working or after I was working?

    Q.   While you were working there that night.

    A.   I was having a relatively decent time, yes.

    Q.   Did you have fun during your entire employment

at The Lobby House?

    A.  During my entire employment, no.

    Q.   Other than up to March of 2006, did you enjoy

working at The Lobby House?

    A.  Any -- I mean the money there was great.  I

can't complain about the money whatsoever.  That's the

one thing that I never complained of when I was working

there.  Some of the incidences and some of the people I

worked with were better than others.  Just like anybody

you work with.  Certain nights you are going to enjoy.

Whenever Andrea and I would work together we would have a

# EXHIBIT G

115

1    girls night.  Football Sundays were great.  I could sit

2    there and watch football.  Everybody was football fans

3    around me.  Mike Limmer for the most part was a manager

4    on duty and he was a huge Steelers fan, too.  Certain

5    things like that, yes.  I have had fun.  There are some

6    nights where you don't have fun.  Even if -- you're

7    getting slammed, then you have to deal with people's bad

8    attitudes once they are off work.  It's just like any

9    job, you have good days and bad days.

10       Q.   Other than New Year's Eve, can you specify any

11   facts that Rick Anibal exhibited sexually harassing

12   behavior to other employees?

13       A.   That's the only night that I recall.

14       Q.   Can you give us the facts on which you

15   predicate that assistant manager Don Wilmont had

16   subjected various employees of the facility to numerous

17   incidents of sexually harassing behavior?

18       A.   One incident was his birthday.  He stuck a

19   dollar bill in his mouth and told Tessa to feed the

20   kitty.  Tessa was an ex Internet porn star, and he would

21   routinely make comments about that.

22       Q.   What date was that?

23       A.   What?

24       Q.   The incident you just referred to.

# EXHIBIT H

Plaintiff or from Mr. Sinegar, that Plaintiff did not welcome the disrespectful treatment that she received from management.

4.    Upon reporting issues of sexual harassment and/or hostile work environment to Rick Anibal on or around March 2006, Plaintiff experienced no further incidents concerning sexual harassment and/or hostile work environment while employed at the Lobby House.

**RESPONSE:** Admitted that after Plaintiff's conversation with Mr. Anibal on or about March 8, 2006, she experienced no further specific incidents of sexual harassment.    However, Plaintiff worked a total of only four shifts thereafter prior to her termination.    This schedule itself was a result of retaliation, as prior to this point Plaintiff had routinely worked at least four days a week; moreover, one of the shifts for which Plaintiff was scheduled was a Saturday morning, which she had never worked.

5.    Plaintiff displayed her vertical hood piercing to two other employees of the Lobby House during her work shift at the Lobby House.

**RESPONSE:** Admitted that following Brian Doucette's numerous demands and pressuring of Plaintiff and cornering of Plaintiff, Plaintiff displayed her vertical hood piercing to Mr. Doucette and Mary Anderson.

6.    Plaintiff was intoxicated while working on at least one occasion during her employment with the Lobby House.

**RESPONSE:** Admitted that Plaintiff was intoxicated while working on at least one occasion during her employment, but this was under management supervision.

7.  Mary Anderson is a friend of Plaintiff.

**RESPONSE:** Admitted that during Plaintiff's employment, Ms. Anderson and Plaintiff were friends. However, since Plaintiff's termination, Plaintiff has only had two conversations with Ms. Anderson.

8.  Mary Anderson was present at the time Plaintiff displayed her vertical hood piercing at the Lobby House.

**RESPONSE:** Admitted. See response to Request number 5.

9.  Plaintiff filed a charge of discrimination after she was terminated from the Lobby House.

**RESPONSE:** Denied as stated. By way of further explanation, Plaintiff proceeded to the Delaware Department of Labor to file a discrimination charge on or about March 9, 2006. At that time, Plaintiff discussed her discrimination charge with a representative of the Department of Labor and received initial paperwork to fill out. Plaintiff actually signed the discrimination charge at a later time.

10.  Plaintiff discussed with customers that the Defendant refused to pay her medical bills during her employment with the Lobby House.

**RESPONSE:** Denied as stated. By way of further explanation, Plaintiff did have discussions with some customers, primarily after owner Ken Caudill confronted Plaintiff on or about March 3, 2006, over Plaintiff's "suing" of Defendant. As a result

# EXHIBIT I

Shannon Laymon

117

1   involving him dealing with customers?

2       A.    Yes.

3       Q.    Are there other incidents which you can name?

4       A.    There was another incident where he actually

5   was groping another customer.   There was plenty of

6   customers, but the girl was so intoxicated -- there was a

7   party in the back room, and he was actually sticking his

8   fingers in the girl's vagina and telling us about how

9   stinky she was.

10      Q.    And what date was that?

11      A.    I don't remember the date.

12      Q.    Did you report that to any managers?

13      A.    No.

14      Q.    Did you report that to the police?

15      A.    No.

16      Q.    Did you talk to anyone else, anyone about that

17  incident?

18      A.    No.   I mean there were a couple of people that

19  worked with me that night that would have known about it,

20  but --

21      Q.    Have you ever gotten drunk at The Lobby House?

22      A.    Yes.

23      Q.    And how many times have you gotten drunk there?

24      A.    A couple of times.

# EXHIBIT J

Shannon Laymon

57

1    Q.    So, it's your testimony here today, you did not

2  often hang out after work at The Lobby House?

3    A.    Well, after -- if I was working that day, I

4  would be there after hours.  To actually go in on my day

5  off, no.

6    Q.    So, you would, during your employment there,

7  you would hang out after hours?

8    A.    Yes.

9    Q.    This is after you've clocked out or work is

10  done?

11    A.    No.  It was -- well, yes.  Sometimes after we

12  clocked out.  A lot of times, I mean we -- it was kind of

13  like once the bar shut down, you hang out, you relax

14  while you're trying to get the rest of your work done.

15    Q.    Okay.  So you would hang out and relax after

16  your work was done?

17    A.    Yes.

18    Q.    And did you drink after your work was done?

19    A.    Occasionally.

20    Q.    And did you have fun hanging out?

21    A.    Certain days yes, certain days no.

22    Q.    But you could have chosen to leave The Lobby

23  House after your work was done?

24    A.    Once the work was done, yes.  But, there was

# EXHIBIT K

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

SHANNON A. LAYMON,          *    C.A. No. 07-129-MPT
                                *
          Plaintiff,    *
                                *
    v.                      *
                                *    TRIAL BY JURY DEMANDED
LOBBY HOUSE, INC., a      *
Delaware corporation,     *
                                *
          Defendant.    *

### PLAINTIFF'S RESPONSES TO DEFENDANT'S FIRST SET OF REQUESTS FOR ADMISSIONS

COMES NOW, Plaintiff Shannon A. Laymon, by and through her attorneys, Schmittinger and Rodriguez, P.A., and responds to Defendant's First Set of Requests for Admissions as follows:

1.    The Plaintiff was diagnosed with depression by a doctor prior to her employment with the Defendant.

    **RESPONSE:** Denied.

2.    Plaintiff's boyfriend was present at the Lobby House on the majority of nights Plaintiff was working.

    **RESPONSE:** Admitted.

3.    Plaintiff first reported the issues of sexual harassment and/or hostile work environment during her employment with the Lobby House to Rick Anibal on or around March 2006.

    **RESPONSE:** Denied as stated.  By way of further explanation, admitted that Plaintiff discussed issues relating to sexual harassment during a meeting with Mr. Anibal in early March 2006.  However, management was previously aware, either from

# EXHIBIT L

Shannon Laymon

62

1     Q.   And did he often hang out at The Lobby House?

2     A.   He hung out there every night that I worked.

3     Q.   So, every night that you worked, he would have

4 been there?

5     A.   Yes.  He was there.

6     Q.   And you said your boyfriend was older.  How old

7 was he?

8     A.   He was 30 to 31.  His birthday -- well, his

9 birthday was in August.  So he was 30.

10     Q.   And would you consider him protective of you?

11     A.   I felt like he was.  I mean not to the point

12 where I wasn't allowed to make my own decisions.

13     Q.   But he was your boyfriend, and he obviously,

14 then, wouldn't want to see you get harmed in any way?

15     A.   Right.

16     Q.   And it's your testimony that he was there

17 almost every night that you worked?

18     A.   Right.

19     Q.   And when you say he was there, was he there for

20 lengthy periods of time?

21     A.   He would be there for almost the duration.  A

22 lot of times he would get ready and then come in, hang

23 out -- he would get his friends in there, as well.  A lot

24 of times he was there up until the point that I left at

# EXHIBIT M

63

1    night, so he would be hanging out after hours while we

2    were trying to clean up the bar.

3        Q.    So even when the other customers left, he would

4    still be there?

5        A.    Right.

6        Q.    And you mentioned he had other friends that

7    hung out at The Lobby House?

8        A.    Yes.

9        Q.    Can you name those friends?

10        A.    Jeff. I don't remember his last name. Matt's

11    come in a couple times.

12        Q.    Matt who?

13        A.    I don't know his last name. I know he works

14    for the guy who -- I don't know if he still owns, or

15    didn't own -- up on Marco Road. The one bar there on the

16    corner. JW's. So he is like his head landscaper guy or

17    whatever.

18              And then Steve Monch. I do know that name.

19    Last name.

20        Q.    So he would be there often where him and his

21    friends would hang out?

22        A.    Right.

23        Q.    And that was when you worked?

24        A.    Yes.

# EXHIBIT N

November 22, 2007

      I, Richard Sinegar,  here by state that I have no intentions of testifying on Shannon Laymon's behalf against The Lobby House Restaurant.  I have not witnessed, or have any direct knowledge of any sexual harassment taking place at the Lobby House.  I do not know of any unwelcomed actions taking place, past or present, at the Lobby House Restaurant.  I have no knowledge of any Hostile environments that Shannon Laymon would have been subjected to at the Lobby House Restaurant, during her employment with the Lobby House Restaurant.

      This statement was suggested by myself to the Lobby House.  I am not being forced in any way to give this statement.  I am not receiving any benefits from the lobby house to give this statement.

Richard Sinegar

_Richard Sinegar_            11/23/06
                                    Date

_Witness_                     11/23/06
                                    date

_Will Mann_               11/23/06
Witness                                   date

# EXHIBIT O

56

1   Q.   October 31, 2005?

2   A.   Yes.

3   Q.   And was this after the bar was closed?

4   A.   Yes.

5   Q.   And who was present?

6   A.   I know Keith was behind the bar.  That night

7 was a blur, because I had off.  I had went in, Mary and I

8 had both went in.  She was having a Halloween party at

9 her house, and then we had went back.

10   Q.   So you actually had off?

11   A.   Yes.

12   Q.   But you chose to come to The Lobby House?

13   A.   Yes.

14   Q.   So you were going there for social reasons?

15   A.   Yes.  At that point in time, I mean it's where

16 everybody went.

17   Q.   Did you often hang out at The Lobby House after

18 work?

19   A.   No.  There was, I think, one time that I went

20 there to watch football, but for the most part, I would

21 work five, six days.  If not, I was doing homework.  I

22 didn't really have time to go out.  Not only that but I

23 have friends that live in Philadelphia and New York, so I

24 would like to go out of state more.

# EXHIBIT P

Shannon Laymon

58

nights where I've had a bad day that day, stuff was going

on that day and I couldn't leave until my duties were

done. Once those duties were done, I would clock out and

leave.

5    Q.   So, did you ever hang out after your work was

6 already done, and you could have left?

7    A.   I -- yes.  Christmas Eve.

8    Q.   Christmas Eve, what year?

9    A.   That would have been 2005.

10    Q.   Are there any other dates where you hung out

11 after your work was done?

12    A.   Maybe like one or two other times.  One night

13 there was a poker night, and it was whenever I first

14 started there.

15    Q.   Other than that date?

16    A.   I don't remember.

17    Q.   Do you remember that there were dates, nights

18 that you would hang out for --

19    A.   For the most part if I was there off -- I was

20 rarely there off the clock.  Put it -- I'll put it that

21 way.  A lot of times, like I said, while we were working,

22 we'd relax, hang out.  But it's not -- for the most part,

23 when I was there I was on the clock.

24    Q.   So, when you say relax and hang out, what do

# EXHIBIT Q

Shannon Laymon

60

1    A.    The last time would have been after the

2    Superbowl.  The Steelers had won, and I came in to

3    celebrate.  Everybody knew that I was a Steelers fan.  So

4    I had especially requested off for that day, and I had

5    come in.  So that would have been in like February.

6    Q.    February of 2005?

7    A.    Yes.  Might have been January.  I don't really

8    remember.

9         MR. PRIMOS:  Let's correct the record.

10   I think you meant February --

11   A.    2006.

12   Q.    2006.  Okay.  So you came to The Lobby House to

13   celebrate?

14   A.    Uh-huh.

15   Q.    And you were there for the -- you weren't

16   clocked in for any reason?

17   A.    No.

18   Q.    Did you drink that night?

19   A.    Yes.

20   Q.    And how many drinks did you have?

21   A.    While I was watching the game, I had a few.

22   Once we had went there -- I was only there for a short

23   period of time, and I might have had like three drinks.

24   I remember I was given a shot, and -- maybe a couple

# EXHIBIT R

Shannon Laymon

93

1    Q.    Did you ever receive any warnings for

2    discipline from The Lobby House?

3    A.    I had received one written warning, and it was

4    for wearing the wrong belt to work.

5    Q.    I'm going to show you a document that's been

6    marked Exhibit 4.  Is this the warning notice you

7    received?

8    A.    Yes.

9    Q.    And did you read it before signing it?

10   A.    There was a part added.

11   Q.    What part was added, are you referring to?

12   A.    This second part that's in darker ink.

13   Q.    And can you read what part that is?

14   A.    "Shannon has already been warned verbally by

15   Rick the" -- oh.  "The GM, prior to this incident."

16   Q.    And did you protest this warning at all?

17   A.    No.

18   Q.    Did you ever receive any verbal warnings during

19   your employment with The Lobby House?

20   A.    Not that I can recall.

21   Q.    Do you remember receiving a verbal warning in

22   November of 2005?

23   A.    November, 2005?  Is that what you just said?

24   Q.    Yes.

## EMPLOYEE WRITTEN WARNING

NAME: Shannon

DATE: 12/23/05

## DISCIPLINARY ACTION BECAUSE OF:

| | | |
|---|---|---|
| EATING | COOKS BULK MEAT | GROUPING |
| RECIPES | CELL PHONE | APPLICATION |
| ALCHOHOL | DRUGS | MINORS |
| "NO SHOW" | RUDENESS | INSUBORDINATION |
| THEFT | DESTRUCTION/PROPERTY | (DRESS CODE) |
| LATENESS | CUSTOMER COMPLAINT | OTHER |

NOTES: Lobby House Hand Book states Belts
should be solid Black or Brown! no studded
or Fassionable Bets. Shannon Has already
Been warned verbaly By Rick The G.M. prior
To This incident.

_____        12/23/05
EMPLOYEE SIGNATURE             DATE

_____
MANAGER SIGNATURE

# EXHIBIT S

94

```
 1        A.   No.

 2        Q.   Did you ever complain about managers stealing

 3   money from bar drawers?

 4        A.   No.   There was a time that we had to start

 5   counting the drawers, because somebody did.

 6        Q.   Did you ever complain that any managers were

 7   ever stealing money from bar drawers?

 8        A.   No.   They count the drawers.  We weren't ever

 9   held responsible for the drawers, so I didn't really

10   care.

11        Q.   So you never said anything about a manager --

12        A.   The drawers --

13        Q.   -- stealing money from a drawer?

14             MR. PRIMOS:   Objection; asked and

15   answered.  You can answer.

16        A.   No -- oh, I mean there was one -- I remember it

17   was in the middle of my employment, and Carrie had

18   started working there, and all of a sudden we had to

19   start counting ones, and I got blamed for the whole

20   incident, and I don't remember why.

21        Q.   So, did you have a discussion with Rick about

22   that incident?

23        A.   I don't recall.

24        Q.   You said you got blamed for it.  How do you
```

95

1    believe you got?

2         A.    It was like the bartenders.    They were like

3    somebody blah, blah, blah.    I knew what it was, because I

4    was asked, Shannon, whenever you start messing the

5    drawers, make sure you're counting the ones, because we

6    turn in the ones at the end of the night.    Nobody

7    recounts them.    The bartenders count them.    First of all,

8    if the ones are short, it could have been us bartenders,

9    two, it could have been a manager.    So I would have never

10   placed blame on anybody.

11             But I knew, because it was a Friday night

12   that this started, where we had to start counting the

13   ones.    I had worked the day shift, and because I had said

14   make sure we're counting the ones, because they have been

15   counted incorrectly.    I wasn't placing blame on anybody

16   for taking money.    They were incorrectly counted is

17   basically what it boiled down to.    But because I had the

18   knowledge, I was told beforehand, and none of the other

19   managers had said anything about it, I was the one that

20   was put at fault.

21        Q.    And did you ever talk to Rick about that

22   incident?

23        A.    Not that I remember.

24        Q.    You talked with a manager about that incident?

# EXHIBIT T

Shannon Layman

128

1      Q.    Now, in your Complaint, you state that you feel

2  you were retaliated, due to your workers' comp claim, in

3  paragraph 16?

4      A.    16?  Yes.

5      Q.    And when did your injury occur?

6      A.    That was in -- it was during football season.

7  Maybe like October, November sometime.

8      Q.    I'm going to show you a document that's been

9  marked Exhibit 7.  Can you identify that for me?

10     A.    Industrial Accident Board, statement of facts

11  upon failure to reach an agreement.

12     Q.    Can you read, say where it says date of

13  accident.

14     A.    It says October 23, 2005.

15     Q.    Okay.  I think if you turn the page.  Is that

16  your signature there?

17     A.    Yes.

18     Q.    Do you believe that was the date of the

19  accident?

20     A.    What?  2 March?

21     Q.    No.  Where it says date of accident.

22     A.    It could be roughly around that period of time.

23  I said between October and November.

24     Q.    Well, you signed this document, right?

# EXHIBIT U

Shannon Laymon

129

1       A.    I guess.   Is this what was in the hospital?   I

2   don't know what this is.

3       Q.    Is that your signature on the second page?

4       A.    It looks close to it.   Yeah.

5       Q.    And on top of the front page it says,

6   Industrial Accident Board, State of Delaware?

7       A.    Yes.

8       Q.    And under that it says statement of facts upon

9   failure to reach an agreement?

10       A.    Yes.

11       Q.    Do you remember filling out that document?

12       A.    Where would I have filled this out?   I don't --

13       Q.    Do you remember reviewing that document?

14       A.    No.   I don't.

15       Q.    Do you doubt that's your signature on the

16   second page?

17       A.    It could be.   I don't remember looking at this.

18   I don't know where I would have been that they would have

19   typed this up.   I don't know what this is.

20       Q.    But you do believe your accident happened

21   around October 23 of '05?

22       A.    Something around there, yes.

23       Q.    Okay.   And that was a little over a month after

24   you initially started working at The Lobby House?

# EXHIBIT V

Shannon Laymon

130

```
 1        A.    Yes.

 2        Q.    And you continued to work there until March 17

 3   of 2006?

 4        A.    Yes.

 5        Q.    What facts do you predicate that allegation

 6   that The Lobby House retaliated against you due to your

 7   workers' comp claim?

 8        A.    Once I finally got an attorney -- I don't -- it

 9   wasn't until I got the attorney, and was like look, you

10   guys need to pay these bills, that that stuff happened.

11   Like I said, I brought them in twice, and nothing was

12   done about it.  I'm still getting these bills in the

13   mail.  But they were now saying they were going to report

14   to the credit agencies and stuff like that if these bills

15   weren't paid.  Do what do I have to do?  I'm not ruining

16   my credit.  I had to seek legal counsel.  I was pulled

17   into the office by Ken saying I heard you're suing me.  I

18   was like blah, blah, blah.  He's like workers' comp.

19   You're not doing this.  He had received in the mail that

20   day the letter that was written, you know, about, yes, I

21   had sought legal counsel, or whatever.  Whatever he had

22   in his hand.  He had something saying yes, I had sought

23   legal counsel.  And I directed him and said, if you have

24   any questions, please direct it to my attorney, and I
```

# EXHIBIT W

On March 3, 2006, I was on the bar with Ali and Limmer. I was working a double. At 3:30 pm, I went to the office to grab Rick's keys to do the Par-list. Ken was dealing with pay and other business matters and confronted me about "suing him." I told him Walt Schmittinger was my attorney and that all questions could be directed to him. He said he wanted to let me know he bills were faxed to the insurance company. Once again, I reminded him that I had an attorney. He then stated that would be the end of the conversation.

A little while later, he brought out "copies" of the fax and told me to give them to my lawyer. I was upset and called home. I was so nervous at the point that I did not get the keys from Rick. My Dad came in and relaxed a little. He said Mom called my lawyer's office and to document everything.

Later, the phone rang. Ali and Ken had both answered it. He yelled in a snappy voice "I got it." Ali went to Rick to let him know and Rick said, "He probably thought it was Shannon." This is proof that they were mad I sought legal counsel.

I went into the kitchen later that night and Rick was sitting at the computer and gave me a glare. I ignored it and went about my business. The rest of the night I felt uncomfortable. Limmer kept calling me Sherman, but I am unsure what that meant.

It was payday, so at closing I asked for my pay. Everyone that was present at the time was paid in cash and taxes were not withheld. I was paid by check. I normally received $100 cash but today my check was $26.72. My tax deductions were abnormally high. I do believe this was done out of spite. Although I prefer checks, for legal purposes, they feel they are doing us a favor by giving us cash. Ken did pay that day while he was at the Lobby House. A copy of the pay stub is attached.

# EXHIBIT X

123

1   I talked about?

2       Q.    I mean incidents of sexual harassment.

3       A.    Well, Don -- the one time whenever I first

4   started working there, I believe he was joking around,

5   I'm not quite sure, but he pulled me into the guy's

6   bathroom and asked me to show him my boobs.

7       Q.    And when did that happen?

8       A.    That was like towards the early part of my

9   employment.  Whenever I first started working there, Don

10  was actually on vacation.  So I hadn't been around him.

11  I just -- I'm one of those people where I try -- I don't

12  want to escalate the problem any more than what it is, so

13  I just try to brush it off.  It wasn't for a long period

14  of time that he had actually triggered me in anything,

15  besides just degrading comments.  On a nightly basis, he

16  would make comments, just -- it was kind of like he would

17  talk down to you.  And I noticed that it was just a

18  select few people that he would do that.

19      Q.    What time --

20      A.    Anybody that he wasn't intimidated by, I felt

21  he would.

22      Q.    What type of things would he say?

23      A.    Just talking about how stupid they were.  He

24  would talk down, because we were his employees, he said.

# EXHIBIT Y

Shannon Laymon

78

1    when this happened?

2        A.    When that happened?    Keith Anibal was in the

3    back counting down the drawer.    He was the manager on

4    duty that night.    The only other person who was around

5    was Mary Anderson.

6        Q.    And did you report this to anyone, after it

7    happened?

8        A.    No.    I felt dirty.    I felt like I was attacked.

9    I didn't know what to do.

10        Q.    Did you call the police?

11        A.    No.

12        Q.    And you didn't tell your boyfriend?

13        A.    Huh-uh.

14        Q.    And Brian Ducette somehow knew that you had a

15    piercing between your legs?

16        A.    Yes.

17        Q.    And where was the piercing?

18        A.    Do I have to give exact details as to the

19    piercing, or --

20        Q.    Well, that's --

21        A.    It's between my legs.

22        Q.    I want to ask you where the actual piercing

23    was.

24        A.    It's called a vertical hood piercing.

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

# EXHIBIT Z

Shannon Laymon

81

1    friends.   If Mary wanted to see it outside of work, I

2    might have showed it to her.   She was another female.

3    Somebody that I felt that I was close with.   But Brian

4    was there.   And they had been drinking.

5         Q.    So Mary was actually there viewing --

6         A.    Yes.

7         Q.    -- wanting to see the piercing, also?

8         A.    Yes.

9         Q.    You never mentioned Mary Anderson's name in --

10   as being one of the harassers, in either your charge of

11   discrimination or your Complaint.   Is there a reason for

12   that?

13        A.    I believe that she was one of my friends.   I

14   just -- I didn't feel like it was her targeting me.   It

15   was Brian targeting me.   She asked to see it one time

16   after Brian had asked numerous times.

17        Q.    So she actually requested to see it, also?

18        A.    Yes.

19        Q.    And you were the one that physically showed

20   them the piercing?

21        A.    Yes.

22        Q.    Had you been drinking that night?

23        A.    I might have had a few drinks.

24        Q.    How many drinks, do you think?   What's "a few

# EXHIBIT A-1





# EXHIBIT A-2

Shannon Laymon

82

1  drinks"?

2      A.    That -- I mean every single night varied.    That

3  night, there was very few drinks, and one of the primary

4  reasons was, Limmer had to leave, so we had to pick up

5  for his additional responsibilities.   I want to say it

6  was a Friday night.   It was either Friday or Saturday,

7  sometime on the weekend.   And I mean you're busy.   Now

8  we're cut down from three people to two.   We're -- Keith

9  had a bad day.   It was just -- it was a bad shift.   And

10  he wasn't going to let us drink very much, because he was

11  in that bad mood.

12      Q.    How many drinks did you have that night?

13      A.    A few.   I don't know the exact number of

14  drinks.

15      Q.    Did the alcohol impair you at all?

16      A.    No.

17      Q.    Did you feel any kind of buzz from --

18      A.    No.

19      Q.    But you had had a few drinks?

20      A.    Right.

21      Q.    And after you showed them the piercing, what

22  happened next?

23      A.    It was -- Brian and them were like oh, that's

24  cool, blah, blah, blah.   And we went about cleaning.   I

# EXHIBIT A-3

83

1  stayed in the back.

2      Q.   When you say you stayed in the back, what did

3  you do in the back?

4      A.   I was running mats through, stuff like that.  I

5  specifically recall, I ran all the mats through, which

6  typically takes a long period of time.  By the time you

7  come out, the majority of the bar is already clean.  I

8  had to go back out there and clean because Brian was

9  intoxicated, and I had to pick up for his additional

10  responsibilities then at that point in time, as well.

11      Q.   So you didn't immediately leave?

12      A.   No.

13      Q.   You finished the closing?

14      A.   Uh-huh.

15      Q.   And you actually helped Brian finish his work?

16      A.   Well, we're not leaving until it gets done.

17  You can't leave unless it's done.  He was sitting down.

18  I wanted to leave.  So I had to pick up that slack.  I

19  didn't help him.  I helped myself to get out of there.

20      Q.   Brian and Mary, no one was cornering you at the

21  point in time after you had showed them the piercing?

22      A.   No.

23      Q.   So you physically could have walked out the

24  door and drove away?

# EXHIBIT A-4

Shannon Layton

84

1      A.    Yes.

2      Q.    But you chose to continue closing the

3    restaurant?

4                MR. PRIMOS:   Objection.   You can

5    answer.

6      A.    What -- I -- I don't see why I should have to

7    leave, because that happened.   Yes, I felt targeted, but

8    this is my job, and I'm not going to lose my job because

9    of him.

10     Q.    Were you crying after it happened?

11     A.    Yes.   I cried the entire way home.

12     Q.    After it happened, did you talk to Mary about

13   it?

14     A.    No.   I just tried to forget about the whole

15   incident.   I didn't want to have to recall things like

16   that.

17     Q.    Did you hang out socially with Mary after this

18   incident?

19     A.    Yes.

20     Q.    You were still friends with her?

21     A.    Yes.

22     Q.    Now, was there, concerning your employment,

23   there was no written contract between you and The Lobby

24   House?

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

# EXHIBIT A-5

Shannon Laymon

89

1   it's been labeled Exhibit 1, you stated, in paragraph 15,

2   it states, "After plaintiff informed a co-worker that the

3   Department of Labor would be contacting him."  Who was

4   the coworker you are referring to in that paragraph 15?

5        A.    That would be Brian Ducette.  He no longer was

6   a coworker at that point in time.

7        Q.    When you say he was no longer a coworker, why?

8   Mr. Ducette was unemployed at that time or --

9        A.    No.  He had another job, he was a full-time

10  person with the wine company, I don't know what it's

11  called, but one of the distributors, and he just realized

12  that he didn't need this second job, so we had no shifts

13  at that time.  He had come in and I asked him if I could

14  speak with him.  Get his number and talk to him at some

15  other point, so that I could tell him something I needed

16  to tell him.

17       Q.    And Mr. Ducette is the one that you've just

18  previously testified made you show your piercing between

19  your legs?

20       A.    Yes.

21       Q.    And you felt comfortable telling Mr. Ducette?

22       A.    No.  I had to tell him what John Adams told me

23  to tell him.  John said contact anybody who has any

24  knowledge about what happened at The Lobby House.  So, I

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

# EXHIBIT A-6

May 8, 2006

I Mary Anderson state that I did flash my breasts one time at the Lobby House. Mr. Doucette did not force me in any way. I did it on my own accord that one time and have not done it since while at the Lobby House.

In reference to Mr. Doucette "forcing" Shannon to reveal her piercing between her legs I was present when this happened and Shannon willingly did it. As a coworker and friend I would have never stood by idly while a man forced a woman to do something like that. It was a friendly situation and I never felt threatened in any way and Shannon never gave reason to believe she felt threatened or distressed about the situation that night.

I would also like to state that at no point in time have I witnessed Amanda Potts being groped by Mr. Wilmott, Mr. Caudill, or Mr. Anibal.

*Mary Anderson*

Mary Anderson
May 8, 2006

WITNESS:

DWAYNE LAVENDER III

MAY 09, 2006

# EXHIBIT A-7

1      Q.    Can you identify all the facts that support the

2   statement "Ken Caudill subjected various employees at the

3   facility to numerous incidents of sexually harassing

4   behavior."

5      A.    That was the incidents with him grabbing Amanda

6   Potts' butt.   The comments he used to make about girls

7   being good for nothing but sex.

8      Q.    Is there any other dates that you can point to,

9   to support that statement?

10     A.    There probably is, but like off the top of my

11  head, no.  I can't.

12     Q.    You also state Rick Anibal subjected various

13  employees to numerous incidents of sexual harassing

14  behavior.  Can you give the facts which that charge was

15  predicated on?

16     A.    That was on New Year's Eve, whenever Tessa was

17  running around topless, Amanda Potts was dancing on the

18  bar, and you know, Rick is contributing to that.  He

19  was -- you know, touching Amanda while she was on the

20  bar.  And dancing with the girls, as they were -- they

21  were on the one side of the dance floor, and Rick was

22  dancing with them.

23     Q.    So Rick was dancing with some of the girls?

24     A.    That were topless, and Amanda was on top of the

Shannon Layton

113

1    bar naked.

2        Q.    Okay.   And were you having a good time that New

3    Year's Eve?

4        A.    I mean it was New Year's Eve.   Obviously,

5    nobody wants to be there.   I was having a relatively okay

6    time.   That night, though, once everything closed, I was

7    ready to go home.   It was New Year's Eve.   I had off the

8    next day.   I didn't want to be there.   We ended up being

9    there until 5:00 in the morning because people were

10   dancing.   I'm back behind the bar cleaning and everything

11   else while everybody else was having a good old time.

12   Was I frustrated?   Yes.   But at the same time, you know,

13   you try to make them -- even if you're in a bad

14   situation, you try to make the best with whatever you

15   can.   Was there other places I wish I was?   Yes.

16       Q.    Did you ask anyone if you could leave?

17       A.    No.   It was my responsibility to clean that

18   bar.

19       Q.    So, you said you were having fun for some of

20   it, at least some of that night?

21              MR. PRIMOS:   Objection.   You can

22   answer.

23       A.    It was -- it was fun throughout like while I'm

24   working.   I try to have a good time while I'm at work,

# EXHIBIT A-8

Shannon Laymon

121

1      Q.   Is Amanda Potts still an employee at The Lobby

2  House?

3      A.   I'm not quite sure.  I don't speak to her.

4      Q.   Have you ever seen Mr. Anibal touch and grope

5  waitress Amanda Potts?

6      A.   Yes.  While she was on the bar.

7      Q.   Is that the same incident you are referring

8  to --

9      A.   On New Year's.

10     Q.   On New Year's Eve?

11     A.   Yes.

12     Q.   Now, you state that Mary Anderson and Christina

13  were forced to flash their breasts?

14     A.   They weren't forced.  They -- in exchange for a

15  beer.  It was -- Brian would say, if you want a beer,

16  flash me your boobs.  That's where that whole incident

17  with me the piercing between my legs had showed up.

18  Because he had asked Christina and Mary if they wanted a

19  beer to show their boobs.  Mary has nipple rings, which

20  triggered this thought in Brian's head about my piercing.

21     Q.   And this was actually after the facility had

22  closed?

23     A.   Yes.

24     Q.   And did Mary and Christina seem to be upset

# EXHIBIT A-9

112

1     Q.   Can you identify all the facts that support the

2  statement "Ken Caudill subjected various employees at the

3  facility to numerous incidents of sexually harassing

4  behavior."

5     A.   That was the incidents with him grabbing Amanda

6  Potts' butt.  The comments he used to make about girls

7  being good for nothing but sex.

8     Q.   Is there any other dates that you can point to,

9  to support that statement?

10    A.   There probably is, but like off the top of my

11  head, no.  I can't.

12    Q.   You also state Rick Anibal subjected various

13  employees to numerous incidents of sexual harassing

14  behavior.  Can you give the facts which that charge was

15  predicated on?

16    A.   That was on New Year's Eve, whenever Tessa was

17  running around topless, Amanda Potts was dancing on the

18  bar, and you know, Rick is contributing to that.  He

19  was -- you know, touching Amanda while she was on the

20  bar.  And dancing with the girls, as they were -- they

21  were on the one side of the dance floor, and Rick was

22  dancing with them.

23    Q.   So Rick was dancing with some of the girls?

24    A.   That were topless, and Amanda was on top of the

# EXHIBIT A-10

September 28, 2005, was Don Wilmont's birthday. He proceeded to get very drunk. Later that night, he sat on the floor with a rolled-up dollar in his mouth and told Tessa to "Feed the Kitty." She repeatedly told him "No" while he kept pursuing it. Tessa was previously in Internet Porn, under the name Ava Monroe, and he continually comments on it to her. I feel like although she did choose to pursue such a career, it is in her past and thus, it is inappropriate for Don to mention while at work.

Halloween 2005, DJ KC was working and Amanda was dancing on the bar in her G-string and bra. Rick was putting money down her underwear. I was not working but I was told about the incident.

New Years Eve 2006 was chaos. At midnight, Rick distributed bottles of champagne to the workers, including Amanda Potts who was only 20. After hours, I began to clean while DJ Manny kept spinning music. My co-workers started dancing. A little while later, Amanda started dancing on the bar in her G-string and bra. Some people gave her money while others commented on her behavior. Tessa was running around topless and managers were grinding with their employees. During this commotion, I was getting frustrated, primarily because I was the only one cleaning and I knew that we would be there really late. Rick was the manager on duty, but was too drunk to do money. Don took over and yelled at us to begin working. He snapped at me and Rich, who had stayed after, told him not to speak to me like that. Don said that I was his employee and that he would speak to me how he wanted. We didn't leave the bar until really late, around 5 am I believe.

February 23, 2006 I worked 9-close. Ken chose to stay since he had been remodeling the bathrooms all day. Ken drank almost a 5th of Crown so he was pretty

# EXHIBIT A-11

124

1    I mean just -- there's so much stuff, whenever it comes

2    to that.  He was just a very negative person.

3         Q.   Now, on this charge of discrimination, you said

4    the earliest date of discrimination took place on

5    September 28th, 2005?

6         A.   He told me to give a rough estimate.

7         Q.   And do you know how he came up with that date?

8         A.   He based it upon whenever -- wait.  September

9    25, it's --

10        Q.   September 28.

11        A.   Okay.  He basically looked at it from about my

12   start date, a couple weeks after, is the incident with

13   Don Wilmont, where he pulled me into the bathroom.

14        Q.   And that was the first incident that you

15   remember?

16        A.   Yes.

17        Q.   And it took until March 3, 2006, to actually

18   make a complaint about this to Rick Anibal?

19        A.   I didn't feel comfortable going to him.  I mean

20   especially whenever you're a new employee, you are there,

21   you don't know what everything entails.  And especially,

22   whenever I first started working there, there wasn't the

23   open door policy.  That manual was distributed after I

24   had already started working there.

# EXHIBIT A-12

Shannon Laymon

125

1    But even then, I had already realized the

2    inner workings of that company.  People were close

3    outside of work.  And the way that I felt is, is that

4    even whenever I did go to him, and this is proof of how I

5    felt that he was, it was like it's their way or no way.

6    It doesn't matter how you feel.  It's that bar is making

7    money, and that's all they care about.  We're making

8    money.

9    Q.   Your relationship with Rick Anibal was, I think

10   you stated, up till -- let me rephrase.  As of late

11   January or early February, 2006, you had come in after

12   the Superbowl to socialize at The Lobby House?

13   A.   Right.  And he happened to be working behind

14   the bar.  Even at that point, I just -- he had never done

15   anything to trigger me, but at the same time, he -- I

16   mean the Amanda Potts incident, that wasn't directly

17   towards me or anything like that.  So, did I think that

18   the things there that were going on is wrong?  I'm the

19   one who pulled Amanda off that bar.  Yes.  I thought the

20   stuff going on was wrong.

21   But I didn't want to let it affect our --

22   he made the schedule, he did this.  He was in control of

23   that place.  I just -- no matter what, I didn't feel like

24   with his relationship with Don -- him and Don were very,

# EXHIBIT A-13

66

1   Schuman?

2        A.    Yes.

3        Q.    Who is that?

4        A.    She worked there for a brief period of time.

5   She was a waitress.  She didn't work there very long.

6        Q.    And what facts can she substantiate, in your

7   Complaint?

8        A.    Basically, she saw some of the stuff that went

9   on, but she didn't really like it there, and didn't stay

10  very long, and I think that she would just be able to

11  say, this is why I left, and her reasons would be a lot

12  similar to how I felt.

13        Q.    You talked about a Superbowl party, I believe

14  you're referring to January 29th is when the Superbowl

15  is, but it's either the end of February, 2006 -- or end

16  of January, 2006, or early February?

17        A.    Somewhere around that period of time, yes.

18        Q.    At that point in time, what was your

19  relationship like with Rick Anibal?

20        A.    I -- I never thought that Rick and I really had

21  very many problems.  When it came down to it and I would

22  bring -- I didn't feel comfortable enough to go to him

23  whenever things were there.  A lot of times there were

24  just like surface relationships.  I mean I -- I thought

# EXHIBIT A-14

Shannon Laymon

68

1  it's kind of like you have to earn that shift.  Because

2  it is a good money-making day shift.

3       Q.   So, Rick did some positive things for you at

4  The Lobby House?

5       A.   Yes.  And also, too, on Thursday nights, the

6  bartenders that weren't as well back behind the bar, they

7  would get put in -- I mean this, I guess, wouldn't have

8  to do so much with Rick, because Don came down to this

9  decision.  But Rick did have input, obviously, as the

10 general manager.  So I feel like general managers should

11 have a little bit of control and say.

12             There was a shooter section, and I never

13 worked that section, because I was needed back behind

14 that bar.  I was given complete sides, where some

15 people -- that I would work that side by myself, there

16 were two of them back there.  Thanksgiving eve, the

17 busiest night of the year, I was put on the busiest

18 section by myself.

19      Q.   And why do you think Rick did that?

20      A.   Because he knew that I could handle what was

21 going on back behind that bar.

22      Q.   Did he ever treat you unfairly?

23      A.   I think that out of the people there, I think

24 he was more fair.  Some of the things that he said, I

1    don't feel was appropriate.

2        Q.    And what did he say?

3        A.    Whenever I did go to him about problems, like I

4    said, I was uncomfortable with going to him.  Finally

5    whenever I brought up the courage to say, hey, this is

6    what's wrong.  He said that if I didn't like it, I could

7    quit.  And I don't feel like that's respectable for a

8    manager to say.

9        Q.    What day did you go to him about this?

10       A.    It was early March.

11       Q.    Early March of what year?

12       A.    Would have been 2006.

13       Q.    And prior to that, had you ever gone to Rick

14   about any problems concerning being sexually harassed?

15       A.    No.

16       Q.    Had you gone to any other supervisors?

17       A.    No.

18       Q.    And this is early March, 2006?

19       A.    Yes.

20       Q.    And did you have a meeting with Rick?

21       A.    Yes, I did.

22       Q.    Where did it take place?

23       A.    In his office.

24       Q.    And was anyone else present?

Shannon Laymon

70

1    A.    No.

2    Q.    Was anyone else outside the office?

3    A.    There were people who worked in the kitchen.

4  His office is right in the kitchen, so could there have

5  been people?  Yes.  I don't know.  The door was shut.

6    Q.    And what was the initial reason for the

7  meeting?

8    A.    The initial reason, he brought me in.  Somebody

9  had made a comment, and it was presumed that I had said

10  it.  However, I didn't.  And then I was like Rick, while

11  I'm in here, this is what I don't think is right, going

12  on.  It was just because at that point, I knew that I

13  needed to say something.  I just -- it had built up so

14  much that I had to get it out.

15              And at that point, I didn't care what the

16  repercussions were, because this had to get out.

17    Q.    Okay.  But the initial reason you went into the

18  meeting was not because -- you didn't initiate the

19  meeting?

20    A.    Right.

21    Q.    And what was the comment Rick brought you in

22  about?

23    A.    Supposedly I said that the way they were paying

24  for my medical claim was by deducting it out of my check.

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Shannon Layman

71

```
 1        Q.    So, he brought you in to discuss that issue?

 2        A.    Yes.

 3        Q.    And did Rick have any other issues to discuss

 4   with you?

 5        A.    That's all I can recall from that meeting that

 6   he had discussed.

 7        Q.    And what was your response?

 8        A.    I told him that Ali is, in fact, the one who

 9   had made that comment.  Because I was sitting looking at

10   my paycheck.  It was Rick -- or not Rick.  It was Rich,

11   me, and Ali all sitting on the one side.  And I was like

12   what is this?  Blah, blah, blah.  My boyfriend obviously

13   knew what my paychecks normally looked like.  She said,

14   oh, they're probably just paying for it out of there.

15        Q.    So did Rick write you up as a result of this

16   conversation?

17        A.    You are referring to the write-up that's in

18   this packet, I've previously seen it today, was the first

19   time that I have seen it.  So, if he wrote me up, I

20   wasn't aware of it at that time.

21        Q.    I'm going to show you what is in the packet as

22   Exhibit 5.  Can you read the date?

23        A.    3/3/06.

24        Q.    Do you know if that was the date that you had
```

# EXHIBIT A-15

Shannon Laymon

72

1  the meeting with Rick?

2      A.    I believe that it was.

3      Q.    And can you read the notes under that?

4      A.    "Shannon told employees that The Lobby House

5  was stealing money out of her check to pay her medical

6  bills."

7      Q.    And was that why Rick brought you into the

8  office initially?

9      A.    Yes.

10     Q.    And did he ever use the term "insubordination"

11 to you, in discussing it?

12     A.    No.

13     Q.    So it's your testimony today that you have

14 never seen that document?

15     A.    I have never seen that document.  The refuse to

16 sign that's on here, it's immediate termination if you

17 refuse to sign a write-up.

18     Q.    So if you refused to sign a write-up, he would

19 have had a right to terminate you?

20     A.    I would have been terminated 3/3/06 and not

21 been allowed back into that building to work.

22     Q.    Has anyone else been terminated that they

23 refused to sign something?

24     A.    Yes.  This Sherman guy, if that's his name.  I

# EXHIBIT A-16

Shannon Laymon

73

1  believe that's why he was terminated, because he refused

2  to sign his write-up.

3      Q.    Well, the conversation you had initially was

4  about the comment that was or was not made concerning

5  stealing money about medical bills.

6      A.    Yes.

7      Q.    And then you gave a response to that?

8      A.    Yes.

9      Q.    And then you offered this information about

10  other things that were going on?

11      A.    Yes.

12      Q.    What specifically did you say to Rick?

13      A.    I had mentioned about Ken grabbing Amanda

14  Potts' butt, on numerous occasions.  I had also brought

15  up about the comment -- Ken had made a comment to me

16  before, about that the only thing girls were good for is

17  sex.  They were remodeling the bathroom at the time, and

18  he was sitting in there in his -- he was a little bit

19  intoxicated.  And he had said -- I had asked him if they

20  were going to put -- if they were going to build a

21  cabinet to put toilet paper in.  And he told me no.  The

22  girls would be too lazy to ever change it anyways.  The

23  only thing they were good for was sex.

24      Q.    After you had the discussion with Rick, did you

# EXHIBIT A-17

1          Q.    Oh, he complained at the same time to

2    Ms. Carroll?

3          A.    Yes.

4          Q.    And do you remember when that was?

5          A.    March 17th.

6          Q.    On that date, they complained to

7    Ms. Carroll?

8          A.    Yes.

9          Q.    But you said you had received earlier

10   complaints from other people, other customers?

11         A.    Other customers.

12         Q.    But you don't remember who they were?

13         A.    No.

14         Q.    Okay.  Did you ever speak actually to

15   Mr. Green and Mr. Satterfield about their complaint?

16         A.    Yes.

17         Q.    And when did you speak to them?

18         A.    I don't remember the date.

19         Q.    Was it in March of '06?

20         A.    No.

21         Q.    It was at a later time?

22         A.    Yes.

23         Q.    Okay.  Now, Mr. Green and Mr. Satterfield,

24   you say, complained to Mr. Carroll.  What specifically

# EXHIBIT A-18

1        A.    Yes.

2        Q.    How many complaints total did you get about

3  Ms. Laymon specifically about a bad attitude?

4        A.    I can't remember.

5        Q.    Was it more than three?

6        A.    More than three customers, yes.

7        Q.    More than three customers?  Was it more than

8  five?

9        A.    Customers, yes.

10        Q.    Was it more than ten?

11        A.    I don't know.

12        Q.    Okay.  So you are saying you know it was

13  more than five customers that complained about

14  Ms. Laymon's attitude?

15        A.    Yes, yes.

16        Q.    Was there anything else that any customers

17  complained about besides Ms. Laymon's attitude?

18        A.    I can't remember any.

19        Q.    So it's possible that there were other types

20  of complaints --

21        A.    Yes.

22        Q.    -- but you just don't remember?

23        A.    Yes.

24        Q.    Yes, you don't remember?

# EXHIBIT A-19

32

1    did they complain about?

2         A.    They complained that if she -- I'm drawing a

3    blank on her name.

4         Q.    Shannon Laymon?

5         A.    Yes.  If Shannon was bartending on Fridays

6    anymore, they would not come back.

7         Q.    And that is based on what Ms. Carroll told

8    you, right, about what they said?

9         A.    Yes.

10        Q.    Did they tell Ms. Carroll why they wouldn't

11   come back if she bartended on Fridays anymore?

12        A.    Yes.

13        Q.    What did they say?

14        A.    She had a bad attitude and complained about

15   the Lobby House.

16        Q.    Did they say anything else about what she

17   had done?

18        A.    I can't remember.

19        Q.    Did she say specifically what she was

20   complaining about in reference to the Lobby House?

21        A.    I can't remember.  They talked to Ken.

22        Q.    They talked to Ken, what?

23        A.    Also.

24        Q.    On that same day?

# EXHIBIT A-20

## EMPLOYEE WRITTEN WARNING

NAME: Shannon

DATE: 3-3-06

### DISCIPLINARY ACTION BECAUSE OF:

| EATING | COOKS BULK MEAT | GROUPING |
| RECIPES | CELL PHONE | APPLICATION |
| ALCHOHOL | DRUGS | MINORS |
| "NO SHOW" | RUDENESS | INSUBORDINATION |
| THEFT | DESTRUCTION/PROPERTY | DRESS CODE |
| LATENESS | CUSTOMER COMPLAINT | OTHER |

NOTES: Shannon told employees' that the Lobby House was stealing money out of her check to pay her medical bills.

Refused to sign

_____
EMPLOYEE SIGNATURE

_____
DATE

_____
MANAGER SIGNATURE

# EXHIBIT A-21

not tolerate any more badmouthing of the company while

on the clock.

    Q.    And what did she say to that?

    A.    She said fine.

    Q.    Did you give Allison a write-up about the

incident?

    A.    No.

    Q.    And why was that?

    A.    I was confident, in my own mind, that

Shannon started the conversation.

    Q.    Why were you confident of that?

    A.    I just was.  I don't know.

    Q.    But you didn't know that for sure, correct?

    A.    Correct.

    Q.    So at that point, after Shannon refused to

sign it, you just put it in her file?

    A.    Yes.

    Q.    Now, this later written warning that we

looked at refers to a conversation about Shannon's

medical bills.  Is that in reference to a work-related

injury that occurred at some point?

    A.    Yes.

    Q.    And what do you know about that work-related

injury?  Well, let me ask you this first.  Was

# EXHIBIT A-22

1        A.    Yes.

2        Q.    Was that because Ms. Carroll referred them

3    to Ken?

4        A.    Ms. Carroll told me, and I also brought it

5    up to Ken.

6        Q.    Okay.  Did Ken then talk to them after you

7    brought it up to him?

8        A.    I believe he was out there at the same time.

9    I'm not sure when he talked to them, whether that was

10   before I said it or after I said it.  I don't know.

11       Q.    How do you know he talked to them?

12       A.    He told me he did.

13       Q.    Okay.  Did he tell you at the time you

14   brought it up to him that he had talked to them already?

15       A.    I can't remember.

16       Q.    Other than the customer complaints, were

17   there any other problems that Ms. Laymon was causing?

18   You said she was causing problems.  Were there any other

19   problems that she was causing?

20       A.    Well, a lot of the employees didn't like to

21   work with her.

22       Q.    Can you mention specifically what employees

23   didn't like to work with her?

24       A.    No, most bartenders.

# EXHIBIT A-23

Today, March 17, 2006, I had off of work. Because I am supposed to make aware the witnesses to call upon for the DOL sexual harassment claim I contacted Brian, an ex-coworker at 3:08 pm. The conversation lasted 1 minute and 13 seconds. I called his cell phone to let him know that DOL may contact him within the next 6 months and that nobody, not even I, will know that he was contacted. I did not go into anything about what they will be contacting him about. We ended the conversation and he did not seem to have a problem.

At 3:24, I got a call from the Lobby House. It was my General Manager, Rick. He questioned me about what I have been calling his employees about. I told him that DOL was involved and that they were going to be contacted. He asked about what, and since they do not know fully that there is sexual harassment charges being pressed, I told him it was about Worker's Compensation. He told me that I was terminated. I then told him that I am aware of retaliation. He then said that he has guest that will testify that I provide bad service, complain about work, and that I am rude. He also said that guest have told him they are glad that I am gone. Additionally, he said that he knows people that will testify that I pulled my pants down at work. I told him that was slander and hung up the phone.

I have never been written up about my service or customer complaints and it takes 6 write-ups to be fired. My ONLY write up is about improper attire, a belt. I know that my customers will testify against his comments and state that there are others, like Keith, that rude. Thus, I am not at fault. Additionally, Rick has been there and put money down Amanda's G-String so I know that is not the reason. This is full out retaliation, he only called to know what was going on and see if the DOL claim was true. He didn't mention anything else before he terminated me; it was only after I had mentioned retaliation. Also,

how did the guest already know I was fired and say this to him?? I know he was lying, he knows that they are in for much trouble ahead.

I immediately contacted my lawyer, John Adams at DOL, and went to the unemployment agency.

My father and I then went to pick up my pay. Once again, I received a check. The check was for $13.19. Never before have I received 2 checks in the same month. Although I know that my pay is legal then, this is another form of retaliation. We always get paid more when we get cash. Rick did not bring out the check, but instead Mike Limmer did. Employees already knew that I was terminated and my Dad caught Shannon M. talking about it with her table. We left with no confrontation.

At 3:33 AM, Mary Anderson got off of work and called me. We talked for 37 minutes and 30 seconds about what happened. She said Ali came out and told everyone that I was just fired but that nobody knew why. I explained to her what had happened and she thought the whole thing was ridiculous. She also informed me that Justin arrived to work already intoxicated that day. He was not fired, but sent home. Additionally, Ken was there and policies had already begun to change. Mary had been pulled behind the bar with no training and shift drinks had to be approved by Ken, when normally managers do it. She said she will keep me informed of what is said there in reference to me, and correct those that are spreading false information.

# EXHIBIT A-24

1  Q. When did that conversation with Ken Caudill

2 happen?

3  A. It might have happened a week or two weeks

4 before the incident where I was brought in about

5 supposedly I said that they're taking money out of my

6 paycheck to pay for my medical bills.  So it was roughly

7 two weeks before March 3.

8  Q. And did you make that statement to anyone?

9  A. What statement?

10  Q. Concerning them not paying your medical bills?

11  A. No.  I made a comment about my check being low,

12 but that was it.

13  Q. And who said that you had stated that they were

14 not paying your medical bills?

15  A. I don't know.  I wasn't told who said that.

16 Obviously, I didn't say it.  To any of the managers, I

17 didn't say it to anybody.  Whenever they are brought in a

18 meeting, you know, you are not told, hey, such and such

19 said that you said this.  We were sitting around, there

20 was waitresses on the one side, me and Ali and my

21 boyfriend on the other side.  Ali had made the comment

22 and they had presumed that it was me.

23  Q. Now, in count 4 of your Complaint under

24 slander, in paragraph 31, it says, "Defendant's agents

Shannon Laymon

133

1   have made false oral statements regarding plaintiff."

2        A.    Where?

3        Q.    In paragraph 31.

4        A.    Okay.

5        Q.    What false statements are you referring to?

6        A.    When Rick had said that -- this, from what I

7   have heard, people, and even whenever I was on the phone

8   with them, about there were complaints made by other

9   customers, saying that I was a rude and incompetent

10  bartender.  And then he said, you know, she just dropped

11  her pants.  Well, to me, that's not what happened.  So,

12  it's not like I just dropped it.  That portrays my image,

13  that I do this on a regular basis, I just go around

14  dropping my pants.

15       Q.    So, the false statements you're referring to

16  specifically is that customers had complained about you?

17       A.    That's one of them.  I mean were there -- there

18  might have afterwards, but nothing -- it was never

19  brought to my attention that customers had complained

20  about me.  It was also about the dropping of the pants.

21  And just other things.

22              There were so many different things,

23  that -- I mean throughout this whole thing, I'm saying,

24  you know, people have been saying this.  People saying

134

1   this.  There's constantly comments being made.  There's

2   also, you know, people, whenever I started bartending

3   other where, other places, I was approached by people off

4   the street saying oh, this is what The Lobby House said,

5   blah, blah, blah.  Whatever.

6       Q.    Specifically what statements are you referring

7   to?

8       A.    Basically, that, you know, I drop my pants at

9   work, dah, dah, dah.  They heard about the claims that

10  were -- that I had brought against them.  They are

11  completely inaccurate.  I am blowing things out of

12  proportion, stuff like that.

13      Q.    And who can corroborate that The Lobby House

14  made those statements?

15      A.    Rich can.

16      Q.    Can anyone else corroborate those --

17      A.    A lot of them were like customers that were

18  there that I've seen afterwards.  There was this one

19  lady, Val, who -- you know, and then I was at Drynk one

20  night.  And one of our customers came and she was like

21  yeah, they told me we're not allowed to even speak your

22  name, this, that and the other.  But my old customers

23  used to come up to me and ask me why I'm not there.

24  Why -- or say that they've heard all this stuff.

**W&F**

WILCOX & FETZER LTD.

Registered Professional Reporters

1      Q.    And paragraph 33, it states "Defendant's agents

2    have published such statements in an improper manner and

3    for an improper purpose." What published statements are

4    you referring to?

5      A.    I believe that was in the counterclaim, where

6    supposedly, that I am the cause of their lack -- that

7    I've caused them lack of business.

8      Q.    Well, this is your Complaint, that you've --

9            MR. PRIMOS:  I'm just going to object,

10   in the sense that published there is a legal term.

11   That just means broadcast, or say to the world.  It

12   doesn't necessarily refer to a document, and Ms.

13   Laymon may be unaware of that legal use of the term.

14   You can go ahead and question her about it.

15   BY MR. POLIQUIN:

16     Q.    This is your initial Complaint.  There was no

17   counter-complaint at the time you filed this.

18     A.    Right.

19     Q.    So what published statements are you referring

20   to?

21     A.    I mean for me -- I mean from what I am taking

22   in reading this, because I have looked at everything

23   else.  You know, I am thinking of where I was getting

24   counterclaims, and the cause of lack of business and

Brannon Laymen

136

1    stuff like that.  If this was written prior, so

2    whenever -- I guess whenever I was speaking with

3    Mr. Primos, it was just about the stuff that was being

4    said about me, about -- you know.  Just generalized

5    basis, that they were saying stuff about me.  And I think

6    it's a repeat of 31, kind of.

7         Q.   Do you know Rick's statement that customers

8    were complaining about you to be false?

9         A.   Were there probably like a couple people that

10   said that?  There might have been.  But was it ever

11   brought to my attention at all, that a customer

12   complained to me, prior to my termination?  No.

13        Q.   That's not the question I asked you.  I asked

14   you, do you know that statement to be false?

15        A.   No, I do not.

16        Q.   And the other statement that you specify is a

17   statement that you pulled down your pants.

18        A.   Yes.

19        Q.   Are there any other specific false statements

20   that you are referring to in this claim?

21        A.   That -- that I can think of off the top of my

22   head, I guess not.

23        Q.   Did you ever make the statement that you wanted

24   to sue the defendant's ass off?

137

1      A.    Not that I can remember, but -- I don't know.

2              MR. POLIQUIN:  I have no further

3  questions.

4              MR. PRIMOS:  I have no questions.

5              THE COURT REPORTER:  Read and sign?

6              MR. PRIMOS:  Yeah.  I think we will.

7              (Deposition concluded at 4:38 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

# EXHIBIT A-25

55

BY MR. PRIMOS:

Q.   Did you tell Shannon that that didn't even make sense to you?

A.   No.

Q.   Okay.  In other words, did you ask her to explain that further, perhaps what the context of that statement was?

A.   No.

Q.   Did she tell you who she overheard him talking to when he made that statement?

A.   No.

Q.   How did you respond to that when she told you that?

A.   I told her I would look into it and I would like to Ken to make sure that if an offensive joke had been said, that it not be said around her.

Q.   What did she say at that point?

A.   Okay.

Q.   What else was said during your meeting with Shannon on that date?

A.   At that point I told her she needed to sign her write-up.  She said she didn't feel it was fair for her to sign the write-up, because she didn't start the conversation.  At that point, I said:  Okay.  But I will

# EXHIBIT A-26

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

SHANNON A. LAYMON,                     *    C.A. No. 07-129-MPT
                                       *
            Plaintiff,                 *
                                       *
v.                                     *
                                       *
LOBBY HOUSE, INC.,                     *
a Delaware Corporation,                *
                                       *
                                       *
            Defendant.                 *
                                       *

## <u>AFFIDAVIT OF JAMES SATTERFIELD</u>

The affiant, James Satterfield, hereby duly sworn, deposes and states as follows:

1. I was a regular customer of the Lobby House on or around March 17, 2006.

2. I was regularly served by Shannon Laymon who was a waitress at the Lobby House.

3. I, along with several other individuals who regularly frequented the Lobby House complained to the Lobby House management about Shannon Laymon's performance.

4. Specifically, we complained about Shannon Laymon's consistent bad attitude and her constant "bad-mouthing" of the Lobby House.

5. We stated to the Lobby House's management that if Shannon Laymon continued to work during the Fridays we were there, then we would stop coming to the Lobby House.

6. If called to testify, I could competently testify to the foregoing facts.

James Satterfield

1

STATE OF DELAWARE      :
                                          :ss
COUNTY OF KENT         :

SWORN TO AND SUBSCRIBED before me, a Notary Public on this 31st day of January, 2008.

_____
Notary Public

GWEN S. STUBBS
NOTARY PUBLIC
STATE OF DELAWARE
COMMISSION EXPIRES 09/28/08

2

# EXHIBIT A-27

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| SHANNON A. LAYMON, | * | C.A. No. 07-129-MPT |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| LOBBY HOUSE, INC., | * | |
| a Delaware Corporation, | * | |
| | * | |
| | * | |
| Defendant. | * | |
| | * | |

## AFFIDAVIT OF ROBERT A. REED

The affiant, Robert A. Reed, hereby duly sworn, deposes and states as follows:

1. I was a regular customer of the Lobby House on or around March 17, 2006.

2. I was regularly served by Shannon Laymon who was a waitress at the Lobby House.

3. I, along with several other individuals who regularly frequented the Lobby House complained to the Lobby House management about Shannon Laymon's performance.

4. Specifically, we complained about Shannon Laymon's consistent bad attitude and her constant "bad-mouthing" of the Lobby House.

5. We stated to the Lobby House's management that if Shannon Laymon continued to work during the Fridays we were there, then we would stop coming to the Lobby House.

6. If called to testify, I could competently testify to the foregoing facts.

Robert A. Reed

1

STATE OF DELAWARE        :
                          :ss
COUNTY OF KENT           :

SWORN TO AND SUBSCRIBED before me, a Notary Public on this 31st day of January, 2008.

_____
Notary Public

MARSHA R. WILSON
NOTARY PUBLIC
STATE OF DELAWARE
COMMISSION EXPIRES 02-14-2009

2