IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

SHANNON A. LAYMON,        \*     C.A. No. 07-129-MPT
                            \*
          Plaintiff,      \*
                            \*
    v.                  \*
                            \*
LOBBY HOUSE, INC.,      \*
a Delaware corporation,  \*
                            \*
         Defendant.     \*

---

## PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

SCHMITTINGER & RODRIGUEZ, P.A.

BY:   NOEL E. PRIMOS, ESQUIRE
       Bar I.D. #3124
       414 S. State Street
       P.O. Box 497
       Dover, DE   19903
       (302) 674-0140
DATED:  February 29, 2008      Attorneys for Plaintiff

## TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . .    ii

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS . . . .    1

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . .    2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . .    3

ARGUMENT . . . . . . . . . . . . . . . . . . . . .    13

    I.    SUMMARY JUDGMENT STANDARD. . . . . . . . . . . .    13

    II.    PLAINTIFF SUFFERED SEXUAL HARASSMENT FROM DEFENDANT
    BECAUSE SHE WAS SUBJECTED TO A HOSTILE ENVIRONMENT
    BASED UPON HER SEX. . . . . . . . . . . . . . .    13

        A.    Plaintiff suffered intentional discrimination
        based upon her gender. . . . . . . . . . .    14
        B.    The harassment was pervasive and regular. . .    16
        C.    The harassment detrimentally affected
        Plaintiff. . . . . . . . . . . . . . . .    16
        D.    The harassment would detrimentally affect a
        reasonable woman in Plaintiff's position. . .    17
        E.    Defendant is liable for the hostile
        environment under a theory of respondeat
        superior because the perpetrators of the
        harassment were primarily management and/or
        owners, and Defendant took no action to end
        the harassment. . . . . . . . . . . . . .    18

    III.    DEFENDANT RETALIATED AGAINST PLAINTIFF FOR
    COMPLAINING ABOUT THE HOSTILE WORK ENVIRONMENT AND
    FOR FILING A DISCRIMINATION CLAIM WITH THE DELAWARE
    DEPARTMENT OF LABOR. . . . . . . . . . . . . .    20

    IV.    DEFENDANT RETALIATED AGAINST PLAINTIFF FOR PURSUING
    HER RIGHTS UNDER THE DELAWARE WORKERS' COMPENSATION
    STATUTES. . . . . . . . . . . . . . . . . .    22

    V.    PLAINTIFF WITHDRAWS HER BREACH OF COVENANT CLAIM.    24

    VI.    DEFENDANT COMMITTED SLANDER AGAINST PLAINTIFF BY
    ASCRIBING IMMORAL CONDUCT TO HER AND DISPARAGING
    HER IN HER TRADE AND OCCUPATION. . . . . . . . .    24

CONCLUSION . . . . . . . . . . . . . . . . . . . .    26

## TABLE OF AUTHORITIES

**PAGE**

**CASES**

Andrews v. City of Philadelphia
    895 F.2d 1469 (3d Cir. 1990) . . . . . . . . . . . . 14

Bishop v. Wood
    426 U.S. 341 (1976) . . . . . . . . . . . . . . . 13

Celotex Corp. v. Catrett
    477 U.S. 317 (1986) . . . . . . . . . . . . . . . 13

Cifarelli v. Village of Babylon
    93 F.2d 47 (2d Cir. 1996) . . . . . . . . . . . . 13

Faragher v. City of Boca Raton
    524 U.S. 775 (1998) . . . . . . . . . . . . . 18-20

Harris v. Forklift Systems, Inc.
    510 U.S. 17 (1993) . . . . . . . . . . . . . . . 16

Lacy v. AMTRAK
    2007 U.S. App. LEXIS 27279 (3d Cir.) . . . . . . . 21

Marra v. Philadelphia Hous. Auth.
    497 F.3d 296 (3d Cir. 2007) . . . . . . . . . . . 21

Price v. Delaware Department of Correction
    40 F.Supp. 2d 544 (D. Del. 1999) . . . . . . . . . 20

Schwapp v. Town of Avon
    118 F.2d 106 (2d Cir. 1997) . . . . . . . . . . . 13

United States v. Diebold, Inc.
    369 U.S. 654 (1962) . . . . . . . . . . . . . . . 13

Wilcoxon v. Red Clay Consolidated School
    Dist. Bd. of Educ., 437 F.Supp.2d 235
    (D. Del. 2006) . . . . . . . . . . . . . . . . . 24

**STATUTES**

19 Del. C. §2365 . . . . . . . . . . . . . . . . 1, 22

**OTHER AUTHORITIES**

Fed.R.Civ.P. 56(c) . . . . . . . . . . . . . . . 13

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff filed this action on March 1, 2007, against her former employer, Lobby House, Inc. Plaintiff alleged that Defendant had violated Title VII by subjecting her to a hostile environment based upon sex and by retaliating against her for complaining about the harassment and for pursuing her rights under the anti-discrimination laws; that Defendant had violated 19 <u>Del</u>. <u>C</u>. §2365 by retaliating against her for pursuing her rights under the worker's compensation statutes; that Defendant had breached the covenant of good faith and fair dealing; and that Defendant had committed slander against her. Defendant filed an Answer on April 16, 2007. A period of discovery followed.

On January 31, 2008, Defendant filed a Motion for Summary Judgment. This is Plaintiff's Answering Brief in opposition thereto.

1

## SUMMARY OF ARGUMENT

1.    Construing the facts in a light most favorable to Plaintiff, she was subjected to a hostile environment based upon her sex.   The harassment was pervasive, regular, severe, and objectively unreasonable, and Plaintiff had no way to effectively complain about the harassment, as her superiors either condoned or participated in the harassment.

2.    Defendant retaliated against Plaintiff for complaining about the hostile environment and for filing a discrimination claim with the Delaware Department of Labor.

3.    Defendant retaliated against Plaintiff for pursuing her rights under the Delaware workers' compensation statutes.

4.    Plaintiff withdraws her breach of the covenant of good faith and fair dealing claim.

5.    Defendant committed slander against Plaintiff by ascribing immoral conduct to her and disparaging her in her trade and occupation.

2

### STATEMENT OF FACTS

Plaintiff was hired as a waitress in September 2005. Due to her superior serving abilities, she was immediately promoted to bartender following her training. (Laymon Dep. 49 (B2).[1] Plaintiff did her work and did not often socialize at the Lobby House during her non-work hours or on her days off. (Laymon Dep. 56-57 (B3-B4)).

Plaintiff's positive work performance was noted by both co-workers and customers. According to co-worker Mary Anderson, customers and co-workers had no problems with Plaintiff, and she never heard customers complain about Plaintiff. (Anderson Dep. 10-12 (B47-B49)). According to co-worker Andrea Stewart (who was still employed by Defendant at the time of her deposition), Plaintiff was a hard worker (Stewart Dep. 8 (B40)); Plaintiff gave good service to customers and got along well with them (Stewart Dep. 18 (B41)); and Stewart had no knowledge of customers' complaining about Plaintiff (Stewart Dep. 18 (B41)). According to co-worker Sarah Geesaman, Plaintiff was a good bartender and related well to the customers. (Geesaman Aff. ¶13 (B56)). Co-worker Rhianna Turner states that Plaintiff was friendly to co-workers and customers. (Turner Aff. ¶3 (B57)).

Early in her employment, Plaintiff began experiencing a hostile environment based upon gender, but she was uncomfortable

---

[1]  Reference is to page 49 of Plaintiff Shannon Laymon's deposition, found in the Appendix filed herewith at page B2.

3

going to the Manager, Rick Anibal, about the problem.[2]  (Laymon Dep. 69 (B5)).  The hostile environment that Plaintiff experienced, and that Defendant's agents promoted and maintained, included the following:

(1)  On his birthday, September 28, 2005, Assistant Manager Don Wilmot became intoxicated, sat on the floor with a rolled-up dollar bill in his mouth, and repeatedly told a waitress, Tessa, to "feed the kitty."[3]  (Journal Entry attached to Laymon Aff. (B60); Laymon Dep. 115 (B18)).

(2)  On Halloween 2005, a 20-year-old waitress, Amanda Potts, was dancing on the bar in her "G" string and bra.  (Journal Entry attached to Laymon Aff. (B60)).

(3)  On another occasion, owner Ken Caudill[4] was intoxicated and grabbing Ms. Potts' buttocks as she bent over, and he was "grinding" with her on the dance floor.  (Journal Entry attached to Laymon Aff. (B62)).

(4)  A fellow bartender, Brian Doucette, cornered Plaintiff on one occasion and repeatedly asked her to show him a

---

2  This hesitation was justified, because when Plaintiff eventually complained to Anibal, he brushed off her complaints and retaliated against her, as demonstrated *infra*.

3  Wilmot testified at his deposition that he would become intoxicated during work hours between five to ten times a year.  (Wilmot Dep. 23, 24 (B32, B33)).

4  Caudill is the father-in-law of Manager Rick Anibal.  (Anibal Dep. 5 (B29)).

piercing that he had found out she had on her vaginal area. Plaintiff was backed up against a trash can and a metal table used to wash dishes, and she eventually showed Doucette the piercing. (Laymon Dep. 77, 79, 80 (B10, B11, B12); Journal Entry (B62)). Though Plaintiff was upset about the incident, she did not leave the work location because she did not want to lose her job. (Laymon Dep. 84 (B13)).

(5)    On another occasion, Doucette told female employees to show their breasts to him to receive beer.    (Laymon Dep. 118-19 (B21-B22)).

(6)    Doucette told Plaintiff, "Why don't we just have sex and get this over." Plaintiff was offended by that statement and told Doucette this.    (Laymon Dep. 119 (B22)).    However, Plaintiff was afraid to complain about Doucette because she knew he had a personal friendship with Caudill, and she was afraid that if she complained about Doucette, her job would be in jeopardy. (Laymon Dep. 119-20 (B22-B23)).

(7)    Assistant Manager Wilmot would have female customers do "blow job shots," which would involve his holding an alcoholic beverage in his crotch while female customers would drink from the container.    (Wilmot Dep. 36 (B34); Journal Entry (B62)).

(8)    At closing time, Wilmot would say, "If you don't work here or are f _ _ _ ing someone who does, get out!"    (Journal Entry (B63); Anderson Dep. 33 (B53).

5

(9)  Wilmot would make comments about Plaintiff, a female co-worker named Kristina, and two brothers whom Plaintiff and Kristina, respectively, were dating, having orgies that would involve the brothers' mother.  (Journal Entry (B63); (Laymon Dep. 122 (B24)).

(10) Wilmot would dance on the bar with customers in his boxers.  (Laymon Dep. 116 (B19)).

(11) On one occasion, Wilmot was sticking his fingers into a customer's vagina in a back room and talking about how "stinky" it was.  (Laymon Dep. 117 (B20)).

(12) Owner Ken Caudill told Plaintiff that she needed to wear more revealing tops in order to get better tips, and he would also state that he was willing to give "blow jobs" for money. (Journal Entry (B63)).

A co-worker employed by Defendant while Plaintiff was also employed, Sarah Geesaman, experienced the sexual harassment resulting from the hostile environment as well:

(1)  During her employment, Geesaman was subjected to sexually explicit comments by Wilmot.  (Geesaman Aff. ¶3 (B54)). For example, on one occasion, when Geesaman was leaving the work place with a male co-worker, Wilmot, in front of other employees, split a potato and made a comparison with Geesaman's private parts, and stated that Geesaman and the male co-worker would be having sexual relations (a false statement).  (Geesaman Aff. ¶4 (B54-B55)).

6

(2)  On another occasion when Geesaman had fallen at work and broken her tail bone, Wilmot told her not to move and bent down to look under her skirt and made a comment about her body.  Wilmot then made a disgusting comment about ranch dressing that had spilled onto Geesaman's hair and clothes, saying something to the effect of "pulling out" and getting "it" all over her.  (Geesaman Aff. ¶5 (B55)).

(3)  On other occasions, Wilmot would tell Geesaman and other female employees that they needed to wear revealing tops in order to obtain better tips.  Wilmot would also make comments about Geesaman's physical attributes and would tell her that she needed to stuff her bra.  (Geesaman Aff. ¶6 (B55)).

(4)  At least two or three times a month, and also on Halloween and New Year's Eve, management would conduct wild parties after work at the work place.  Geesaman and other employees were required to be present at the work place during these events in order to clean the restaurant and bar area, but Geesaman never observed Plaintiff participating in any of the inappropriate behavior.  This inappropriate behavior consisted of female employees' stripping off their tops and lying on the bar and doing body shots (allowing people to lick alcoholic beverages off their bodies).  Wilmot told Geesaman the day after one of these parties that Ms. Potts had stripped to her thong and was dancing; such behavior was encouraged by management.  During these parties, Ms. Potts, who was underage, was allowed to drink alcohol by management.  (Geesaman Aff. ¶7 (B55)).

7

(5)   Wilmot would offer to pay female employees to do "lap dances" (dance around him half naked).  (Geesaman Aff. ¶9 (B56)).

(6)   On one occasion, Geesaman saw manager Rick Anibal put a liquor bottle into his pants and open up the zipper, after which female employees knelt in front of him, and he poured alcohol into their mouths and all over them.  (Geesaman Aff. ¶10 (B56)).

(7)   Ms. Potts was allowed to show deliberately the tattoo on her chest while Plaintiff and Geesaman were reprimanded for accidentally showing the tattoos on their backs when they bent over.  (Geesaman Aff. ¶12 (B56)).

In October 2005, Plaintiff suffered a work injury when she slipped behind the bar.  Plaintiff began to attempt to get Defendant to pay her medical bills, but she was unsuccessful in these attempts.

On New Year's Eve 2005-2006, Anibal distributed bottles of champagne to the employees at midnight, including underage Ms. Potts.  (Journal Entry (B60)).  Potts began dancing on the bar in her "G" string and bra.  (Journal Entry (B60); Anderson Dep. 14-15 (B50-B51); Stewart Dep. 27 (B42)).  Plaintiff was upset that Potts was dancing on the bar in her underwear, as were other female employees, and Plaintiff was adamant about getting Potts off the bar.  (Anderson Dep. 17 (B52)).  Plaintiff herself did not act inappropriately that night.  (Stewart Dep 30 (B43)).  However, Anibal and Wilmot, who were also there, were both intoxicated.

(Stewart Dep. 38, 39 (B44, B45)). Anibal and Wilmot both admit that Potts was in her bra that night, but they insist that she still had her pants on. (Anibal Dep. 110 (B30); Wilmot Dep. 42-43 (B35-B36)).

On February 23, 2006, when Plaintiff was working the late shift, Caudill was sitting at the bar intoxicated. The bathrooms were being remodeled, and Plaintiff asked Caudill how much was left to do, and she asked if Caudill was putting cabinets into the bathroom to store extra toilet paper. Caudill told Plaintiff she was stupid and that the female employees were too lazy to refill toilet paper. He then stated that girls are only good for sex. Plaintiff was extremely upset at this statement. (Journal Entry (B61)).

Because she was unable to get her medical bills paid, Plaintiff retained Walt Schmittinger, Esquire, to pursue a workers' compensation claim on her behalf. When Caudill received a letter from Schmittinger about the claim, he called Plaintiff into his office on March 3, 2006, and confronted Plaintiff about "suing him." (Laymon Dep. 130 (B25); Journal Entry (B64)). Plaintiff told Caudill that any questions should be directed to her attorney. (Journal Entry (B64)). Plaintiff was upset and crying. (Laymon Dep. 131 (B26)). Later that night, Anibal saw Plaintiff and glared at her. (Journal Entry (B64)). When Plaintiff received her paycheck at closing, her check was drastically reduced. (Journal Entry (B64)).

When Plaintiff reported to work on March 8, 2006, she was called into the office by Anibal. Plaintiff was accused of making a comment that she did not make. (Laymon Dep. 70, 71 (B6, B7)). Anibal told Plaintiff that employees had told him that Plaintiff was concerned about her paycheck and that she had accused Defendant of paying for her medical bills with her paycheck. Plaintiff told Anibal that she was concerned about her pay, but that another employee, Ali, had made the comment about Defendant's paying Plaintiff's bills with her wages. Anibal told Plaintiff that she should have gone to management before going to see a lawyer because she "handled the situation wrong." (Journal Entry (B65)). Laymon never received the "write up" that Defendant now claims she received. In fact, she had never seen the document until the day of her deposition. (Laymon Dep. 71, 72 (B7, B8)).

At the same meeting, Plaintiff complained to Anibal about the work environment. When she complained about Caudill's commenting that girls are only good for sex, Anibal replied that it was Caudill's business and "he can do what he wants," and when she told Anibal about Caudill's grabbing Potts' buttocks, Anibal said that that did not concern him. (Laymon Dep. 73 (B9); Journal Entry (B66)). Anibal's suggested solution was that he would not schedule Plaintiff when Caudill came in, but Plaintiff did not feel that this was fair because her schedule would be reduced due to Caudill's inappropriate behavior. (Journal Entry (B66)). Anibal told Plaintiff that if she did not like the way things were, she could leave. (Journal Entry (B66)).

10

Following the March 8 meeting with Anibal, Plaintiff noticed that her schedule was significantly reduced. (Journal Entry (B68)). Prior to March 17, Plaintiff met with a representative of the Delaware Department of Labor to file a discrimination claim. (Laymon Dep. 87 (B87)).

On March 17, 2006, Plaintiff called Brian Doucette, who was no longer working for Defendant, to tell him that the Department of Labor would be contacting him because she had put him down as a witness. (Laymon Dep. 89 (B17)). Plaintiff made the call to Mr. Doucette at 3:08 p.m. Plaintiff was not working that day. (Journal Entry (B73)). At 3:24 p.m., Anibal called Plaintiff and questioned her about what she had been calling his employees about. She told him that the Department of Labor was involved and the employees were going to be contacted by the Department of Labor. Because Plaintiff did not want Anibal to know about the sexual harassment charges, she told him that it had to do with her workers' compensation claim. Anibal then told her that she was terminated. (Journal Entry (B73); Laymon Dep. 85-86 (B14-B15)). When Plaintiff protested that this was retaliation, Anibal said that he would have guests testify that she had provided bad service, complained about work, and was rude, and that he also knew people who would testify that she had pulled her pants down at work. Plaintiff said that this was slander and hung up. (Journal Entry (B73)). Later that day, Plaintiff learned that a male co-worker had arrived at work intoxicated that day, and instead of being terminated was merely sent home. (Journal Entry

11

(B74)).  When Plaintiff started working elsewhere, she was told that Defendant was saying that she had been dropping her pants at work.  (Laymon Dep. 134 (B27)).

Caudill testified that at the time of his deposition on August 27, 2007, Richard Sinegar, Plaintiff's former boyfriend, was continuing to patronize the Lobby House.  (Caudill Dep. 74 (B38)).

**ARGUMENT**

## I.    SUMMARY JUDGMENT STANDARD.

Summary judgment is only appropriate where there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(c). The Court must view the facts in the light most favorable to the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). The party moving for summary judgment has the burden of identifying evidence it believes demonstrates the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). For purposes of a summary judgment motion, the non-moving party's version of the facts must be accepted, and all disputed facts resolved in her favor. Bishop v. Wood, 426 U.S. 341 (1976). The Court must also resolve all ambiguities and draw all reasonable inferences against the moving party. Cifarelli v. Village of Babylon, 93 F.2d 47, 51 (2d Cir. 1996).

## II.    PLAINTIFF SUFFERED SEXUAL HARASSMENT FROM DEFENDANT BECAUSE SHE WAS SUBJECTED TO A HOSTILE ENVIRONMENT BASED UPON HER SEX.

A court should be "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question." Schwapp v. Town of Avon, 118 F.2d 106, 110 (2d Cir. 1997).

In order to make out a case for hostile work environment sexual harassment, the Plaintiff must show each of the following five elements:  (1) she suffered intentional discrimination because of her sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected her; (4)

the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) there is *respondeat superior* liability. <u>Andrews v. City of Philadelphia</u>, 895 F.2d 1469, 1482 (3d Cir. 1990).

### A.  Plaintiff suffered intentional discrimination based upon her gender.

In the summary judgment record, Plaintiff and her female co-workers have described an environment that is offensive to women in general, and that was offensive to Plaintiff in particular.  In this environment, women were routinely demeaned by management and ownership of Defendant.

Owner Ken Caudill told Plaintiff that girls were only good for sex.  (B61).  Caudill grabbed Amanda Potts' buttocks and was "grinding" with her on the dance floor.  (B62).  Caudill told Plaintiff that she needed to wear more revealing tops in order to get better tips.  (B63).

Assistant Manager Don Wilmot would have female customers do "blow job shots" on him.  (Wilmot Dep. 36 (B34)).  He would make comments to Plaintiff about her having orgies with a female co-worker, two brothers that the women were dating, and the brothers' mother.  (B63, B24).  He would offer to pay female employees to do "lap dances" around him.  (B56).  He sat on the floor with a rolled up dollar bill in his mouth, telling a waitress to "feed the kitty."  (Laymon Dep. 115 (B18)).  He stuck his fingers into a customer's vagina and talked about how "stinky" it was.  (Laymon Dep. 117 (B20)).  Wilmot would make sexually explicit comments to

co-worker Sarah Geesaman as well, including comparing her private parts to the inside of a potato and making an offensive comment about ranch dressing that had spilled on her.  (B54, B55).

Manager Rick Anibal would put a liquor bottle into his pants and have female employees kneel in front of him while he poured alcohol into their mouths and all over them.  (B56).  In response to Plaintiff's complaints about Caudill's commenting that girls are only good for sex, Anibal replied that it was Caudill's business and "he can do what he wants," and when Plaintiff complained that Caudill had grabbed Potts' buttocks, Anibal replied that that did not concern him.  (Laymon Dep. 73 (B9); Journal Entry (B66)).

All of the managers allowed wild parties to occur at the work place at which management were present and in which they participated.  At these parties, Potts would dance on the bar in her bra and "G" string or only in a thong.  (B42, B50-B51, B55, B60).  The female employees would strip their tops off, lie on the bar, and do body shots (allow people to lick alcohol off their bodies).  (B55).

In addition, an environment was created in which co-worker Brian Doucette perpetrated harassing behavior.  Doucette forced Plaintiff to show a piercing in her vaginal area.  (Laymon Dep. 77, 79, 80 (B10, B11, B12)).  He told female employees to show him their breasts in exchange for beer.  (Laymon Dep. 118-19 (B21-B22)).  He told Plaintiff, "Why don't we just have sex and get

this over," a comment that Plaintiff told him was offensive. (Laymon Dep. 119 (B22)).

While not all of this conduct was directed specifically at Plaintiff, at least some of it was, including Wilmot's comments about orgies, Caudill's comments about girls only being good for sex, and Doucette's comments and actions. Moreover, even as to the other comments and actions described *supra*, Plaintiff was forced to endure these comments and actions and the environment they created, as were other female employees. This constituted intentional discrimination on the basis of sex.

### B.    The harassment was pervasive and regular.

Plaintiff and other female employees have described an environment that was overtly sexual, and sexually offensive, in nature. Women were constantly and continually demeaned in this environment. Offensive, sexually laden language and conduct was routine. In order to earn a living, women, including Plaintiff, were forced to subject themselves to this environment. This is exactly the type of sexually hostile environment described in Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993), and other decisions in this area.

### C.    The harassment detrimentally affected Plaintiff.

Defendant points to photographs of Plaintiff enjoying herself at the New Year's Eve party, and the fact that she sometimes socialized at the Lobby House during her non-work hours, as alleged proof that the harassment did not detrimentally affect her. Admittedly, Plaintiff enjoyed at least some aspects of the

16

social interaction that she experienced with co-workers and customers. She was a good bartender and enjoyed giving excellent service to her customers. (Geesaman Aff. ¶13 (B56); Stewart Dep. 18 (B41)).

Nevertheless, the sexual harassment did detrimentally affect Plaintiff. For example, on New Year's Eve, she was obviously upset at Potts' exposing and humiliating herself by dancing on the bar half-naked, according to former co-worker Mary Anderson. (Anderson Dep. 17 (B52)). Plaintiff was upset enough about Caudill's comment that girls are only good for sex, and his grabbing Potts' buttocks, to complain to Anibal about this behavior on March 8, even though she suffered retaliation for it. Plaintiff was upset about Brian Doucette's treatment of her, but she did not complain to upper management because she knew that Doucette had a personal friendship with Caudill. Moreover, in general, Plaintiff was reluctant to complain to Anibal -- a reluctance that was proven to be justified when Anibal retaliated against her after she did complain in March 2006.

**D.  The harassment would detrimentally affect a reasonable woman in Plaintiff's position.**

The sexual harassment that Plaintiff experienced would detrimentally affect any reasonable woman in her position -- as it actually did affect Plaintiff's female co-workers.

For example, female co-workers of Defendant were upset about Potts' behavior on New Year's Eve, which management only encouraged and condoned rather than controlled. Plaintiff herself

was particularly upset about Potts' behavior, which was degrading not only to Potts herself but also to all the women present, and as former co-worker Anderson testified, Plaintiff was adamant about getting Potts off the bar.  (Anderson Dep. 17 (B52)).

Sarah Geesaman was another woman who was detrimentally affected by the sexually hostile environment.  As demonstrated by Geesaman's affidavit, she was forced to endure the disgusting and demeaning comments of the Assistant Manager, Don Wilmot.

In short, any reasonable woman would have been detrimentally affected by the environment that Plaintiff and her female co-workers were forced to endure.  Moreover, while some of the behavior occurred after hours, it was nonetheless part of the work place environment, particularly since employees were required to stay on these after-hours occasions in order to perform cleaning duties.  (Geesaman Aff. ¶7 (B55)).

E.    **Defendant is liable for the hostile environment under a theory of *respondeat superior* because the perpetrators of the harassment were primarily management and/or owners, and Defendant took no action to end the harassment.**

Defendant's owners and/or management, namely, Caudill, Anibal, and Wilmot, created the hostile environment through their direct words and actions and also by permitting offensive conduct to take place and condoning such conduct.  Accordingly, Defendant Lobby House, Inc., is vicariously liable for their actions.

The United States Supreme Court, in <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775 (1998), made clear that the actions of an employee's supervisor may be imputed to the employer.  In

_Faragher_, the Plaintiff, a lifeguard for the City of Boca Raton, claimed that two of her supervisors had created a sexually hostile environment.  The Supreme Court held that the Plaintiff had a valid claim against the City for the actions of her supervisors, subject to an affirmative defense of the reasonableness of the employer's conduct.  _Id._ at 809-10.

Under the "passive or implicit" misuse of supervisory authority test adopted by the _Faragher_ Court, an employer can show, as an affirmative defense to liability,

> that the employer had exercised reasonable care to avoid harassment and eliminate it when it might occur, and that the complaining employee had failed to act with like reasonable care to take advantage of the employer's safeguards and otherwise to prevent harm that could have been avoided.

_Id._ at 805.

Under the facts in the summary judgment record, Defendant simply cannot contend that this affirmative defense is available to it.  First of all, Defendant took no reasonable care to avoid the harassment and eliminate it.   In fact, not only was ownership/management aware of the offensive conduct and did nothing to prevent it, but ownership/management themselves were the perpetrators of much of the offensive conduct.

With regard to the second part of the _Faragher_ test -- whether the employee failed to act with reasonable care to take advantage of the employer's safeguards -- the _Faragher_ Court required a finding that "the plaintiff employee **unreasonably** failed to take advantage of any preventive or corrective

opportunities provided by the employer or to avoid harm otherwise." 524 U.S. at 807 (emphasis added). In this case, Plaintiff was afraid to complain about the harassment that she experienced from the beginning of her employment for fear of retaliation. As it turned out, those fears were justified, because when she did complain to Anibal on March 8, 2006, not only did Anibal spurn her complaints and tell Plaintiff that if she didn't like it, she could leave (B66), but he retaliated against her by reducing her hours and ultimately firing her. Thus, Plaintiff did not unreasonably fail to take advantage of preventive or corrective opportunities; rather, she reasonably feared complaining to management, and those fears were ultimately proven to be justified.

Thus, the facts establish all five elements of the test for hostile work environment sexual harassment. Defendants discriminated against Plaintiff by subjecting her to a hostile work environment, and she should be permitted to move forward with this element of her claim.

**III. DEFENDANT RETALIATED AGAINST PLAINTIFF FOR COMPLAINING ABOUT THE HOSTILE WORK ENVIRONMENT AND FOR FILING A DISCRIMINATION CLAIM WITH THE DELAWARE DEPARTMENT OF LABOR.**

In order to establish a *prima facie* case for retaliation under Title VII, Plaintiff must show that: (1) she engaged in a protected activity; (2) she suffered adverse employment actions; and (3) a causal link exists between the employment actions and the exercise of the protected activity. Price v. Delaware Department of Correction, 40 F.Supp. 2d 544, 552 (D. Del. 1999).

In this case, Plaintiff engaged in protected activities, both by complaining to Anibal about Caudill's sexually harassing conduct during her meeting with Anibal on March 8, 2006, and by meeting with a Delaware Department of Labor representative between March 8 and March 17 to begin the discrimination filing process.

In addition, the facts are clear that Plaintiff suffered adverse employment actions. Immediately after her meeting with Anibal, Plaintiff saw her hours drastically reduced. Indeed, Anibal told Plaintiff in the March 8 meeting, when she was complaining about Caudill's conduct, that he would schedule her to work during times when Caudill was not present -- a solution that was patently unfair to Plaintiff because it resulted in a reduction in her hours. In addition, within 15 minutes after Plaintiff called Doucette on March 17 to tell him that the Department of Labor might be contacting him as a potential witness, Anibal called Plaintiff and terminated her.

Finally, Plaintiff can show the causal link between these adverse employment actions and her exercise of protected activities by the mere temporal proximity between the two. In proving a retaliation case, "[a] plaintiff may establish the requisite causal connection by showing a close temporal proximity between the protected activity and the alleged retaliatory conduct, or by submitting 'circumstantial evidence . . . that give[s] rise to an inference of causation.'" Lacy v. AMTRAK, 2007 U.S. App. LEXIS 27279 (3d Cir.) (quoting Marra v. Philadelphia Hous. Auth., 497 F.3d 296, 302 (3d Cir. 2007)).

In this case, of course, there was a close temporal proximity between Plaintiff's complaint to Anibal and the reduction in her hours -- and as noted *supra*, Anibal himself told Plaintiff that he would not be scheduling her for times when Caudill was present, which was unfair because it punished Plaintiff.  In addition, the extremely close temporal proximity between Plaintiff's call to Doucette informing him that he could be called as a witness regarding her sex discrimination claim, and Anibal's call to her to terminate her, is strong evidence that the termination was in retaliation for Plaintiff's filing her claim.  Of course, the fact that Plaintiff discussed with Doucette that he could be called as a witness, and Anibal's question to Plaintiff about why she was calling his employees, is also strong circumstantial evidence of the causal connection between her filing a claim and Defendant's termination of her.

From the beginning of her employment, Plaintiff was reluctant to complain about discrimination because she feared reprisal.  As noted *supra*, those fears were justified, because when she ultimately did complain, her hours were reduced, and shortly thereafter she was terminated.

## IV. DEFENDANT RETALIATED AGAINST PLAINTIFF FOR PURSUING HER RIGHTS UNDER THE DELAWARE WORKERS' COMPENSATION STATUTES.

19 Del. C. §2365 provides in relevant part as follows:

It shall be unlawful for any employer or the duly authorized agent of any employer to discharge or to retaliate or discriminate in any manner against an employee as to the employee's employment because such employee has claimed or attempted to claim workers' compensation benefits from such employer. . . .

22

Plaintiff was injured at work in October 2005. When she had trouble getting her medical bills paid, she went to see an attorney, Walt Schmittinger, Esquire. When Caudill received a letter from Schmittinger, he called Plaintiff into his office on March 3, 2006, and confronted Plaintiff about "suing him." Later that night, Anibal saw Plaintiff and glared at her, and when Plaintiff received her paycheck at closing, her check was drastically reduced.

On March 8, Anibal falsely accused Plaintiff of telling co-workers that Defendant was paying Plaintiff's medical bills out of her paycheck, and Anibal told Plaintiff that she had "handled the situation wrong" by going to an attorney instead of coming to management. (B65). Following that meeting, Plaintiff's hours were cut.

On March 17, 2006, as discussed *supra*, Anibal called Plaintiff at home and terminated her. Significantly, during the March 17 conversation, Plaintiff told Anibal that the Department of Labor charge that she was pursuing had to do with her workers' compensation claim because she did not want to disclose to him the sex discrimination charge that she had filed. Anibal terminated her immediately thereafter. (B73). Thus, even if, as Defendant claims, Defendant did not know about Plaintiff's sexual discrimination claim until after she was terminated (even though the temporal proximity between Plaintiff's call to Doucette and Anibal's call to Plaintiff makes that claim extremely doubtful),

Defendant indisputably knew that Plaintiff was pursuing her rights under the workers' compensation statutes, and thus the facts for purposes of summary judgment establish that Defendant terminated Plaintiff either as an immediate reaction to her pursuit of a sex discrimination claim, or as an immediate reaction to her pursuit of a workers' compensation claim (or a combination of both).

**V.    PLAINTIFF WITHDRAWS HER BREACH OF COVENANT CLAIM.**

Plaintiff concedes that, given current case authority, she cannot pursue a pendent claim for breach of the covenant of good faith and fair dealing.  See <u>Wilcoxon v. Red Clay Consolidated School Dist. Bd. of Educ.</u>, 437 F.Supp.2d 235, 247 (D. Del. 2006).

**VI.    DEFENDANT COMMITTED SLANDER AGAINST PLAINTIFF BY ASCRIBING IMMORAL CONDUCT TO HER AND DISPARAGING HER IN HER TRADE AND OCCUPATION.**

When Anibal terminated Plaintiff, he told her that he would have guests testify that she had provided poor service, complained about work, and was rude, and that he would have people testify that she had dropped her pants at work.  (B73).  These allegations were untrue:  co-workers have testified that she gave good service and was friendly to customers, and the only time she pulled her pants down at work was when Doucette cornered her and coerced her into doing so.

After Plaintiff started working elsewhere, she was told that Defendant's agents were saying that she had dropped her pants at work.  (Laymon Dep. 134 (B27)).  Thus, it is obvious that since Plaintiff's termination, Defendant's agents have maligned Plaintiff in her trade and occupation and have falsely ascribed

24

immoral conduct to her.  Accordingly, Plaintiff should be permitted to proceed to trial with her slander claims against Defendants.

**CONCLUSION**

For the reasons provided in this Answering Brief, Defendant's Motion for Summary Judgment should be denied, and Plaintiff should be permitted to present her claims (with the exception of her breach of covenant claim) to a jury.

Respectfully submitted,

SCHMITTINGER & RODRIGUEZ, P.A.

BY: _____
    NOEL E. PRIMOS, ESQUIRE
    Bar I.D. #3124
    414 S. State Street
    P.O. Box 497
    Dover, DE   19903
    (302) 674-0140
    Attorneys for Plaintiff

DATED: 2-29-08
NEP:pmw

26

## CERTIFICATE OF SERVICE

I hereby certify that I have caused copies of the following:

## PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

to be served upon:     RONALD G. POLIQUIN, ESQUIRE
Young, Malmberg & Howard
30 The Green
Dover, DE   19901

by electronic service on *February 29*, 2008.

SCHMITTINGER & RODRIGUEZ, P.A.

BY: _____
NOEL E. PRIMOS, ESQUIRE
Bar I.D. #3124
414 S. State Street
P.O. Box 497
Dover, DE   19903
(302) 674-0140
Attorneys for Plaintiff

DATED: 2-29-08
NEP:pmw