IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SHANNON A. LAYMON, | * | C.A. No. 07-129-MPT |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| LOBBY HOUSE, INC., | * | |
| a Delaware corporation, | * | |
| | * | |
| Defendant. | * | |

---

**APPENDIX TO
PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

SCHMITTINGER & RODRIGUEZ, P.A.

BY:   NOEL E. PRIMOS, ESQUIRE
Bar I.D. #3124
414 S. State Street
P.O. Box 497
Dover, DE   19903
(302) 674-0140
Attorneys for Plaintiff

DATED:   February 29, 2008

## TABLE OF CONTENTS

PAGE

Deposition of Shannon Laymon (Excerpts) . . . . . . . . . . B1

Deposition of Rick Anibal (Excerpts). . . . . . . . . . . B28

Deposition of Donald Wilmot (Excerpts). . . . . . . . . . B31

Deposition of Ken Caudill (Excerpts). . . . . . . . . . . B37

Deposition of Andrea Stewart (Excerpts) . . . . . . . . . . B39

Deposition of Mary Veronica Anderson (Excerpts) . . . . . . . B46

Affidavit of Sarah Geesaman . . . . . . . . . . . . . B54

Affidavit of Rhianna Turner . . . . . . . . . . . . . B57

Affidavit of Shannon Laymon . . . . . . . . . . . . . B58

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

SHANNON A. LAYMON,                    )
                                      )   C.A. No. 07-129
              Plaintiff,  )
                                      )
                                      )
  -vs-                                )
                                      )
LOBBY HOUSE, INC.,                    )
a Delaware corporation,               )
                                      )
              Defendant.  )

          Deposition of SHANNON LAYMON taken pursuant
to notice at the law offices of Young, Malmberg & Howard,
30 The Green, Dover, Delaware, beginning at 2:10 p.m. on
August 3, 2007, before Julianne LaBadia, Registered
Diplomate Reporter and Notary Public.


APPEARANCES:

          NOEL E. PRIMOS, ESQ.
          SCHMITTINGER AND RODRIGUEZ, P.A.
            414 South State Street
            Dover, Delaware  19901
            For the Plaintiff


          RONALD G. POLIQUIN, ESQ.
          YOUNG, MALMBERG & HOWARD
            30 The Green
            Dover, Delaware  19901
            For the Defendant
     ALSO PRESENT: Rick Anibal

              WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
              (302) 655-0477
              www.wilfet.com




WILCOX & FETZER LTD.
Registered Professional Reporters

Shannon Laymon

49

1    floor, I went through training on the bar, and they were

2    just intermingled with each other.

3        Q.    So is being a bartender preferable to being a

4    waiter or waitress?

5        A.    Yes.

6        Q.    And after you trained, you were immediately

7    placed as a bartender?

8        A.    Yes.

9        Q.    Was that preferable to being a server, to you?

10       A.    Yes.

11       Q.    And who made that decision?

12       A.    It would have been Rick.

13       Q.    And did he have any conversations with you

14   about you becoming a bartender, other than your --

15       A.    No.

16       Q.    -- initial interview?

17       A.    I had pretty much -- I looked at the schedule

18   where I was, and that's where I was.

19       Q.    And can you describe your job duties.

20       A.    We had to make the drinks, we had to ring up

21   food, and any customers over there, greet them, ask them

22   if they want any food.  Make their drinks, get their

23   drinks, clean up their dishes, stuff like that.  Make

24   sure their food was run out.  Just cater to whatever they

Shannon Laymon

56

1    Q.    October 31, 2005?

2    A.    Yes.

3    Q.    And was this after the bar was closed?

4    A.    Yes.

5    Q.    And who was present?

6    A.    I know Keith was behind the bar.  That night

7    was a blur, because I had off.  I had went in, Mary and I

8    had both went in.  She was having a Halloween party at

9    her house, and then we had went back.

10   Q.    So you actually had off?

11   A.    Yes.

12   Q.    But you chose to come to The Lobby House?

13   A.    Yes.

14   Q.    So you were going there for social reasons?

15   A.    Yes.  At that point in time, I mean it's where

16   everybody went.

17   Q.    Did you often hang out at The Lobby House after

18   work?

19   A.    No.  There was, I think, one time that I went

20   there to watch football, but for the most part, I would

21   work five, six days.  If not, I was doing homework.  I

22   didn't really have time to go out.  Not only that but I

23   have friends that live in Philadelphia and New York, so I

24   would like to go out of state more.

B3

Shannon Laymon

57

Q.   So, it's your testimony here today, you did not often hang out after work at The Lobby House?

A.   Well, after -- if I was working that day, I would be there after hours.  To actually go in on my day off, no.

Q.   So, you would, during your employment there, you would hang out after hours?

A.   Yes.

Q.   This is after you've clocked out or work is done?

A.   No.  It was -- well, yes.  Sometimes after we clocked out.  A lot of times, I mean we -- it was kind of like once the bar shut down, you hang out, you relax while you're trying to get the rest of your work done.

Q.   Okay.  So you would hang out and relax after your work was done?

A.   Yes.

Q.   And did you drink after your work was done?

A.   Occasionally.

Q.   And did you have fun hanging out?

A.   Certain days yes, certain days no.

Q.   But you could have chosen to leave The Lobby House after your work was done?

A.   Once the work was done, yes.  But, there was

Shannon Laymon

69

1  don't feel was appropriate.

2      Q.   And what did he say?

3      A.   Whenever I did go to him about problems, like I

4  said, I was uncomfortable with going to him.  Finally

5  whenever I brought up the courage to say, hey, this is

6  what's wrong.  He said that if I didn't like it, I could

7  quit.  And I don't feel like that's respectable for a

8  manager to say.

9      Q.   What day did you go to him about this?

10      A.   It was early March.

11      Q.   Early March of what year?

12      A.   Would have been 2006.

13      Q.   And prior to that, had you ever gone to Rick

14  about any problems concerning being sexually harassed?

15      A.   No.

16      Q.   Had you gone to any other supervisors?

17      A.   No.

18      Q.   And this is early March, 2006?

19      A.   Yes.

20      Q.   And did you have a meeting with Rick?

21      A.   Yes, I did.

22      Q.   Where did it take place?

23      A.   In his office.

24      Q.   And was anyone else present?

Shannon Laymon

70

A.    No.

Q.    Was anyone else outside the office?

A.    There were people who worked in the kitchen. His office is right in the kitchen, so could there have been people?  Yes.  I don't know.  The door was shut.

Q.    And what was the initial reason for the meeting?

A.    The initial reason, he brought me in.  Somebody had made a comment, and it was presumed that I had said it.  However, I didn't.  And then I was like Rick, while I'm in here, this is what I don't think is right, going on.  It was just because at that point, I knew that I needed to say something.  I just -- it had built up so much that I had to get it out.

And at that point, I didn't care what the repercussions were, because this had to get out.

Q.    Okay.  But the initial reason you went into the meeting was not because -- you didn't initiate the meeting?

A.    Right.

Q.    And what was the comment Rick brought you in about?

A.    Supposedly I said that the way they were paying for my medical claim was by deducting it out of my check.

W&F
WILCOX & FETZER LTD.
Registered Professional Reporters

Shannon Laymon

71

1    Q.    So, he brought you in to discuss that issue?

2    A.    Yes.

3    Q.    And did Rick have any other issues to discuss

4  with you?

5    A.    That's all I can recall from that meeting that

6  he had discussed.

7    Q.    And what was your response?

8    A.    I told him that Ali is, in fact, the one who

9  had made that comment.  Because I was sitting looking at

10  my paycheck.  It was Rick -- or not Rick.  It was Rich,

11  me, and Ali all sitting on the one side.  And I was like

12  what is this?  Blah, blah, blah.  My boyfriend obviously

13  knew what my paychecks normally looked like.  She said,

14  oh, they're probably just paying for it out of there.

15    Q.    So did Rick write you up as a result of this

16  conversation?

17    A.    You are referring to the write-up that's in

18  this packet, I've previously seen it today, was the first

19  time that I have seen it.  So, if he wrote me up, I

20  wasn't aware of it at that time.

21    Q.    I'm going to show you what is in the packet as

22  Exhibit 5.  Can you read the date?

23    A.    3/3/06.

24    Q.    Do you know if that was the date that you had

**W&F**
WILCOX & FETZER LTD.
Registered Professional Reporters

Shannon Laymon

72

1 the meeting with Rick?

2     A.   I believe that it was.

3     Q.   And can you read the notes under that?

4     A.   "Shannon told employees that The Lobby House

5 was stealing money out of her check to pay her medical

6 bills."

7     Q.   And was that why Rick brought you into the

8 office initially?

9     A.   Yes.

10     Q.   And did he ever use the term "insubordination"

11 to you, in discussing it?

12     A.   No.

13     Q.   So it's your testimony today that you have

14 never seen that document?

15     A.   I have never seen that document.  The refuse to

16 sign that's on here, it's immediate termination if you

17 refuse to sign a write-up.

18     Q.   So if you refused to sign a write-up, he would

19 have had a right to terminate you?

20     A.   I would have been terminated 3/3/06 and not

21 been allowed back into that building to work.

22     Q.   Has anyone else been terminated that they

23 refused to sign something?

24     A.   Yes.  This Sherman guy, if that's his name.  I

B8

Shannon Laymon

73

1  believe that's why he was terminated, because he refused

2  to sign his write-up.

3      Q.   Well, the conversation you had initially was

4  about the comment that was or was not made concerning

5  stealing money about medical bills.

6      A.   Yes.

7      Q.   And then you gave a response to that?

8      A.   Yes.

9      Q.   And then you offered this information about

10  other things that were going on?

11      A.   Yes.

12      Q.   What specifically did you say to Rick?

13      A.   I had mentioned about Ken grabbing Amanda

14  Potts' butt, on numerous occasions.  I had also brought

15  up about the comment -- Ken had made a comment to me

16  before, about that the only thing girls were good for is

17  sex.  They were remodeling the bathroom at the time, and

18  he was sitting in there in his -- he was a little bit

19  intoxicated.  And he had said -- I had asked him if they

20  were going to put -- if they were going to build a

21  cabinet to put toilet paper in.  And he told me no.  The

22  girls would be too lazy to ever change it anyways.  The

23  only thing they were good for was sex.

24      Q.   After you had the discussion with Rick, did you

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

B9

Shannon Laymon

77

1   people we were working with had to go pick up his

2   girlfriend so it was me and Brian cleaning the bar. I

3   was in the back and somebody had let him know that I have

4   a piercing between my legs, and he cornered me and asked

5   me to see it, after repeatedly telling him no, that I had

6   a boyfriend and that he was married, he continued to ask

7   me about it.

8          Eventually, it was shown, and I didn't -- I

9   felt like it was something that Rich -- that I would have

10  been blamed, and that he would have gotten mad about the

11  whole situation, so I didn't feel comfortable explaining

12  that to him.

13     Q.   And what date did this happen?

14     A.   I don't remember the date.

15     Q.   You're saying Brian Ducette forced you to show

16  the piercing?

17     A.   We were in the back, in the kitchen. And he

18  just -- is one of those things, he would not leave me be

19  until it happened. I was backed up into the trash can.

20     Q.   How many other people were at The Lobby House

21  that night?

22     A.   I mean total? Who was there working, or

23  customers?

24     Q.   Well, who was there working at The Lobby House

B10    **W&F**
WILCOX & FETZER LTD.
Registered Professional Reporters

Shannon Laymon

79

Q.    What is a vertical hood piercing?

A.    The hood is the part right above your clitoris.

Q.    And how long have you had this piercing?

A.    I've had it for, at that point, maybe two years.

Q.    And this happened during your shift at The Lobby House?

A.    Yes.  It was as we were cleaning up.

Q.    And what time was it?

A.    It was after 1:00 somewhere, anywhere between 1:00 and 3:00.

Q.    And did anyone else at The Lobby House know that you had this piercing?

A.    Apparently, I found out that day that people knew.  D.C. Lavender is the one who knew, because I used to date one of his friends, and his friend told him.

Q.    Where were you at exactly in The Lobby House when this happened?

A.    I was back in the kitchen.  The way that the back is, where the dishwasher is, there is a piece in front of -- there is a shorter piece in front of a long piece and the trash can is right there, so that people can clean off their plates, whatever.  I was in that little section, so there is a trash can to my left.  Back

Shannon Laymon

80

1  behind me was the metal piece where you clean off the

2  dishes and stuff.

3      Q.    And why did you not walk away from Mr. Ducette?

4      A.    I tried, numerous times.

5      Q.    Did he hold you down?

6      A.    He never held me down.  But I -- I felt

7  cornered.

8      Q.    When you say you felt cornered, but you weren't

9  actually physically --

10      A.    I mean I was --

11      Q.    -- cornered.

12      A.    I was enclosed by everything.  Whenever

13  somebody is pressuring you about something like that, to

14  me, that's personal.  One, how do people know about it,

15  and he told me how he found out about it.  But he

16  repeatedly asked me, well over ten times, to see it.

17              And I explained to him, no.  I have a

18  boyfriend.  You're married.  Why would a married guy ever

19  ask me that, I was thinking.  But I felt -- there's

20  something back behind me.  A trash can to my left.  There

21  is no place to go.  It's him on one side and Mary on the

22  other side.

23      Q.    Did you scream to Mary?

24      A.    No.  Mary wanted to see it.  She was one of my

Shannon Laymon

84

1    A.    Yes.

2    Q.    But you chose to continue closing the

3    restaurant?

4              MR. PRIMOS:   Objection.   You can

5    answer.

6    A.    What -- I -- I don't see why I should have to

7    leave, because that happened.   Yes, I felt targeted, but

8    this is my job, and I'm not going to lose my job because

9    of him.

10   Q.    Were you crying after it happened?

11   A.    Yes.   I cried the entire way home.

12   Q.    After it happened, did you talk to Mary about

13   it?

14   A.    No.   I just tried to forget about the whole

15   incident.   I didn't want to have to recall things like

16   that.

17   Q.    Did you hang out socially with Mary after this

18   incident?

19   A.    Yes.

20   Q.    You were still friends with her?

21   A.    Yes.

22   Q.    Now, was there, concerning your employment,

23   there was no written contract between you and The Lobby

24   House?

B13    **W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

Shannon Laymon

85

A.   I guess there was no -- they never took any of my information at all.

Q.   You were considered an at will employee?

A.   Delaware is an at will state.

Q.   So you were an at will employee?

A.   Yes.

Q.   Did anyone fell you how long you would be employed for?

A.   No.

Q.   And no one ever told you you would have employment there for life, did they?

A.   No.

Q.   You understood that you could be terminated at any time?

A.   Yes.

Q.   At the time Rick Anibal told you you were terminated, what were the reasons that he gave?

A.   He had heard that I was filing a lawsuit.  He called me at home on my day off, and it was St. Patrick's day, so I had requested off so I could go to Philadelphia.

He had called me on my day off while I was at home.  He had called to ask me about the situation.  I said yes, I have filed a Complaint with the Department of

Shannon Laymon

86

1    Labor.  I didn't go into too much detail about anything,

2    you know.  And I told him I was -- you already know I

3    have attorneys.  Just we're talking about it, and he was

4    like you're no longer employed.  And I told him, Rick,

5    that's retaliation.  And he said well, I'm going to have

6    people testify that you were a rude and incompetent

7    bartender and that you dropped your pants at work.

8        Q.    Now, he made this call, according to your

9    Complaint, I think on March 17th?

10       A.    Yes.  St. Patrick's Day.

11       Q.    And what date did you file your charge with the

12   Department of Labor?

13       A.    It was prior to that.

14       Q.    I'm going to show you what's been marked as

15   Exhibit 6.

16       A.    It -- I don't know what this is.

17       Q.    Can you identify that document for me?

18       A.    Charge of discrimination.  This is -- I had met

19   with DOL.  I had met with John Adams.  This is the

20   document after my initial meeting with John Adams.  This

21   was the formal charge of discrimination.

22       Q.    Okay.  You remember signing that document?

23       A.    Yes.

24       Q.    And can you read the document's date for me?

Shannon Laymon

87

1    A.    April 5, 2006.

2    Q.    And that was several weeks after you had

3  already been terminated; is that correct?

4    A.    Yes.  Because I couldn't -- I had called John

5  Adams the date of termination, directly afterwards.  And

6  that was the earliest that he could get me in with the

7  DOL.  Their agency is backed up, he said, so I couldn't

8  get in right away.

9            Prior to that, I want to say it was maybe

10  March 9th I had already met with John Adams and we were

11  going to fill this out, but we couldn't schedule it until

12  this date.  So my charge was actually started before this

13  document was signed.

14    Q.    You never actually filed a charge of

15  discrimination as of March 17th, 2006?

16    A.    I had met with John to go through all the

17  process for the charge.  I had already received legal

18  counsel.  Two days after I received legal counsel, I went

19  to the Department of Labor.

20    Q.    But the charge wasn't actually filed until

21  April?

22    A.    Right.  Because this is when he could do it.

23  But I had been to John Adams.

24    Q.    So there had been no charge of discrimination

Shannon Laymon

89

1  it's been labeled Exhibit 1, you stated, in paragraph 15,

2  it states, "After plaintiff informed a co-worker that the

3  Department of Labor would be contacting him."  Who was

4  the coworker you are referring to in that paragraph 15?

5      A.    That would be Brian Ducette.  He no longer was

6  a coworker at that point in time.

7      Q.    When you say he was no longer a coworker, why?

8  Mr. Ducette was unemployed at that time or --

9      A.    No.  He had another job, he was a full-time

10 person with the wine company, I don't know what it's

11 called, but one of the distributors, and he just realized

12 that he didn't need this second job, so we had no shifts

13 at that time.  He had come in and I asked him if I could

14 speak with him.  Get his number and talk to him at some

15 other point, so that I could tell him something I needed

16 to tell him.

17     Q.    And Mr. Ducette is the one that you've just

18 previously testified made you show your piercing between

19 your legs?

20     A.    Yes.

21     Q.    And you felt comfortable telling Mr. Ducette?

22     A.    No.  I had to tell him what John Adams told me

23 to tell him.  John said contact anybody who has any

24 knowledge about what happened at The Lobby House.  So, I

Shannon Laymon

115

1   girls night.  Football Sundays were great.  I could sit

2   there and watch football.  Everybody was football fans

3   around me.  Mike Limmer for the most part was a manager

4   on duty and he was a huge Steelers fan, too.  Certain

5   things like that, yes.  I have had fun.  There are some

6   nights where you don't have fun.  Even if -- you're

7   getting slammed, then you have to deal with people's bad

8   attitudes once they are off work.  It's just like any

9   job, you have good days and bad days.

10      Q.    Other than New Year's Eve, can you specify any

11  facts that Rick Anibal exhibited sexually harassing

12  behavior to other employees?

13      A.    That's the only night that I recall.

14      Q.    Can you give us the facts on which you

15  predicate that assistant manager Don Wilmont had

16  subjected various employees of the facility to numerous

17  incidents of sexually harassing behavior?

18      A.    One incident was his birthday.  He stuck a

19  dollar bill in his mouth and told Tessa to feed the

20  kitty.  Tessa was an ex Internet porn star, and he would

21  routinely make comments about that.

22      Q.    What date was that?

23      A.    What?

24      Q.    The incident you just referred to.

Shannon Laymon

116

1    A.    The --

2    Q.    Birthday.

3    A.    Feed the kitty?  It was Don's birthday.  I try

4 not to keep track of -- it's not like it's a birthday I

5 remember.  I just remember it was his birthday.  That day

6 he actually got so drunk that -- actually, that might not

7 have been the same day.  There was another instance where

8 it could have been that day, or a little bit after, he

9 actually was drunk, he had been drinking Crown that

10 night, and he had taken off his pants and was dancing on

11 top of the bar with customers of the bar, in his boxers.

12        I was in the back of -- trying to get

13 liquor and stuff, cleaning up, for most of that incident.

14 I just remember I came out and he was in his boxers.  As

15 to the surroundings of that incident, I don't know the

16 full details of the incident, but I recall him on the

17 floor on his birthday, telling Tessa feed the kitty.

18    Q.    And was Tessa upset about this?

19    A.    She tried to joke around about it.  She had

20 heard so much about her ex Internet porn -- I mean we are

21 in a small state.  Everybody finds out about it.  It was

22 constantly brought up.  I just think that it was probably

23 something that she just tried to brush off.

24    Q.    And this other incident you talk about was

Shannon Laymon

117

1   involving him dealing with customers?

2       A.   Yes.

3       Q.   Are there other incidents which you can name?

4       A.   There was another incident where he actually

5   was groping another customer.  There was plenty of

6   customers, but the girl was so intoxicated -- there was a

7   party in the back room, and he was actually sticking his

8   fingers in the girl's vagina and telling us about how

9   stinky she was.

10      Q.   And what date was that?

11      A.   I don't remember the date.

12      Q.   Did you report that to any managers?

13      A.   No.

14      Q.   Did you report that to the police?

15      A.   No.

16      Q.   Did you talk to anyone else, anyone about that

17  incident?

18      A.   No.  I mean there were a couple of people that

19  worked with me that night that would have known about it,

20  but --

21      Q.   Have you ever gotten drunk at The Lobby House?

22      A.   Yes.

23      Q.   And how many times have you gotten drunk there?

24      A.   A couple of times.

Shannon Laymon

1    Q.   Was that during the time you were working or

2  was that after work?

3    A.   For the most part it was -- well, since we

4  couldn't really figure out this earlier, after work is

5  considered while still on the clock but still cleaning,

6  still doing work.  There were times while I was on the

7  clock, cleaning, what you might consider after hours, for

8  us it's still on the clock.  And it's still part of your

9  work day, even though it is after bar hours.  There were

10  times where I was, yes.

11            For the most part, after hours, no.  I

12  didn't sit around and get drunk off the clock there.  I

13  may have had a few drinks, but I was never drunk there.

14    Q.   Can you point to the facts that predicate the

15  statement bartender Brian Ducette subjected various

16  employees at the facility to numerous incidents of

17  sexually harassing behavior.

18    A.   Point to it?

19    Q.   Excuse me.  Identify the facts on which you

20  make that statement.

21    A.   The incident that I explained earlier, about

22  Brian asked me to pull down my pants, after I had told

23  him no numerous times.  That same night, he had also told

24  the girls that if they wanted a beer for after hours,

Shannon Laymon

119

1    that they would have to show their boobs.

2                There was other comments that Brian had

3    made, about why don't we just have sex and get this over.

4    Because we did have a work -- we constantly butted heads

5    back behind that bar.  And he had said, if we just have

6    sex, I think that will ease everything else.

7        Q.    And were you offended by that statement?

8        A.    Yes.  If I wanted to have sex with him, I would

9    have.  But I never did, and I don't want to.

10       Q.    Did you make any complaints about that to any

11   of the managers?

12       A.    No.

13       Q.    Did you think he was serious about that, when

14   he made that comment?

15       A.    Yes.  Because he mentioned it numerous times.

16       Q.    Did you ever inform him that you didn't like

17   him making that comment?

18       A.    Yes.

19       Q.    And how many times did you tell him that?

20       A.    Every time he would say it.  And I would tell

21   him, Brian, blah, blah, blah.  We're here to work.  You

22   have a wife, I have a boyfriend.  That's pretty much how

23   I dealt with Brian, because he was there for so long.  He

24   used to go golfing with Ken.  I mean he had a personal

Shannon Laymon

120

1  relationship with the managers.  And if I went into

2  detail, I thought that my job was at stake.

3      Q.   And in the charging statement, you also state

4  that Mr. Caudill, Mr. Anibal touched and grouped waitress

5  Amanda Potts after the facility closed?

6      A.   Yes.

7      Q.   And when did that happen?

8      A.   Ken -- wait.  Where is this?

9      Q.   It says, I believe, "On numerous occasions,

10  Mr. Wilmont and Mr. Caudill and Mr. Anibal touched and

11  groped waitress Amanda Potts after the facility closed."

12          MR. PRIMOS:  Wait.  Oh.  I see it.

13      A.   Okay.  The wording of this is where -- numerous

14  occasions.  Okay.  They're talking about each of these

15  people, separately, different occasions is my

16  understanding of that statement.  Rick, like I said was

17  grinding with Amanda Potts, and she was on the bar naked

18  on New Year's Eve.  Ken was all the time, whenever he was

19  there.

20      Q.   Was that after, you state after the facilities

21  closed?

22      A.   Yes.  Ken, it would be during and after.

23  Whenever Amanda was naked on the bar, obviously it's not

24  going to be during open hours.

W&F
WILCOX & FETZER LTD.
Registered Professional Reporters

Shannon Laymon

122

1   about this?

2        A.   I'm not quite sure.  I wasn't really paying

3   attention.  I mean they could have or they couldn't have.

4        Q.   Did they say anything to you about being upset

5   and flashing their breasts?

6        A.   No.

7        Q.   And it says "Additionally, Mr. Wilmont stated

8   to someone that she was participating in sexual orgies

9   with waitress Christina."

10        A.   Christina was dating my boyfriend at the time,

11   Rich's, brother John.  We came into work one day.  I had

12   previously stated Christina and I didn't have a

13   relationship, then we were around each other a little

14   more because of our boyfriends and that relationship.

15   And Don had made a comment about the four of you are

16   having orgies, referring to me, Christina, John and Rich.

17        Q.   And when did that statement happen?

18        A.   That happened one day at work.  I just came in.

19        Q.   Do you know the date?

20        A.   No.

21        Q.   Other than the incidents, the allegations here,

22   are there any other incidents that happened while you

23   were employed at The Lobby House?

24        A.   Do you mean that are actually in here, or that

B24   **W&F**
WILCOX & FETZER LTD.
Registered Professional Reporters

Shannon Laymon

130

1       A.    Yes.

2       Q.    And you continued to work there until March 17

3  of 2006?

4       A.    Yes.

5       Q.    What facts do you predicate that allegation

6  that The Lobby House retaliated against you due to your

7  workers' comp claim?

8       A.    Once I finally got an attorney -- I don't -- it

9  wasn't until I got the attorney, and was like look, you

10  guys need to pay these bills, that that stuff happened.

11  Like I said, I brought them in twice, and nothing was

12  done about it.  I'm still getting these bills in the

13  mail.  But they were now saying they were going to report

14  to the credit agencies and stuff like that if these bills

15  weren't paid.  Do what do I have to do?  I'm not ruining

16  my credit.  I had to seek legal counsel.  I was pulled

17  into the office by Ken saying I heard you're suing me.  I

18  was like blah, blah, blah.  He's like workers' comp.

19  You're not doing this.  He had received in the mail that

20  day the letter that was written, you know, about, yes, I

21  had sought legal counsel, or whatever.  Whatever he had

22  in his hand.  He had something saying yes, I had sought

23  legal counsel.  And I directed him and said, if you have

24  any questions, please direct it to my attorney, and I

B25

Shannon Laymon

131

1    gave him the name.

2        Q.    And what happened after that?

3        A.    After that I went back out to the bar.  I was

4    crying.  I was upset, frustrated.  All I had wanted to do

5    was go get the keys so I could stock the liquor for that

6    night.  Ali was back there.  She's like is everything

7    okay.  I was like, you know, it's about the workers'

8    comp.  Whatever.

9            Like I said, Ali and I sometimes did talk

10   about things.  I actually called home and my dad came and

11   sat at the bar that day after they had talked to the

12   lawyer, so he could calm me down.

13       Q.    Were you upset that The Lobby House was not

14   paying your medical bills?

15       A.    Yes.  I was.

16       Q.    Is that the retaliation you're talking about?

17       A.    I mean that's one of the retaliation.  I

18   believe that there was just -- you have to -- I believe

19   it's a big picture.  You got to look at everything.  I

20   believe that once they found out about that I had went to

21   DOL about the sexual harassment claim, I believe that

22   with the workers' compensation claim -- I just believe it

23   was a big picture, they knew there were bigger things

24   going on, and that it was just everything.

Shannon Laymon

134

1   this. There's constantly comments being made. There's

2   also, you know, people, whenever I started bartending

3   other where, other places, I was approached by people off

4   the street saying oh, this is what The Lobby House said,

5   blah, blah, blah. Whatever.

6        Q.   Specifically what statements are you referring

7   to?

8        A.   Basically, that, you know, I drop my pants at

9   work, dah, dah, dah. They heard about the claims that

10  were -- that I had brought against them. They are

11  completely inaccurate. I am blowing things out of

12  proportion, stuff like that.

13       Q.   And who can corroborate that The Lobby House

14  made those statements?

15       A.   Rich can.

16       Q.   Can anyone else corroborate those --

17       A.   A lot of them were like customers that were

18  there that I've seen afterwards. There was this one

19  lady, Val, who -- you know, and then I was at Drynk one

20  night. And one of our customers came and she was like

21  yeah, they told me we're not allowed to even speak your

22  name, this, that and the other. But my old customers

23  used to come up to me and ask me why I'm not there.

24  Why -- or say that they've heard all this stuff.

COPY [1]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SHANNON A. LAYMON,                    )
    Plaintiff,                        )
                      )
                      )  C.A. No.
      v.                           )  07-129-MPT
                      )
LOBBY HOUSE, INC.,                    )
a Delaware corporation,               )
    Defendant.                        )

           Deposition of **RICK ANIBAL**, taken
before Cheryl A. Anthony, Court Reporter, in the law
offices of 410 South State Street, Dover, Delaware, on
Monday, August 27, 2007, beginning at 9:30 a.m.

APPEARANCES:

    SCHMITTINGER & RODRIGUEZ
    BY:  NOEL E. PRIMOS, ESQUIRE
    414 South State Street
    Dover, Delaware  19901
    Attorney for Plaintiff.

    YOUNG, MALMBERG & HOWARD
    BY:  RONALD G. POLIQUIN, ESQUIRE
    30 The Green
    Dover, Delaware  19901
    Attorney for Defendant.

ORIGINAL RETAINED BY NOEL E. PRIMOS, ESQUIRE

ANTHONY REPORTING
PO Box 234
Dover, Delaware  19903
(302) 674-8884

B28

1        A.      I don't know.

2        Q.      You just know that Mr. Caudill is the owner?

3        A.      Yes.

4        Q.      Are you familiar with the corporation called

5   the Lobby House, Inc.?

6        A.      I have seen it on documents, the Lobby

7   House, Inc.

8        Q.      Okay.  Do you know if Mr. Caudill owns that

9   corporation?

10       A.      I don't know.

11       Q.      How did you become aware that Mr. Caudill

12  was the owner of the restaurant?

13       A.      He told me.

14       Q.      Okay.  Was he the one that hired you?

15       A.      It's my father-in-law.

16       Q.      Mr. Caudill is your father-in-law?

17       A.      Yes.

18       Q.      Okay.  But my understanding is he is your

19  father-in-law.  Did he also hire you as general manager?

20       A.      Yes.

21       Q.      When did he tell you that he was the owner

22  of the Lobby House?  Before or after he hired you?

23       A.      Before.

24       Q.      Okay.  So I assume you are married to

110

1    A.    Correct.

2    Q.    -- but then she had something else on on the

3    lower part of her body?

4    A.    Correct.

5    Q.    Now, you said you were intoxicated on New

6    Year's Eve 2005.  Do you remember anyone else being

7    intoxicated that evening --

8    A.    No.

9    Q.    -- as far as employees at the Lobby House?

10   A.    I don't remember.

11   Q.    But it is possible there were other people

12   who were intoxicated?

13   A.    It's possible.

14   Q.    Do you remember anyone being intoxicated

15   while they were still on the clock?

16   A.    I don't remember it.

17   Q.    Now, on that occasion, New Year's Eve, were

18   some employees still working, as far as cleaning up,

19   while other employees were off the clock?

20   A.    I don't remember it.

21   Q.    Typically, when the bar would close -- let's

22   say in the evening or early morning -- would some

23   employees stay on the clock and still be working while

24   other employees were off the clock and were still

COPY  1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

SHANNON A. LAYMON,                    )
        Plaintiff,                    )
                                      )
                                      )  C.A. No.
             v.                       )  07-129-MPT
                                      )
LOBBY HOUSE, INC.,                    )
a Delaware corporation,               )
        Defendant.                    )

        Deposition of **DONALD WILMOT**, taken
before Cheryl A. Anthony, Court Reporter, in the law
offices of 410 South State Street, Dover, Delaware, on
Monday, August 27, 2007, beginning at 12:50 p.m.

APPEARANCES:

        SCHMITTINGER & RODRIGUEZ
        BY:  NOEL E. PRIMOS, ESQUIRE
        414 South State Street
        Dover, Delaware  19901
        Attorney for Plaintiff.

        YOUNG, MALMBERG & HOWARD
        BY:  RONALD G. POLIQUIN, ESQUIRE
        30 The Green
        Dover, Delaware  19901
        Attorney for Defendant.

ORIGINAL RETAINED BY NOEL E. PRIMOS, ESQUIRE

ANTHONY REPORTING
PO Box 234
Dover, Delaware  19903
(302) 674-8884

B31

23

1    beverages at work?

2        A.    Yes.

3        Q.    Did you do that frequently?

4        A.    No.

5        Q.    How often would you say you consumed

6    alcoholic beverages at work?

7        A.    I honestly couldn't answer that question.

8        Q.    Did it happen on a weekly basis at least?

9        A.    Most likely.

10        Q.    And would you consume these during work

11    hours?

12        A.    Occasionally.

13        Q.    Was that allowed under Lobby House policy?

14        A.    As long as it's paid for.

15        Q.    Did you ever become intoxicated while you

16    were working?

17        A.    Yes.

18        Q.    How many occasions has that happened since

19    you have been working at Lobby House?

20        A.    I honestly couldn't answer that.

21        Q.    Is that something that happens, say, at

22    least on a weekly basis?

23        A.    No.

24        Q.    Does it happen on at least a monthly basis?

24

1    A.    No.

2    Q.    Does it happen more than once a year?

3    A.    Yes.

4    Q.    More than five times a year?

5    A.    Probably.

6    Q.    More than ten times a year?

7    A.    No.

8    Q.    So it's probably between five and ten times

9    a year?

10    A.    Right.

11    Q.    Is that allowed under Lobby House policy?

12    A.    No.

13    Q.    Then can you explain why it is that that

14    occurs, even though it is not allowed under Lobby House

15    policy?

16    A.    I can't explain why.

17    Q.    Is Mr. Anibal aware that that has happened?

18    A.    I believe he knows of a few occasions.

19    Q.    And I'm talking about being intoxicated

20    while working.

21    A.    Right.

22    Q.    Has he ever spoken to you about it?

23    A.    Yes, he has.

24    Q.    What has he said to you about it?

B33    Anthony Reporting
(302) 674-8884

36

1    either Ms. Laymon or Ms. Sells about having orgies?

2        A.    No.

3        Q.    Have you ever asked female employees or

4    customers to take what were called blow job shots out of

5    your crotch?

6        A.    Yes.

7        Q.    How often has that occurred?

8        A.    Maybe twice.

9        Q.    Were they employees or customers?

10       A.    Customers.

11       Q.    One of those occasions when that occurred,

12   was that during the period that Ms. Laymon was employed?

13       A.    I don't remember.

14       Q.    Do you remember who specifically you asked

15   to do this?

16       A.    Yes.

17       Q.    Who was it?

18       A.    Renee, a friend of mine; it was a

19   bachelorette party.

20       Q.    Do you remember her last name?

21       A.    No.

22       Q.    Was she a customer?

23       A.    Yes.

24       Q.    And did she do that?

42

1          Q.    Did she clean up after the official close of

2   the business?

3          A.    All the employees did.

4          Q.    Do you remember who she was dancing with?

5          A.    Specifically, no.

6          Q.    Do you remember any of the employees taking

7   off their clothes?

8          A.    No.

9          Q.    Now, I believe you said you remembered

10  Amanda Potts dancing around in her bra.  Was that on New

11  Year's Eve?

12         A.    I don't remember.

13         Q.    Was Amanda Potts there that night, New

14  Year's Eve?

15         A.    Yes.

16         Q.    You said you don't remember if she was

17  dancing around in her bra.  What was she doing that

18  night?

19         A.    She was dancing like the rest of us, but I

20  don't recall if she had her clothes on or not.

21         Q.    It is possible she didn't have her clothes

22  on?

23         A.    It's possible she didn't have her shirt on.

24         Q.    Is it possible she didn't have her pants on?

43

1      A.    She had her pants on.

2      Q.    How do you know?

3      A.    I have never seen Amanda without her pants

4  on.

5      Q.    Were you intoxicated that night?

6      A.    Yes.

7      Q.    Is it possible you don't remember everything

8  that happened?

9      A.    It's possible.

10     Q.    You said you remember Ms. Laymon drinking

11  and dancing that night, correct?

12     A.    Yes.

13     Q.    Do you remember whether she became

14  intoxicated?

15     A.    I don't remember.

16     Q.    Have you ever seen Ms. Laymon intoxicated?

17     A.    Yes.

18     Q.    Have you ever seen her intoxicated during

19  work hours?

20     A.    Yes.

21     Q.    How many occasions?

22     A.    I don't remember specifically.

23     Q.    Was it more than once?

24     A.    Yes.

COPY

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SHANNON A. LAYMON,                    )
    Plaintiff,                        )
                        )
                        )  C.A. No.
        v.                       )  07-129-MPT
                        )
LOBBY HOUSE, INC.,                    )
a Delaware corporation,               )
    Defendant.                        )

           Deposition of **KEN CAUDILL**, taken
before Cheryl A. Anthony, Court Reporter, in the law
offices of 410 South State Street, Dover, Delaware, on
Monday, August 27, 2007, beginning at 3:00 p.m.

APPEARANCES:

        SCHMITTINGER & RODRIGUEZ
        BY:  NOEL E. PRIMOS, ESQUIRE
        414 South State Street
        Dover, Delaware  19901
        Attorney for Plaintiff.

        YOUNG, MALMBERG & HOWARD
        BY:  RONALD G. POLIQUIN, ESQUIRE
        30 The Green
        Dover, Delaware  19901
        Attorney for Defendant.

ORIGINAL RETAINED BY NOEL E. PRIMOS, ESQUIRE

ANTHONY REPORTING
PO Box 234
Dover, Delaware  19903
(302) 674-8884

B37

74

1    work.

2         Q.    Other than Jim Satterfield and Bobby Green,

3    are you aware of the names of any customers who have

4    complained about Shannon Laymon?

5         A.    I will get those names.  I don't have them.

6         Q.    Do you know Rich Sinagar, who was

7    Ms. Laymon's boyfriend?

8         A.    I'm not personal friends with him.  I know

9    of him.

10        Q.    Do you know if he continues to come into the

11   Lobby House?

12        A.    Yes.

13        Q.    He does continue to come?

14        A.    Yes.

15        Q.    How frequently?  Do you know?

16        A.    You would have to ask Rick or Don, somebody

17   else.  I don't know.

18        Q.    Is Andrea Stewart still employed at the

19   Lobby House?

20        A.    Yes.

21             MR. PRIMOS:  I have no further questions.

22             MR. POLIQUIN:  I have no questions.

23             (Presentation, reading, and signature of the

24   deposition were waived.)

COPY [1]

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

SHANNON A. LAYMON,                        )
    Plaintiff,                            )
                           )
           v.                            ) C.A. No.
                           ) 07-129-MPT
LOBBY HOUSE, INC.,                        )
a Delaware corporation,                   )
    Defendant.                            )

          Deposition of **ANDREA STEWART**, taken
before Cheryl A. Anthony, Court Reporter, in the law
offices of Schmittinger & Rodriguez, 410 South State
Street, Dover, Delaware, on Monday, September 17, 2007,
beginning at 12:35 p.m.

APPEARANCES:

      SCHMITTINGER & RODRIGUEZ
      BY:  NOEL E. PRIMOS, ESQUIRE
      414 South State Street
      Dover, Delaware  19901
      Attorney for Plaintiff.

      YOUNG, MALMBERG & HOWARD
      BY:  RONALD G. POLIQUIN, ESQUIRE
      30 The Green
      Dover, Delaware  19901
      Attorney for Defendant.

 ALSO PRESENT:

      SHANNON LAYMON

      ORIGINAL RETAINED BY NOEL E. PRIMOS, ESQUIRE

---

**ANTHONY REPORTING**
PO Box 234
Dover, Delaware  19903
(302) 674-8884

B39

8

1    A.    Yes.

2    Q.    Okay.  So she was employed from August of

3  '05 to March of '06?

4    A.    Yes.

5    Q.    Now, obviously, you would have worked with

6  Shannon while she was working at the Lobby House, right?

7    A.    Yes.

8    Q.    Okay.  During that period of time that

9  Shannon was working at the Lobby House and you were also

10  working there, did you work well together with Shannon?

11    A.    Yes.

12    Q.    Would you say you got along with each other?

13    A.    In the work environment, yes.

14    Q.    Would you describe Shannon as a hard worker?

15    A.    Yes.

16    Q.    Was she a pleasure to work with, in fact?

17    A.    Sometimes.

18    Q.    Okay.  What times was she not a pleasure to

19  work with?

20    A.    Busy times, when the restaurant was busy.

21    Q.    And why was she not a pleasure to work with

22  then?

23    A.    Stress.

24    Q.    But in other words, what would she do that

18

1    Q.    Did you say anything to her about it again?

2    A.    No.

3    Q.    Okay.  Did Shannon give good service to

4    customers?

5    A.    Yes.

6    Q.    Did she get along well with the customers?

7    A.    Yes.

8    Q.    Did the customers like her?

9    A.    As far as I know, yes.

10    Q.    Okay.  Did you ever hear about any of the

11    customers complaining about Shannon?

12    A.    No.

13    Q.    Other than the waitressing staff that you

14    were talking about, did you ever hear any coworkers

15    complaining about Shannon?

16    A.    No, because the waitressing staff were the

17    coworkers.

18    Q.    Well, in other words, did you ever hear any

19    of the bartenders complaining about Shannon?

20    A.    Possibly.

21    Q.    Why do you say possibly?

22    A.    I don't recall any specific instances, but

23    it could have -- it could have happened.

24    Q.    But you don't remember it, as you testify

27

1        THE WITNESS:   Probably not, because she was

2   underage.

3   BY MR. PRIMOS:

4        Q.    Did you ever see Amanda Potts drinking at

5   the Lobby House while she was underage?

6        A.    No.

7        Q.    At any point that night was Amanda Potts

8   dancing up on the bar?

9        A.    Yes.

10       Q.    And was she in her bra and G-string when she

11  was doing that?

12       A.    She was in her bra and underwear.

13       Q.    Her bra and underwear?

14       A.    Yes.

15       Q.    Had she ever done that before?

16       A.    No.

17       Q.    Now, isn't it true, Ms. Stewart, that you

18  had conversations with Shannon about Amanda's behavior

19  that night?

20       A.    I don't recall.

21       Q.    So it's possible that you did?

22       A.    Yes, it is possible.

23       Q.    What did you think about Amanda dancing up

24  on the bar in her bra and underwear?

1     A.     Yes.

2          MR. POLIQUIN:  Objection.  You can answer.

3   BY MR. PRIMOS:

4     Q.     Okay.  Your answer was yes, correct?

5     A.     Yes.

6     Q.     Do you feel anyone else was acting

7   inappropriately that night at the Lobby House?

8     A.     Not that I remember.

9     Q.     Okay.  Was Shannon acting inappropriately

10   that night at the Lobby House?

11     A.     No.

12          MR. PRIMOS:  Can I have that marked?

13          (Stewart Exhibit Number 2 was marked for

14   identification and attached to the record.)

15   BY MR. PRIMOS:

16     Q.     Do you recognize the document that has just

17   been marked as Stewart 2, Ms. Stewart?

18     A.     Yes.

19     Q.     What is that, or what do we see there?

20     A.     Pictures.

21     Q.     Can you tell me who is in the top picture?

22     A.     Shannon and I.

23     Q.     Is there somebody in the background?

24     A.     Yes.

38

1          A.    No, I don't recall.

2          Q.    Now, you were talking about New Year's Eve.

3    There was an after-hours party by the employees on New

4    Year's Eve of 2005, correct?

5          A.    Yes.

6          Q.    Do you remember any other after-hours

7    parties besides that one at the Lobby House?

8          A.    I don't recall.

9          Q.    So it's possible that there have been?

10         A.    Possible, yes.

11         Q.    On that night, on New Year's Eve of 2005,

12   did you see anybody getting intoxicated at the Lobby

13   House?  I'm talking about employees there, not

14   customers.  But did you see any employees intoxicated at

15   that after-hours party on New Year's Eve?

16         A.    Yes.

17         Q.    Who do you remember specifically?

18         A.    Christina.

19         Q.    Anybody else?

20         A.    I don't recall.

21         Q.    What about Don Wilmot?

22         A.    Yes.

23         Q.    He was intoxicated?

24         A.    I believe so.

1    Q.    What about Keith Anibal?

2    A.    I don't recall.

3    Q.    What about Rick Anibal?

4    A.    Yes.

5    Q.    He was intoxicated?

6    A.    Yes.

7    Q.    What about Ken Caudill?

8    A.    I don't recall.

9    Q.    What about Brian Doucette?

10   A.    I don't recall.

11   Q.    I may have already asked you about this

12   person.  What about Mary Anderson?  Was she intoxicated?

13   A.    I don't recall.

14   Q.    Was Tessa Weiss intoxicated?

15   A.    I don't recall.

16   Q.    Did you ever observe Don Wilmot being drunk

17   at the Lobby House other than on New Year's Eve of 2005?

18   A.    Yes.

19   Q.    How frequently did he get drunk at the Lobby

20   House?

21   A.    I don't recall.

22   Q.    Was it at least once a month?

23   A.    I don't recall.

24   Q.    Do you remember being present for a birthday

COPY 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

SHANNON A. LAYMON,                    )
    Plaintiff,                        )
                           )
                           )  C.A. No.
        v.                            )  07-129-MPT
                           )
LOBBY HOUSE, INC.,                    )
a Delaware corporation,               )
    Defendant.                        )

            Deposition of **MARY VERONICA ANDERSON**, taken
before Cheryl A. Anthony, Court Reporter, in the law
offices of Schmittinger & Rodriguez, 410 South State
Street, Dover, Delaware, on Friday, November 2, 2007,
beginning at 9:05 a.m.

APPEARANCES:

    SCHMITTINGER & RODRIGUEZ
    BY:  NOEL E. PRIMOS, ESQUIRE
    414 South State Street
    Dover, Delaware  19901
    Attorney for Plaintiff.

    YOUNG, MALMBERG & HOWARD
    BY:  RONALD G. POLIQUIN, ESQUIRE
    30 The Green
    Dover, Delaware  19901
    Attorney for Defendant.

ORIGINAL RETAINED BY NOEL E. PRIMOS, ESQUIRE

---

**ANTHONY REPORTING**
PO Box 234
Dover, Delaware  19903
(302) 674-8884

B46

10

1      A.    We were friends, but like we hadn't known

2   each other for a really long time.  So --

3      Q.    How would you say you got along with

4   Shannon?

5      A.    We got along well.

6      Q.    Okay.  How was Shannon as a bartender?  Did

7   she do a good job as a bartender?

8      A.    To the best of my knowledge, but the

9   majority of time, when there's the bartending and

10  serving, there's kind of two different worlds.  So I was

11  never really behind the bar.  I was off doing my own

12  thing.

13     Q.    You say to the best of your knowledge.  The

14  knowledge that you do have that she was a good employee,

15  what is that based on?

16     A.    Just --

17     Q.    Is it based on feedback from customers or

18  your own observations of how she worked?

19     A.    My own observations.

20     Q.    What were those observations?  How did you

21  see Shannon work?

22     A.    It seemed that no one had a problem with

23  her.

24     Q.    When say no one had a problem, do you mean

11

1    employees or customers?

2        A.    Customers.

3        Q.    Customers didn't seem to have a problem with

4    her?

5        A.    Not that anyone would come to me and say

6    anything to me about.

7        Q.    Okay.  What about coworkers?  Did any

8    coworkers have any problems with her?

9        A.    Coworkers always tend to have little, petty

10   problems with each other, but nothing big.

11       Q.    Okay.  So you're not aware of any

12   significant problems that any coworkers had with

13   Shannon?

14       A.    No.

15       Q.    Other than these little, petty problems that

16   some coworkers might have had with Shannon, did you ever

17   hear any coworkers complaining about Shannon?

18       A.    No one ever really did to me.

19       Q.    Did anyone complain to anyone else?

20       A.    If they did, I would not know what they said

21   or what they complained about.

22       Q.    But are you aware that some people were

23   complaining about Shannon?

24       A.    Yes, but never to me, because I was her

12

1   friend.

2        Q.    Okay.  Who are you aware that was

3   complaining about Shannon?

4        A.    There's so many people that have worked

5   there and gone, come and gone.  I know one girl; her

6   name was Courtney.  She was not too fond of Shannon.

7        Q.    Do you know why?

8        A.    Not really, but I think it was just

9   personal.  It didn't really have anything to do with

10  work.

11       Q.    Anyone else that you can remember complained

12  about Shannon?

13       A.    Not that complained directly about her.

14       Q.    Okay.  Indirectly?

15       A.    No, not that I recall.

16       Q.    Okay.  Did you ever hear any customers

17  complaining about Shannon?

18       A.    No one -- like I said, no one ever

19  complained to me.

20       Q.    Did you hear of customers complaining?  Even

21  if they didn't complain to you, did you hear about

22  customers complaining about Shannon?

23       A.    I heard of it later on in the time when we

24  were working; definitely not when I was working.

14

1        A.    Halloween 2005, I don't remember if I was at

2   work, honestly.

3        Q.    Okay.  Do you remember an after-work party

4   on New Year's Eve 2005?

5        A.    Yes.  I was working on New Year's Eve 2005.

6        Q.    And did you stay after work for this

7   after-work party?

8        A.    It wasn't necessarily staying after for a

9   party.  We stayed after regardless, because of cleaning,

10  and it kind of turned into that.

11       Q.    So you stayed after to clean --

12       A.    Yes.

13       Q.    -- and then it turned into a party?

14       A.    Yes.

15       Q.    Okay.  Was there champagne?  Do you

16  remember?

17       A.    I had champagne that night.

18       Q.    You did?

19       A.    Yes.

20       Q.    Do you remember the managers or management

21  offering the employees champagne?

22       A.    Yeah.  I was offered champagne for New

23  Year's.

24       Q.    Do you remember it being in a basin or

15

1    something or some kind of common container where people

2    could get it, or was it out of a bottle?

3         A.    No, out of a bottle.

4         Q.    Okay.  Were you the only person who was

5    offered champagne?

6         A.    No.

7         Q.    Other employees were, as well?

8         A.    Yes.

9         Q.    Okay.  Are you familiar with a coworker

10   named Amanda Potts?

11        A.    Yes.

12        Q.    Do you remember her taking off some of her

13   clothes and dancing that night?

14        A.    Yes.

15        Q.    What clothes did she take off?

16        A.    She was never completely nude.  I remember

17   her getting down, I believe, to her underwear.

18        Q.    Like a bra?

19        A.    She had a bra and underwear on, and I'm

20   trying to remember if anything else ever came off.  But

21   it's not something I was paying that much attention to.

22        Q.    So it's possible even more came off?

23        A.    Yes.  But --

24             MR. POLIQUIN:  Objection.

17

1   get off.

2        Q.    Do you remember who told her to get off?

3        A.    I remember Andrea being one of the ones to

4   tell her to get off.

5        Q.    Do you remember Shannon being one of the

6   ones that told her to get off?

7        A.    She may have possibly.  I do remember

8   Shannon was very adamant about getting her off the bar.

9        Q.    Do you know why Andrea was adamant about

10  getting her off the bar?

11       A.    We just didn't want to see her up there like

12  that.

13       Q.    When you say we, who do you mean we?

14       A.    Mostly the girls over there.

15       Q.    Okay.  So it wasn't the managers who were

16  telling her to get off the bar?

17       A.    No, but no one was egging her on either, so

18  she did it fully on her own accord.

19       Q.    Got up on the bar, you mean?

20       A.    Yes.

21       Q.    But some of the female coworkers didn't

22  really want her up on the bar?

23       A.    No.

24       Q.    Was she drinking?

33

1   marijuana.

2       Q.    Marijuana.  Okay.  I'm not necessarily

3   talking about work hours.  I'm just saying at the Lobby

4   House, did you ever see him smoking marijuana, even if

5   it was after work hours?

6       A.    No.

7       Q.    You never did?

8       A.    No.

9       Q.    Do you ever remember Don Wilmot saying

10  something to the effect of:  If you don't work here or

11  are not F'ing -- and I'm not using the actual word -- if

12  you don't work here or are not F'ing someone who does,

13  get out?

14      A.    I've heard a couple of different people

15  saying that, I believe.

16      Q.    Okay.  Don Wilmot and who else?

17      A.    Don, I know definitely, but that is kind of

18  a common saying in bars.  So maybe I've heard that at

19  other places, too.  But I have heard Don say that.

20      Q.    Okay.  Did you ever observe anyone grabbing

21  Amanda Potts's behind?

22      A.    Not that I ever saw.

23      Q.    Other than these comments we have talked

24  about by management, do you remember any other comments

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

SHANNON A. LAYMON,           *    C.A. No. 07-129-MPT
                             *
            Plaintiff,       *
                             *
    v.                       *
                             *    TRIAL BY JURY DEMANDED
LOBBY HOUSE, INC., a         *
Delaware corporation,        *
                             *
            Defendant.       *


STATE OF DELAWARE     *
                      *    SS:
COUNTY OF KENT        *


### AFFIDAVIT OF SARAH GEESAMAN

COMES NOW, Sarah Geesaman, who being duly sworn doth depose and say as follows:

1.    I am over the age of eighteen (18) and make this affidavit based upon my own personal knowledge.

2.    I was employed by the Lobby House Restaurant and Bar as a waitress during portions of 2005 and 2006.

3.    During the period of my employment, I was subjected to sexually explicit and other inappropriate comments and behavior on the part of management, and particularly Assistant Manager Don Wilmont.

4.    On one occasion, when I was leaving the work place with a male co-worker, Mr. Wilmont humiliated me by making sexually explicit statements in front of other employees. Specifically, Mr. Wilmont split a potato and made a comparison with my private

B54

parts, and stated that I and my male co-worker would be having sexual relations, which was false.

5.    On another occasion when I had fallen at work and broken my tailbone, Mr. Wilmont told me not to move and bent down to look under my skirt and made a comment about my body. Mr. Wilmont then made a disgusting comment about ranch dressing that had spilled onto my hair and my clothes, saying something to the effect of "pulling out" and getting "it" all over me.

6.    On other occasions, Mr. Wilmont would tell me and other female employees that we needed to wear revealing tops in order to obtain better tips. Mr. Wilmont would also make comments about my physical attributes and would tell me that I needed to stuff my bra.

7.    At least two or three times a month, management would conduct wild parties after work at the work place. Such parties also took place on Halloween and New Year's Eve. I and other employees were required to be present at the work place during these events in order to clean the restaurant and bar area, but I never observed Shannon Laymon participating in any of the inappropriate behavior. This inappropriate behavior consisted of female employees stripping off their tops and lying on the bar and doing body shots (allowing people to lick alcoholic beverages off their bodies). Mr. Wilmont also told me the day after one of these parties that Amanda Potts stripped to her thong and was dancing. Management would encourage such behavior. During these parties, Ms. Potts, who was under the legal age limit of 21, was allowed to drink alcohol by management.

B55

8.   I saw Don Wilmont smoking marijuana after work on many occasions.

9.   I heard Mr. Wilmont offer to pay female employees to do "lap dances" (dance around him half naked).

10.  On one occasion I saw Rick Anibal put a liquor bottle into his pants and open up the zipper, after which female employees knelt in front of him, and he poured alcohol into their mouths and all over them.

11.  I never saw or heard of Shannon Laymon participating in any of the aforementioned inappropriate behavior.

12.  Amanda Potts was allowed to show deliberately the tattoo on her chest, while Shannon Laymon and I were reprimanded for accidently showing the tattoos on our backs when we bent over.

13.  Shannon Laymon was a good bartender and related well to customers.


FURTHER AFFIANT SAITH NOT.

_____
SARAH GEESAMAN


SWORN TO AND SUBSCRIBED before me this ___/___ day of November, 2007.

_____
Notary Public
Commission Expires: _____

B56

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

SHANNON A. LAYMON,　　　　　*　　C.A. No. 07-129-MPT
　　　　Plaintiff,　　　　　　　*
　　　　　　　　　　　　　　　*
　　　　　　　　　　　　　　　*
　　v.　　　　　　　　　　　　*
　　　　　　　　　　　　　　　*
LOBBY HOUSE, INC.,　　　　　 *　　TRIAL BY JURY DEMANDED
a Delaware corporation,　　　*
　　　　　　Defendant.　　　　*

STATE OF DELAWARE　　*
　　　　　　　　　　　*
COUNTY OF KENT　　　 *

### AFFIDAVIT OF RHIANNA TURNER

COMES NOW, Rhianna Turner, who being of sound mind, doth depose

and say as follows:

　　1.　　I worked at the Lobby House as a waitress from January 2006 to February 2006.

　　2.　　During the period that I worked at the Lobby House, I knew Shannon Laymon as

a co-worker.

　　3.　　To my knowledge, Shannon was always friendly to co-workers and customers.

　　4.　　I was never aware that any customers complained about Shannon.

FURTHER, AFFIANT SAITH NOT.

　　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　RHIANNA TURNER

SWORN TO AND SUBSCRIBED before me this 13 day of February, 2008.

_____
Notary Public
My commission expires: 3-13-01

B57

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

SHANNON A. LAYMON,　　　　　*　　C.A. No. 07-129-MPT
　　　　　Plaintiff,　　　　　　　　*
　　　　　　　　　　　　　　　　*
　　　v.　　　　　　　　　　　　*
　　　　　　　　　　　　　　　　*
LOBBY HOUSE, INC.,　　　　　　*　　TRIAL BY JURY DEMANDED
a Delaware corporation,　　　　　 *
　　　　　Defendant.　　　　　　 *

STATE OF VIRGINIA　　　　　*
　　　　　　　　　　　　　　*
CITY OF VIRGINIA BEACH　　*

## AFFIDAVIT OF SHANNON LAYMON

COMES NOW, Shannon Laymon, who being of sound mind, doth depose and say as follows:

1.　　I wrote the journal attached hereto as Exhibit "A" during and immediately after my employment by The Lobby House, Inc.

2.　　The journal is a true and accurate account of events that occurred during and immediately after my employment by The Lobby House, Inc.

FURTHER, AFFIANT SAITH NOT.

_____
SHANNON LAYMON

SWORN TO AND SUBSCRIBED before me this 18th day of February, 2008.

_____
Notary Public
My commission expires: 7/31/2010

KATHY L. GIANQUITTO
Notary Public
Commonwealth of Virginia
Reg. #7052015
My Commission Exps. July 31, 2010

B58

# EXHIBIT A

B59

September 28, 2005, was Don Wilmont's birthday. He proceeded to get very drunk. Later that night, he sat on the floor with a rolled-up dollar in his mouth and told Tessa to "Feed the Kitty." She repeatedly told him "No" while he kept pursuing it. Tessa was previously in Internet Porn, under the name Ava Monroe, and he continually comments on it to her. I feel like although she did choose to pursue such a career, it is in her past and thus, it is inappropriate for Don to mention while at work.

Halloween 2005, DJ KC was working and Amanda was dancing on the bar in her G-string and bra. Rick was putting money down her underwear. I was not working but I was told about the incident.

New Years Eve 2006 was chaos. At midnight, Rick distributed bottles of champagne to the workers, including Amanda Potts who was only 20. After hours, I began to clean while DJ Manny kept spinning music. My co-workers started dancing. A little while later, Amanda started dancing on the bar in her G-string and bra. Some people gave her money while others commented on her behavior. Tessa was running around topless and managers were grinding with their employees. During this commotion, I was getting frustrated, primarily because I was the only one cleaning and I knew that we would be there really late. Rick was the manager on duty, but was too drunk to do money. Don took over and yelled at us to begin working. He snapped at me and Rich, who had stayed after, told him not to speak to me like that. Don said that I was his employee and that he would speak to me how he wanted. We didn't leave the bar until really late, around 5 am I believe.

February 23, 2006 I worked 9-close. Ken chose to stay since he had been remodeling the bathrooms all day. Ken drank almost a 5th of Crown so he was pretty

B60

intoxicated. He confronted Ali about how she needs to let him know who is "stealing" from him by giving out free drinks. He then sat at the bar and was talking with DC Lavender. Since the bathrooms were in the middle of being remodeled, I asked Ken how much was left to do. I also asked if he was putting cabinets in the bathroom to store extra toilet paper. He proceeded to call me stupid and tell me that the women that work there are too lazy to refill toilet paper. He then told me the only think girls are good for is sex. I was very upset and left to finish cleaning the bar.

B61

Other events that I do not have dates for:

- It was a Friday night and Ali and I were behind the bar. I believe Tessa was working behind there as well. Ken was drunk and grabbing Amanda's butt as she bent over. He was also grinding with her on the dance floor. Ali and I kept making comments about that is why she is getting promoted to bartender once she turns 21. I feel that employees should not be grabbing their employees' butts while they are on the job.

- Bethann Schuman started working at the Lobby House. She complained about the sexual nature of the job. Rumor is that she was told by management that it was a bar and that if she did not like it, she could find a new job. She was employed for only a brief time.

- One night, Keith was managing. Brian got really drunk and Limmer had to leave to pick up his girlfriend, Alicia, because her car broke down. I was cleaning the bar while Brian was talking to servers. I was in the back washing mats when he told servers they needed to flash him if they wanted a beer. They did and Mary's nipple rings were revealed. Since DC knew me before working there, he knew of my clit ring and told everyone about it. Mary's nipple rings reminded Brian of my ring and he cornered me near the dishwasher. I repeatedly told him "No" and reminded him that he was married and I had a boyfriend. He said they would never find out and continued to pressure me. Anyone who knows me knows my character and knows that I would never willingly reveal myself, I am very personal.

- Don gets females to take "Blow Job Shots" out of his crotch



- Amanda was allowed to show her tattoo. I asked her why and she said Don said she could because it was on her boob. I brought this to Rick's attention who said it was not allowed. It was then covered briefly; however, recently it has been showing again, without punishment.

- Every Thursday night at closing, you can hear Don say, "Put out or Get out" or "If you don't work here or are fucking someone who does, get out!"

- Kristina is dating my boyfriend's brother. Thus, Don feels like it is necessary to comment on orgies, saying that John, Rich, Kristina and I get together and that we sometimes involve their mother. I find this very repulsive.

- When I first started at the Lobby House, Ken told me I need to wear more revealing tops to "get better tips" because that is what guys want to see.

- Ken says that he will give blowjobs for money.

B63

On March 3, 2006, I was on the bar with Ali and Limmer. I was working a double. At 3:30 pm, I went to the office to grab Rick's keys to do the Par-list. Ken was dealing with pay and other business matters and confronted me about "suing him." I told him Walt Schmittinger was my attorney and that all questions could be directed to him. He said he wanted to let me know he bills were faxed to the insurance company. Once again, I reminded him that I had an attorney. He then stated that would be the end of the conversation.

A little while later, he brought out "copies" of the fax and told me to give them to my lawyer. I was upset and called home. I was so nervous at the point that I did not get the keys from Rick. My Dad came in and relaxed a little. He said Mom called my lawyer's office and to document everything.

Later, the phone rang. Ali and Ken had both answered it. He yelled in a snappy voice "I got it." Ali went to Rick to let him know and Rick said, "He probably thought it was Shannon." This is proof that they were mad I sought legal counsel.

I went into the kitchen later that night and Rick was sitting at the computer and gave me a glare. I ignored it and went about my business. The rest of the night I felt uncomfortable. Limmer kept calling me Sherman, but I am unsure what that meant.

It was payday, so at closing I asked for my pay. Everyone that was present at the time was paid in cash and taxes were not withheld. I was paid by check. I normally received $100 cash but today my check was $26.72. My tax deductions were abnormally high. I do believe this was done out of spite. Although I prefer checks, for legal purposes, they feel they are doing us a favor by giving us cash. Ken did pay that day while he was at the Lobby House. A copy of the pay stub is attached.

B64

Today, March 8. 2006, I went into work at 7PM. Upon getting to work, I was asked questions about why I was there. Apparently Shannon M. called out from work with food poisoning. Management never asked which Shannon it was, but assumed that it was me. I was then called into the office by Rick. He said that people told him I was concerned with my paycheck and that I said they were paying my bills with my money. I informed him that Rich and I did have concerns about my pay and that Ali had made the comment. It was Rich, Ali, and I sitting on that side of the bar when I got my check. I also explained to him that things get twisted and people lie. I used examples such as Amanda lying to Des that I was racist to get her mad at me and that Andrea hated me at first because I was a bartender and didn't have to work my way up the ladder, and that people are vengeful and that he can not believe exactly what everyone says. He explained to me that he "overpaid" me and that he sends our information to accountants who do our checks. He and Ken do not do the paychecks. My claimed tips are supposedly what affected my low pay. I asked him when we get checks and when we get cash and he said I will always get checks unless there is a problem. However, this has not been the case previously; I have received more cash than checks previously. Additionally, when I get checks others get cash and vice versa. I asked what the system is, and I received no answer.

Another issue discussed was the workman's compensation issue. He told me that I should have gone to them before going to a lawyer because I "handled the situation wrong." I told him that I handed the bills to him twice and that nothing was achieved so I had to get an attorney to handle the situation. He said that I should have warned them about going to the attorney before hand, which I still see unnecessary. He said that Ken

B65

took the $37 bill twice and the bills were both faxed the 16th and it has been hanging on the board in the office. I do not have access to the office, thus I would not have known about the fax. Additionally, when I talked to Keith about the issue Sunday, he said he hadn't seen the faxed memo but did notice that the bills were off the board.

Finally, we discussed the problems of the workplace. He said the handbook was created as a gateway to handle problems and that I should not stoop to a lower level by discussing problems with co-workers. I did make it clear to him that I am uncomfortable with some members of management for they are very disrespectful. Additionally, I told him that I fear the consequences of talking to people. I let him know about what Ken said to me on February 23, and he replied, "It is his business, he can do what he wants." I told Rick that just because it is Ken's business it does not give him the right to disrespect people. I also told him that I am still upset about the issue. I also told him about Ken grabbing Amanda's butt and he said that does not concern me. I let him know that it does offend me because employers should not treat their employees in such a manner. Rick said that he will not schedule me when Ken comes in, but I feel that is not fair to me. I am being punished; my schedule is going to be changed because Ken is disrespectful. Additionally, I told him about Don disrespecting me. I told him that Rich, my boyfriend, has addressed the issue to Don before and that many of the workers feel the same way. He said I am the only one who has ever gone to him about being disrespected. Many people that work there do not know their rights and fear saying anything. However, they have come to me and Rich about issues before. I know personally Ali felt disrespected by Ken the 23rd as well when he confronted her about stealing things. Rick told me that if I didn't like the way things are that I can leave.

*Blde*

The meeting was concluded and I was upset. Mary, Amanda, Kristina, and DC all saw that I was upset. I did not talk to any of them about what happened, but DC agreed to cover my shift since I was upset. I went to tell Rick, who was in a meeting outside with Mike Limmer and Don about the issues brought in our meeting, to let him know DC would cover my shift. I believe that this meeting, between Rick, Mike, and Don, goes against the "open door policy" and feel even less like the issues I brought up will be handled properly. Things I discussed with Rick, should not be addressed to others with my name brought into it, especially when they were not brought up; Limmer was never discussed in my meeting with Rick.

B67

Today, March 9, 2006 I went into work at 9PM. Nothing really happened. During work, I just tended to my customers and steered away from the others. I did check my schedule though. I have almost always worked at least 4 days a week and I have NEVER worked a Saturday morning. This week my schedule is: Thursday at 9- close, Saturday 11-5, and Sunday 5-close. I did request off Friday, when I'm normally scheduled an 11 Double because of the Holiday and I will be out of town. I was weirded out that I was scheduled Saturday morning and also was not working Wednesday. I believe this may be due to the fact management is upset with me, but I will not worry about it until I see what my future schedules look like.

After we were done cleaning, I talked to Ali about the meeting Rick and I had. I told her that I was accused of saying that they were paying my bills through my pay, which in fact she said, and she told Rick she had said it. We discussed what Rick said about paychecks and she was surprised to find out that Rick was in charge of our pay, not Ken. I also told her about Rick saying I will always get checks unless they can't get the checks out in time, which she found odd. We normally get paid cash under the table, so she also saw this as punishment for me. Additionally, I told her that Rick told me to discuss problems with management and that I brought up the way Ken and Don talk down and degrade the employees. She informed me that she had a conversation with Don about his behavior at work in the past. She said she had asked him how he gets away with saying the things he does and that he replied it is because nobody ever confronted him about it. I found this interesting. I told her that I feel uncomfortable talking to management about things and fear that my job is on the line if I were to tell them how I feel. After all, Rick told me if I didn't like it, I could leave. She asked me why I was sent

B68

home and I told her I was not sent home Wednesday but chose to leave since I was upset and they had already called DC in. Ali told me that she can see how I would feel belittled and that she has recently seen the tension revolving around me. Additionally, she did say that she could see that they were treating me differently; what she meant by that I'm unsure. But, I feel as though I am not the only one who is noticing the changes made in attitudes toward me.

Today, March 11, 2006, nothing much occurred at work. I was working with Mike Limmer who was constantly pulling out his cell phone. He was not the manager on duty and thus, should not have been allowed to have his cell phone out, it is against policy. Don did not write him up, nor did he tell him to put it away. If you are going to have a policy, I do believe it should be enforced.

B70

March 12, 2006, I went into work at 5 PM. Nothing really happened. Rick was on duty. The only thing we discussed was getting out early because he wanted to watch the Sopranos. He said we would be out no later than 11:30. We were dead, but we did have a party of 12 walk in. I was very polite and talking to the table and helped Mary out. They left, and we closed.

B71

Today, March 16, 2006, I went into work at 9 PM. Nothing unusual happened. Mike Limmer was manager on duty. Amanda's tattoo was once again showing. I have discussed this issue with Rick and she is to have it hidden. However, it has not been enforced, nor has she ever been written up for it.

B72

Today, March 17, 2006, I had off of work. Because I am supposed to make aware the witnesses to call upon for the DOL sexual harassment claim I contacted Brian, an ex-coworker at 3:08 pm. The conversation lasted 1 minute and 13 seconds. I called his cell phone to let him know that DOL may contact him within the next 6 months and that nobody, not even I, will know that he was contacted. I did not go into anything about what they will be contacting him about. We ended the conversation and he did not seem to have a problem.

At 3:24, I got a call from the Lobby House. It was my General Manager, Rick. He questioned me about what I have been calling his employees about. I told him that DOL was involved and that they were going to be contacted. He asked about what, and since they do not know fully that there is sexual harassment charges being pressed, I told him it was about Worker's Compensation. He told me that I was terminated. I then told him that I am aware of retaliation. He then said that he has guest that will testify that I provide bad service, complain about work, and that I am rude. He also said that guest have told him they are glad that I am gone. Additionally, he said that he knows people that will testify that I pulled my pants down at work. I told him that was slander and hung up the phone.

I have never been written up about my service or customer complaints and it takes 6 write-ups to be fired. My ONLY write up is about improper attire, a belt. I know that my customers will testify against his comments and state that there are others, like Keith, that rude. Thus, I am not at fault. Additionally, Rick has been there and put money down Amanda's G-String so I know that is not the reason. This is full out retaliation, he only called to know what was going on and see if the DOL claim was true. He didn't mention anything else before he terminated me; it was only after I had mentioned retaliation. Also,

B73

how did the guest already know I was fired and say this to him?? I know he was lying, he knows that they are in for much trouble ahead.

I immediately contacted my lawyer, John Adams at DOL, and went to the unemployment agency.

My father and I then went to pick up my pay. Once again, I received a check. The check was for $13.19. Never before have I received 2 checks in the same month. Although I know that my pay is legal then, this is another form of retaliation. We always get paid more when we get cash. Rick did not bring out the check, but instead Mike Limmer did. Employees already knew that I was terminated and my Dad caught Shannon M. talking about it with her table. We left with no confrontation.

At 3:33 AM, Mary Anderson got off of work and called me. We talked for 37 minutes and 30 seconds about what happened. She said Ali came out and told everyone that I was just fired but that nobody knew why. I explained to her what had happened and she thought the whole thing was ridiculous. She also informed me that Justin arrived to work already intoxicated that day. He was not fired, but sent home. Additionally, Ken was there and policies had already begun to change. Mary had been pulled behind the bar with no training and shift drinks had to be approved by Ken, when normally managers do it. She said she will keep me informed of what is said there in reference to me, and correct those that are spreading false information.

B74

It's 1:12 AM on March 19, 2006. I'm upset so I called Mom to try and get her to calm me down. I'm scared about what is to come in the case against the Lobby House. Since I talked to Rick, I have thought of nothing but the incidents that have occurred. My mind is wondering and I can't sleep. I dream of the Lobby House events. I want this to all go away. Maybe that is why I called Mom, I feel safe talking to her. I think she can make it all go away. I pray that God gives me a little extra strength in the months ahead. There is going to be a whirlwind of chaos.

Today, I talked to Chad. He and I were acquaintances before working at the Lobby House. He has been a bouncer there for some time. I discussed what was going on there and saved the conversation. He is proof about that antics of the Lobby House and that Ken thinks he can pay people off to get his way, and that money is power.

*B75*

## CERTIFICATE OF SERVICE

I hereby certify that I have caused copies of the following:

### APPENDIX TO
### PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO
### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

to be served upon:    RONALD G. POLIQUIN, ESQUIRE
Young, Malmberg & Howard
30 The Green
Dover, DE    19901

by electronic service on *February 29*, 2008.

SCHMITTINGER & RODRIGUEZ, P.A.

BY: _____
NOEL E. PRIMOS, ESQUIRE
Bar I.D. #3124
414 S. State Street
P.O. Box 497
Dover, DE    19903
(302) 674-0140
Attorneys for Plaintiff

DATED: 2-29-08
NEP:pmw