**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| SHANNON A. LAYMON, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C. A. No. 07-129-MPT |
| | : | |
| LOBBY HOUSE, INC., | : | |
| a Delaware corporation, | : | |
| | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM OPINION**

Noel E. Primos, Esquire, Schmittinger & Rodriguez, P.A., 414 S. State Street, P.O. Box 497, Dover, DE 19903

Ronald G. Poloquin, Esquire, Young, Malmberg & Howard, P.A., 30 The Green, Dover, DE 19901

April 14, 2008

**U.S. Magistrate Judge**

**I. Introduction**

This is a sexual harassment case involving several claims. Plaintiff, Shannon Laymon ("Laymon") alleges that defendant, Lobby House, Inc. ("Lobby House"), violated Title VII by subjecting her to a hostile environment based upon sexual harrassment and by retaliating against her for complaining about the harassment. Further, Laymon alleges that Lobby House violated 19 Del. C. § 2365 by retaliating against her for pursuing a worker's compensation claim. Lastly, Laymon alleges Lobby House committed slander by making false claims about her. Lobby House moved for summary judgment on all claims pursuant to Fed. R. Civ. P. 56(c) on the basis that no genuine issue of material fact exists.

**II. Facts**

Laymon worked as a waitress and bartender at the Lobby House restaurant from September, 2005 until March, 2006. During that time, Laymon alleges she was subjected to a hostile work environment. Specifically, Laymon alleges that assistant manager Don Wilmot ("Wilmot"), owner Ken Caudill ("Caudill"), and fellow bartender Brian Doucette ("Doucette") made sexually harassing comments and engaged in sexually harassing conduct toward herself and other female employees. Laymon further alleges that when she brought her concerns to manager Rick Anibal ("Anibal") his response was that it was Caudill's business and "he [could] do what he wants." According to Laymon, Anibal also proposed to reduce Laymon's schedule so that she would not work at times when Caudill was in the restaurant. Laymon protested that the

solution was unfair because her hours would be reduced due to someone else's conduct. Anibal allegedly responded that if she did not like the situation, she could leave.

In addition to her sexual harassment claim, Laymon asserts retaliation stemming from a worker's compensation claim. In October, 2005, Laymon slipped behind the bar and was injured. When Lobby House refused to pay her resulting medical bills, Laymon retained counsel to pursue a worker's compensation claim. After receiving a letter from Laymon's attorney, Anibal allegedly confronted her about "suing him." Laymon was upset by the meeting. Further, when she received her paycheck that night, she maintains that it was drastically reduced. Subsequently, Anibal accused Laymon of telling other employees that Lobby House paid her medical bills with the money deducted from her paycheck, which Layman denies.

Thereafter, Laymon argues that her schedule was drastically reduced. Consequently, Laymon approached the Delaware Department of Labor ("DDOL") about filing a discrimination claim. On March 17, 2006, Laymon contacted Doucette to advise that she listed him as a witness in her complaint. Laymon alleges that approximately fifteen minutes later, Anibal called and asked what she was "calling his employees about." Laymon contends that when she told him about her discussion with Doucette, Anibal fired her. On April 5, 2006, Laymon filed discrimination charges with the DDOL.

## III. Legal Standard

### Summary Judgment

Granting summary judgment pursuant to Fed. R. Civ. P. 56(c) is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together

with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[1] A Rule 56(c) movant bears the burden of establishing the lack of a genuinely disputed material fact by demonstrating "that there is an absence of evidence to support the nonmoving party's case."[2] "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."[3] The nonmovant must be given the benefit of all justifiable inferences and the court must resolve any disputed issue of fact in favor of the nonmovant.[4] The mere existence of some evidence in support of the nonmoving party, however, is insufficient to deny a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the nonmoving party on that issue.[5] If the nonmoving party fails to make a sufficient showing on an essential element of its case, the moving party is entitled to judgment as a matter of law.[6]

**IV. Analysis**

Title VII Claim

To survive a motion for summary judgment on her Title VII claims, Laymon must

---

[1] Fed. R. Civ. P. 56(c).

[2] *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

[3] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[4] *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992).

[5] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

[6] *See Celotex Corp.*, 477 U.S. at 325.

establish a *prima facie* showing of a hostile work environment based on gender. To do that, Laymon must prove five elements: (1) she suffered intentional discrimination because of her sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected her; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of *respondeat superior* liability.[7] The opinion will address each element individually.

1. Intentional Discrimination Based on Sex

Laymon describes a work environment at the Lobby House restaurant as offensive to women in general, and as offensive to her in particular. Among the litany of facts Laymon alleges are:

- Caudill told Laymon that she needed to wear more revealing tops in order to get better tips.[8]
- Caudill told Laymon that "girls are only good for sex."[9]
- Wilmot commented to Laymon about her having orgies with a female co-worker, two brothers that the women were dating, and the brothers' mother.[10]
- Wilmot stuck his fingers into a customer's vagina at the restaurant and

---

[7] *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 (3d Cir. 1990).

[8] D.I. 47 at 14.

[9] *Id.* at 16.

[10] *Id.* at 14.

    then reported to Laymon about how "stinky" it was.[11]

- Anibal put a liquor bottle in his pants and had female employees kneel in front of him while he poured alcohol into their mouths and over their bodies.[12]
- Doucette forced Laymon to show a piercing in her vaginal area.[13]
- Doucette said to Laymon, "Why don't we just have sex and get this over?"[14]

Lobby House disputes these allegations on the basis that the alleged sexual harassment was welcomed by Laymon.[15] However, Lobby House does not set forth any basis to support its argument other than a recitation of cases supporting the proposition. Nonetheless, factual disputes are not for the court to decide at the summary judgment stage. Therefore, as to the first element, the court holds that there are genuine issues of material fact.

2. Pervasive and Regular Discrimination

To satisfy the second element of a *prima facie* case of hostile environment based on gender, Laymon must show that the conduct complained of was pervasive and

---

[11] *Id.*

[12] *Id.* at 15.

[13] D.I. 47 at 15.

[14] *Id.* at 15-16.

[15] D.I. 44 at 12-13.

regular.[16] Indeed, she avers that the conduct complained of herein occurred over the course of her employment with Lobby House. Lobby House, however, contends that the incidents were only "isolated" or "occasional."[17] To support its contention, Lobby House merely disputes the seriousness of the incidents and not whether they occurred.[18] Thus, the court finds that the conduct was sufficiently pervasive and regular to satisfy the second element.

3. The Harassment Detrimentally Affected Laymon

The third element which Laymon must show is that the harassment had a detrimental affect on her. Laymon relies on several material facts to prove this factor. First, Laymon maintains that she was "upset" as a result of the alleged harassment.[19] Second, she was sufficiently affected by the harassment to complain to her manager, Anibal.[20] Third, Laymon discussed the harassment with one of her co-workers, Sarah Geesaman ("Geesaman").[21]

Lobby House disputes that the alleged harassment detrimentally affected her. To support its argument, Lobby House relies on photographs of Laymon apparently enjoying herself at its New Year's Eve party.[22] Although the photographs may show that

---

[16] *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993).

[17] D.I. 44 at 16.

[18] *Id.* at 17.

[19] D.I. 47 at 17.

[20] D.I. 44 at 17. Both parties agree that she complained of the behavior.

[21] D.I. 47 at 17.

[22] *Id.* at 16.

Laymon was not negatively affected by the alleged harassment, they also may just show that she was having fun. The interpretation of the pictures, however, is a factual dispute and not a matter for the court to decide at the summary judgment stage. Therefore, the third element of a *prima facie* case of hostile environment based on sex is satisified.

4. The Harassment Would Detrimentally Affect a Reasonable Woman in Laymon's Position

Assuming Laymon's accusations are true and resolving all reasonable inferences in her favor, as the court must at the summary judgment stage, the harassment she describes would detrimentally affect a reasonable woman in her position. Comments by her superiors at work describing the smell of a customer's vagina or telling her that she is "only good for sex" as Laymon claims occurred, would be offensive to a reasonable woman.[23] Thus, this court concludes that the fourth element of a *prima facie* case of hostile work environment based on gender is satisfied.

5. Whether Defendant is Subject to *Respondeat Superior* Liability

Under Title VII, an employer is subject to *respondeat superior* liability of a victimized employee for an actionably hostile environment created by a supervisor who has immediate or successively higher authority over that employee.[24] In the present matter, defendant's owner and managers are alleged to have created the hostile environment through their words and actions. Although *Faragher v. City of Boca Raton* sets forth an affirmative defense to a hostile environment claim, the defense requires the employer to exercise reasonable care to "avoid harassment and eliminate it when it

---

[23] D.I. 47 at 14 -16.

[24] 524 U.S. 775, 807 (1998).

might occur." No measures were taken to either prevent or reduce harassment. In fact, the very people who were responsible for monitoring employee conduct were the same people whose behavior is alleged to have created the hostile work environment in the first place. Consequently, no disciplinary measures were instituted, despite the defendant's concession that at least "isolated incidents" of sexual harassment occurred.[25] Moreover, rather than responding with "reasonable care" to Laymon's concerns, management told Laymon to leave if she was uncomfortable with the work environment. Since that element of the *Faragher* affirmative defense is unsatisfied, it is unnecessary to address the remaining element.[26] Accordingly, all the elements of a *prima facie* claim of a hostile work environment based on sex have been satisfied by Laymon. Therefore, Lobby House's motion for summary judgment on Laymon's Title VII claim of hostile work environment based on sex is denied.

Retaliation Claim

Laymon claims that Lobby House retaliated against her for complaining about sexual harassment to Anibal and the DDOL. To establish a prima facie case of retaliation under Title VII, Laymon must show that: (1) she engaged in a protected activity; (2) she suffered adverse employment actions; and (3) a causal link exists

---

[25] D.I. 44 at 17.

[26] 524 U.S. at 807 (explaining that the second element of the affirmative defense to liability is whether "the complaining employee had failed to act with like reasonable care to take advantage of the employer's safeguards and otherwise to prevent harm that could have been avoided.")

between the employment actions and the exercise of the protected activity.[27]

In the present matter, the first two elements are uncontested. Thus, only the third element will be addressed: whether a causal link exists between the employment actions and the exercise of the protected activity. A plaintiff may establish the requisite causal connection by "showing a close temporal proximity between the protected activity and the alleged retaliatory conduct, or by submitting 'circumstantial evidence that gives rise to an inference of causation.'"[28] Laymon has satisfied this burden.

Laymon first engaged in a protected activity when she complained to her supervisor, Anibal, about the work environment. Immediately after she complained to Anibal, he told her that he would reduce her hours – which a reasonable jury could interpret as punishment for others alleged misconduct. Thus, there is a close temporal relationship between the protected activity and the adverse employment action.

Laymon again engaged in a protected activity when she spoke to a DDOL representative about the allegedly hostile work environment at Lobby House. As a result of that conversation, Laymon informed her co-worker, Doucette, about the possible need for his testimony. Immediately after that conversation, Anibal terminated Laymon's employment – another close temporal relationship between the protected activity and the adverse employment action. Thus, Laymon has established a *prima facie* retaliation claim. Accordingly, Lobby House's motion for summary judgment on that issue is

---

[27] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Price v. Delaware Dept. of Corrections*, 40 F. Supp. 2d 544, 552 (D. Del. 1999).

[28] *Lacy v. AMTRAK*, 2007 U.S. App. LEXIS 27279 (3d Cir.) (quoting *Marra v. Philadelphia Hous. Auth.*, 497 F.3d 296, 302 (3d. Cir. 2007)).

denied.

Slander Claim

Laymon alleges that Lobby House committed slander by reporting to her customer complaints about her service and by spreading rumors that she removed her pants at work. Slander, a subset of the tort of defamation, is defined as "that which tends to injure reputation in the popular sense; to diminish the esteem, respect, goodwill or confidence in which the plaintiff is held."[29] It is spoken as opposed to written defamation, which is libel.[30] Further, it is divided into the subsets of slander *per se* and slander *per quod*.[31] The elements to prove each are the same except that the latter requires the additional element of pleading special damages.[32] Four types of statements are considered slander *per se.* Those are statements which: (1) malign one in a trade, business, or profession; (2) impute a crime; (3) imply that one has a loathsome disease; or (4) impute unchastity to a woman.[33]

To survive a motion for summary judgment, Laymon must also show all elements of a slander claim are met. Those elements are: (1) defamatory character of the communication; (2) publication; (3) the communication refers to the plaintiff; (4) the third party's understanding of the communication's defamatory character; and (5) injury.

---

[29] *Spence v. Funk*, 396 A.2d 967, 969 (Del. 1978).

[30] *Id.* at 970.

[31] *Id.*

[32] *Id.*

[33] *Id.*

Whether the two allegations of slander fall into the category of slander *per* se or slander *per quod*, plaintiff has not proffered appropriate evidence to show slander. According to her brief, the only two exhibits on which plaintiff relies as evidence of slander is her deposition testimony and her self-serving diary.

According to her deposition testimony as contained in Laymon's appendix,[34] she *heard* that comments were constantly being made. The sum and substance of those comments which plaintiff attributes to Lobby House are as follows:

> A. There's constantly comments being made. There's also, you know, people whenever I started bartending other where, other place, I was approached by people off the street saying, oh, this is what The Lobby House said, blah, blah, blah. Whatever.
>
> Q. Specifically what statements are you referring to?
>
> A. Basically, that you know, I drop my pants at work, dah, dah, dah. They heard about the claims that were – that I had brought against them. They are completely inaccurate. I am blowing things out of proportion, stuff like that.[35]

When asked who could corroborate that such statements were made by Lobby House, Laymon advised that "Rich can."[36] She also identified a lady, "Val," but did not

---

[34] The only two pages referenced by Laymon as supporting her allegations of slander was a single page of her deposition testimony and a page from her diary regarding a conversation that she had with Rick, her general manager. *See* D.I. 48 at B27, B73.

[35] D.I. 48 at B27.

[36] *Id.*

attribute what remarks "Val" conveyed to her.[37] In response to that inquiry, Laymon also testified:

> A. And one of our customer came and she was like, yeah. they told me we're not allowed to even speak your name, this, that and the other. But my old customers used to come up to me and ask me why I'm not there. Why – or say that they've heard all this stuff.

According to Laymon's dairy, which is the only "evidence" she proffered regarding Rick's alleged slanderous remarks arose from a conversation between them:

> . . . He told me that I was terminated. I then told him it was about Worker's Compensation. He then said that he has guest [sic] that will testify that I provide bad service, complain about work [sic], and that I am rude. He also said that guest [sic] have told him they are glad that I am gone. Additionally, he said that he knows people that will testify that I pulled my pants down at work. I told him that was slander and hung up the phone.[38]

Laymon's "evidence" regarding any comments attributed to Lobby House are pure hearsay.[39] She relies primarily on unidentified individuals as to what was reported by them to her. Most of Laymon's testimony about the comments conveyed is not slander:[40] that Lobby House may have discussed the claims raised by Laymon in this matter with others; that customers were encouraged not to mention her name; that Laymon was inaccurate or blowing things out of proportion; or as Laymon described,

---

[37] *Id.*

[38] D.I. 48 at B73.

[39] *See* FRE 801. "'Hearsay'" is a statement, other than one made by the declarant while testifying . . . offered in evidence to prove the truth of the matter asserted." *See also*, FRE 802 which provides that hearsay is not admissible.

[40] Comments such as "blah, blah" or "dah, dah, dah" are unintelligible. *See* D.I. 48 at B27.

"stuff like that."[41] Although the remark attributed to Lobby House by Laymon from conversations with third parties about her undressing may impute unchaste behavior towards her, again, Laymon's only evidence is what someone else said to her. She does not present any evidence, such as, deposition testimony or affidavits from those individuals who allegedly heard that comment from Lobby House.[42] "Summary judgment, of course, looks only to admissible evidence."[43] Moreover, hearsay statments "that are inadmissible at trial should not be considered when determining whether Plaintiff has established a triable issue of fact."[44]

Regarding the conversation with Rick as noted in Laymon's diary in which he mentions customer complaints reported to him, that included Laymon undressing, that conversation occurred between Rick and Laymon. Laymon presents no reliable evidence that the disrobing comment was published by Lobby House, which requires a defendant to communicate the defamatory statement to a *third party.*[45] Therefore, the

---

[41] *Id.*

[42] Fed. R. Civ. P. 56 (e) requires that when a motion for summary judgment is properly made and supported, as Lobby House did through affidavits, the opposing party must submit appropriate evidence. Hearsay is not proper evidence to defeat summary judgment. In fact, changes made to Rule 56 in 1963 as noted in the *Advisory Committee Notes*, was specifically drafted to address the problem in this Circuit because "[t]he very mission of the summary judgment procedure is to pierce the pleadings and to assess *the proof* in order to see whether there is a genuine need for trial" on an issue. (emphasis added).

[43] *Arnold Pontiac-GMC v. Budd Baer, Inc.*, 826. F2d 1335, 1339 (3d Cir. 1987)

[44] *Sosa v. Chertoff*, 2008 WL 800691, *3 (D.N.J. March 21, 2008); *See also*, *Blackburn v. United Parcel Service*, 179 F.3d 81, 95 (3d Cir. 1999); *Reganick v. Southwestern Veterans' Center*, 2008 WL 768423, *6, n.8 (W.D. Pa. March 20, 2008).

[45] *Spence v. Funk*, 396 A.2d 967, 970 (Del. 1978).

relaying of customer complaints to the individual about whom they are made is not publication. As a result, summary judgment is granted in favor of Lobby House on the claim for slander.

**V. Conclusion**

For the reasons contained herein, Lobby House's motion for summary judgment is GRANTED in part and DENIED in part.