Law Offices of
**YOUNG, MALMBERG & HOWARD, P.A.**
Professional Association
30 The Green
Dover, Delaware 19901
www.youngmalmberg.com

Kenneth J. Young
Constantine F. Malmberg, III
Kevin M. Howard
Ronald G. Poliquin

Phone: (302) 672-5600
Fax: (302) 674-0549

September 3, 2008

**VIA E-FILE**

The Honorable Mary Pat Thynge
U.S. District Court
District of Delaware
844 N. King Street
Wilmington, DE 19801

      **RE:**    **Shannon A. Laymon v. Lobby House, Inc.**
               **C.A. No. 07-129 MPT**

Dear Judge Thynge:

      Enclosed is a copy of the transcript of Donald Wilmont's trial testimony. Please let me know if there is anything else you need. Thank you for your consideration.

Respectfully,

/s/ Ronald G. Poliquin

Ronald G. Poliquin, Esquire
I.D. No. 4447
RGP/gss

cc:    The Lobby House
       Noel Primos, Esquire

```
1                    IN THE UNITED STATES COURT

2                  FOR THE DISTRICT OF DELAWARE

3

4        SHANNON A. LAYMON          )
                                    ) Civil Action No.
5                    Plaintiff,     ) 07-129 MPT
                                    )
6        -vs-                       )
                                    )
7        LOBBY HOUSE, INC., a       )
         Delaware corporation,      )
8                                   )
                     Defendant.     )
9

10             Videotaped deposition of DONALD WILMOT
         taken pursuant to notice at the law offices of
11       Young, Malmberg & Howard, 30 The Green, Dover,
         Delaware, beginning at 2:00 p.m. on August 29,
12       2008, before Julianne LaBadia, Registered
         Diplomate Reporter and Notary Public.
13
         APPEARANCES:
14           NOEL E. PRIMOS, ESQ.
             SCHMITTINGER & RODRIGUEZ
15           414 South State Street
             Dover, Delaware  19901
16           For the Plaintiff

17           RONALD G. POLIQUIN, ESQ.
             YOUNG, MALMBERG & HOWARD
18           30 The Green
             Dover, Delaware
19           For the Defendant

20       ALSO PRESENT:  Shannon Laymon
                        Rick Anibal
21                      Ken Caudill
                        Randy Draper - videographer
22
                        WILCOX & FETZER
23       1330 King Street - Wilmington, Delaware 19801
                        (302) 655-0477
24                      www.wilfet.com
```

1                    IN THE UNITED STATES COURT

2                  FOR THE DISTRICT OF DELAWARE

3

4        SHANNON A. LAYMON          )
                                    ) Civil Action No.
5                  Plaintiff,       ) 07-129 MPT
                                    )
6          -vs-                     )
                                    )
7        LOBBY HOUSE, INC., a       )
         Delaware corporation,      )
8                                   )
                   Defendant.       )
9

10              Videotaped deposition of DONALD WILMOT
         taken pursuant to notice at the law offices of
11       Young, Malmberg & Howard, 30 The Green, Dover,
         Delaware, beginning at 2:00 p.m. on August 29,
12       2008, before Julianne LaBadia, Registered
         Diplomate Reporter and Notary Public.
13
         APPEARANCES:
14           NOEL E. PRIMOS, ESQ.
             SCHMITTINGER & RODRIGUEZ
15           414 South State Street
             Dover, Delaware  19901
16           For the Plaintiff

17           RONALD G. POLIQUIN, ESQ.
             YOUNG, MALMBERG & HOWARD
18           30 The Green
             Dover, Delaware
19           For the Defendant

20       ALSO PRESENT:  Shannon Laymon
                        Rick Anibal
21                      Ken Caudill
                        Randy Draper - videographer
22
                        WILCOX & FETZER
23       1330 King Street - Wilmington, Delaware 19801
                        (302) 655-0477
24                      www.wilfet.com

Donald Wilmot - trial testimony

1                VIDEOGRAPHER:  This is the

2     videotaped deposition of Don Wilmot, taken by the

3     defendant in the matter of Laymon versus Lobby

4     House, civil action number 07-129, held in the

5     office of Young, Malmberg & Howard in Dover,

6     Delaware, on August 29th, 2008, at approximately

7     2:00 p.m.

8                The court reporter is Juli LaBadia

9     from the firm of Wilcox & Fetzer.  My name is

10    Randy Draper, a video specialist from Discovery

11    Video Services, Incorporated, in association with

12    Wilcox & Fetzer.

13                Counsel will now introduce

14    themselves, and the reporter will swear in the

15    witness.

16                MR. POLIQUIN:  Ron Poliquin on

17    behalf of the defendant, the Lobby House.

18                MR. PRIMOS:  Noel Primos on behalf

19    of the plaintiff, Shannon Laymon.

20                DONALD WILMOT

21           The deponent herein, having first been

22           duly sworn on oath, was examined and

23           testified as follows:

24                DIRECT EXAMINATION

Donald Wilmot - trial testimony

1    BY MR. POLIQUIN:

2        Q.   Mr. Wilmot, where do you currently reside?

3        A.   I live at 36 Heritage Drive, Dover,

4    Delaware.

5        Q.   And how old are you?

6        A.   I am 39.

7        Q.   You're currently employed as the assistant

8    general manager at the Lobby House?

9        A.   That's correct.

10       Q.   How long have you held that position?

11       A.   Approximately eight years.

12       Q.   We are conducting your trial testimony

13   today, because you are unavailable for trial.

14   Why are you unavailable for trial?

15       A.   On Tuesday, September 2, I'm being

16   admitted to Crozer Chester Medical Center in

17   Upland, Pennsylvania.

18       Q.   What are you being admitted for?

19       A.   I have to have two surgical procedures.

20   One is integra and the other is a skin graft.

21       Q.   And what are those procedures treatment

22   for?

23       A.   The integra treatment is -- approximately

24   a year ago I was in a fire and got third and

Donald Wilmot - trial testimony

1      fourth degree burns, full thickness, and I have

2      exposed bone.

3                      The integra procedure is two layers

4      of artificial skin.  Approximately a week after

5      that the top layer is peeled off, and then the

6      final skin graft is done.

7          Q.  So essentially you'll be being

8      hospitalized during the time we have trial in

9      this case?

10         A.  That's correct, yes.

11         Q.  What are your duties and responsibilities

12     as assistant general manager?

13         A.  I am responsible for opening, closing the

14     restaurant, daily receipts and overseeing all

15     functions.

16         Q.  Prior to being employed at the Lobby

17     House, did you have management experience

18     anywhere else?

19         A.  Yes.

20         Q.  And where?

21         A.  At The Nuts restaurant in Dover.

22         Q.  What is The Nuts restaurant?

23         A.  It no longer exists, but it used to be a

24     steak house.

Donald Wilmot - trial testimony

1     Q.   And when were you employed there?

2     A.   Approximately '94 to 2000.

3     Q.   What was your position?

4     A.   I started there as a waiter, and

5     eventually became manager.

6     Q.   Can you describe your management style.

7     A.   My management style is laid back, but

8     blunt and to the point.

9     Q.   Does that apply to both women and men?

10    A.   Yes, it does.

11    Q.   Have you ever referred to yourself as

12    arrogant or rude?

13    A.   Yes, I have in a social situation.

14    Q.   And why would you refer to yourself as

15    that?

16    A.   It's basically in a joking manner.

17    Q.   You say social situation.  What exactly do

18    you mean?

19    A.   Just hanging out with friends.

20    Q.   When did you first meet the plaintiff in

21    this case, Shannon Laymon?

22    A.   Shortly after she was hired at the Lobby

23    House.

24    Q.   Would that be around September, 2005?

Donald Wilmot - trial testimony

1      A.   I believe so, yes.

2      Q.   Do you know what position Ms. Laymon

3  originally started off as?

4      A.   She started as a waitress.

5      Q.   And then did Ms. Laymon eventually become

6  a bartender?

7      A.   Yes.

8      Q.   Can you describe your professional

9  relationship with Shannon Laymon during her

10  employment at the Lobby House?

11      A.   That's exactly what it was, professional

12  relationship.  We never really had any issues

13  with each other.

14      Q.   Can you describe your personal

15  relationship with Shannon Laymon during her

16  employment at the Lobby House?

17      A.   I didn't have a personal relationship with

18  her outside the Lobby House.

19      Q.   Were there occasions when Shannon Laymon

20  visited your home on a social basis?

21      A.   Yes.  Two occasions.

22      Q.   And when did -- the first time Shannon

23  Laymon visited your home?

24      A.   The first one is December 25 of '05.

Donald Wilmot - trial testimony

1     Q.   So that would have been Christmas in 2005?

2     A.   Yes.

3     Q.   That would have been approximately almost

4     four months after Ms. Laymon started at the Lobby

5     House?

6     A.   Correct.

7     Q.   And why did she come to your house on

8     Christmas of 2005?

9     A.   She brought me Christmas dinner.

10    Q.   And did she come there by herself?

11    A.   No.  She came with her boyfriend.

12    Q.   Do you know what time she came?

13    A.   I don't know the exact time.

14    Q.   Do you have a roundabout?

15    A.   It was evening.  It was probably, I would

16    say, between 6:30 and 7:30.

17    Q.   And what type of dinner did she bring you?

18    A.   She brought me a traditional holiday

19    dinner.  Turkey, stuffing, mashed potatoes.

20    Q.   And why would Ms. Laymon bring you that

21    dinner?

22    A.   She knew I was spending the day by myself.

23    Q.   And did Ms. Laymon volunteer to bring the

24    dinner or did you ask her to bring it?

Donald Wilmot - trial testimony

1    A.   She volunteered.

2    Q.   And you stated that there was another

3    occasion that Shannon Laymon visited your home

4    during her employment?

5    A.   Yes.   That was in January of '06.

6    Q.   And what type of occasion was that?

7    A.   I had a party at my house.

8    Q.   And what type of party was it?

9    A.   It was just -- I had just invited all the

10   employees that work for me at the Lobby House.

11   Q.   And you said that was in January 15th or

12   16th?

13   A.   15th or 16th, yes.

14   Q.   So that's approximately five months after

15   Ms. Laymon started employment at the Lobby House?

16   A.   That's correct.

17   Q.   And what type of party was it?

18   A.   It was just a social gathering.   It was to

19   pretty much be a Christmas party.

20   Q.   And was there alcohol served at the party?

21   A.   Yes.

22   Q.   And did Ms. Laymon partake in the alcohol?

23   A.   Yes.

24   Q.   And did you -- what was Ms. Laymon's

Donald Wilmot - trial testimony

1      demeanor like when she was at the party?

2          A.   She was having fun.

3          Q.   Now, can you describe the work atmosphere

4      at the Lobby House?

5          A.   The work atmosphere, we -- it's kind of

6      laid back.  It's -- not only is it a work

7      atmosphere, it's also a social atmosphere.  We

8      try to have fun at the same time.

9          Q.   And what is the Lobby House?

10         A.   The Lobby House is a restaurant and bar.

11         Q.   And can you describe the atmosphere for

12     the customers at the Lobby House.

13         A.   Oh, we try to make it as enjoyable as

14     possible.

15         Q.   And why do you do that?

16         A.   We'd like the customers to come back.

17         Q.   Now, is -- what are the hours of -- that

18     the Lobby House opens?

19         A.   It's open at 11:00 a.m. and closes at 1:00

20     a.m.

21         Q.   And you serve -- do you serve lunch at the

22     Lobby House?

23         A.   Yes.

24         Q.   You serve dinner?

Donald Wilmot - trial testimony

1      A.   Yes.

2      Q.   And is there, does the Lobby House change

3      at a certain point of the night?

4      A.   Yeah.   Roughly around 9:00 it turns into a

5      nightclub atmosphere.

6      Q.   And do employees regularly use profanity

7      when working at the Lobby House?

8      A.   Yes, amongst each other.

9      Q.   And does that change depending on whether

10     it's a nightclub or whether or not it's during

11     lunch or dinner hours?

12     A.   No.   It's usually the same.   It might get

13     a little bit more at night.

14     Q.   And do female employees use profanity at

15     the Lobby House?

16     A.   Yes.

17     Q.   Do male employees use profanity at the

18     Lobby House?

19     A.   Yes, they do.

20     Q.   And do customers sometimes use profanity

21     at the Lobby House?

22     A.   Yes.

23     Q.   Was some use of profanity normal for

24     employees at the Lobby House?

Donald Wilmot - trial testimony

1    A.  Amongst each other?  Yes, it was.

2    Q.  And is that different than when -- with

3    customers?

4    A.  Yes.

5    Q.  And how is it different?

6    A.  Well, the employees don't cuss at

7    customers.  It's definitely not tolerated.  Or

8    around them.

9    Q.  And do -- in what context would employees

10   use profanity or cursing at each other?

11   A.  Oh, just in casual conversation.

12   Q.  Do employees ever drink while at the Lobby

13   House?

14   A.  Yes.

15   Q.  In what context do they drink?

16   A.  They come in on their time off and drink,

17   and also, late night in the evening they're

18   allowed to drink occasionally if they get the

19   manager's permission.

20   Q.  And does that apply to both female and

21   male employees?

22   A.  Yes, it does.

23   Q.  And you said -- and when would they be --

24   ask the manager's permission for a drink?

Donald Wilmot - trial testimony

1       A.   It would definitely be late night.

2       Q.   And how would that happen?

3       A.   Usually it would -- a customer would ask

4    if they can buy them a shot.

5       Q.   Is it unusual for employees to socialize

6    at the Lobby House on their days off?

7       A.   No.   Not at all.

8       Q.   Do you remember if Shannon Laymon ever

9    socialized at the Lobby House on her days off?

10      A.   Yes, she has.

11      Q.   Did you ever drink while you were at the

12   Lobby House?

13      A.   Yes.

14      Q.   And how often did you drink?

15      A.   I could -- would have to say occasionally.

16   On my days off when I was in there, I would

17   always drink.

18      Q.   What about during -- when you were on work

19   hours?

20      A.   Usually on special occasions.

21      Q.   Was there occasions when you ever became

22   intoxicated at the Lobby House?

23      A.   There might have been, yes.

24      Q.   And when would that happen?

Donald Wilmot - trial testimony

1    A.   Again, usually on special occasions.   My

2    birthday, New Year's Eve, St. Patrick's Day.

3    Q.   So you're -- would that be a common

4    occurrence?

5    A.   Not a common occurrence, no.

6    Q.   Have you ever seen Shannon Laymon

7    intoxicated at the Lobby House?

8    A.   Yes.

9    Q.   And would that be during times when she

10   worked?

11   A.   Yes.

12   Q.   At closing, is there a way for procedure

13   for getting customers out of the bar, that are

14   still there?

15   A.   Yeah.   Usually if there's a doorman, the

16   doorman will go around and ask the customers to

17   pay their tabs and please leave.

18   Q.   And would you ever tell customers to leave

19   the Lobby House when it's closing time?

20   A.   Yes.

21   Q.   And how would you tell them?

22   A.   I had various different ways.   Basically

23   usually just please pay your tab.   It's time to

24   go.

Donald Wilmot - trial testimony

1    Q.   What happens after the customers leave and

2    the bar is closed?

3    A.   Usually all the employees are assigned

4    cleaning chores, and when those chores are done,

5    the employees are free to go.

6    Q.   After the bar becomes closed, were the

7    employees ever allowed to drink?

8    A.   Yeah.   They were allowed to have one or

9    two drinks.

10    Q.   And when would that occur?

11    A.   That would be usually after we were closed

12    and after all of our cleaning was done.

13    Q.   And how many drinks would usually the

14    employees have?

15    A.   One or two.

16    Q.   And are employees required to stick around

17    after their duties are concluded?

18    A.   No.   Once their job is finished they're

19    free to go.

20    Q.   Initially, when Ms. Laymon first started,

21    how was her performance as a bartender?

22    A.   It was adequate.

23    Q.   Were there ever any problems with

24    Ms. Laymon's performance?

Donald Wilmot - trial testimony

1      A.    Not at the beginning of her employment,

2      no.

3      Q.    During the beginning of her employment,

4      did you ever receive complaints about Ms. Laymon

5      from other employees?

6      A.    Yes.

7      Q.    And what were those complaints?

8      A.    Just pretty much the way she spoke to

9      them.   She used to speak down at employees --

10             MR. PRIMOS:   Objection.

11     A.    -- speak at them.

12             MR. PRIMOS:   Objection; hearsay to

13     this line of questioning, and to the answers.

14     Q.    Did you ever witness Ms. Laymon talk down

15     to employees?

16     A.    No.

17     Q.    Did you ever report complaints by

18     Ms. Laymon to anyone?

19     A.    Yes.   Rick Anibal.

20     Q.    Now I'm going to ask questions focusing on

21     the latter part of Ms. Laymon's employment.   From

22     December, 2005, through her leaving the Lobby

23     House in mid-March, 2006, how would you describe

24     her performance?

Donald Wilmot - trial testimony

1     A.  Again, her performance was adequate, but

2    her attitude got increasingly worse.

3     Q.  And what do you mean about her attitude

4    becoming increasingly worse?

5     A.  Just being negative.

6     Q.  And other than that, did you have any

7    other problems with the -- did the Lobby House

8    have any other problems with Ms. Laymon?

9     A.  Yes.  We had heard from other employees

10   that she had been complaining to customers at the

11   bar about the Lobby House.

12           MR. PRIMOS:  Objection; hearsay.

13     Q.  Did you have any other problems with

14   Ms. Laymon?

15     A.  Accusing managers of stealing money, and

16   Mr. Caudill of stealing money from her paycheck.

17     Q.  And what did you do about Ms. Laymon

18   accusing managers of stealing tips?

19     A.  I brought it to Rick's attention.

20     Q.  Based on your knowledge, was management

21   stealing tips from Ms. Laymon?

22     A.  No.

23     Q.  And how do you know that?

24     A.  I would have to say that I would believe

Donald Wilmot - trial testimony

1      that none of the managers would steal from them.

2      I mean the instance that she's talking about

3      would be -- wouldn't necessarily be the tips.  It

4      would be 50 wraps, which the bar tenders wrap at

5      the end of their night and hand in to their

6      managers.  Managers don't count those.  We just

7      put them right back in the registers.

8          Q.  And did you do anything about Ms. Laymon

9      complain about Ken Caudill taking money out of

10     her paycheck, pay --

11         A.  Yes.  I'm sorry.  I brought it to Rick's

12     attention.

13         Q.  Was there occasion when Ms. Laymon was

14     injured at work?

15         A.  Yes.

16         Q.  And when did that occur?

17         A.  I believe it was October of '05.

18         Q.  And were you present that day?

19         A.  I was.

20         Q.  How did you deal with the situation?

21         A.  I brought her in the kitchen, sat her down

22     and iced down, I believe it's her knee.

23         Q.  So you actually applied the ice to

24     Ms. Laymon's knee?

Donald Wilmot - trial testimony

1      A.   Yes.

2      Q.   And what happened after you iced it down?

3      A.   It continued to swell.

4      Q.   What do you do then?

5      A.   I told her she needed to seek medical

6   attention.

7      Q.   And what happened then?

8      A.   She then called her mom and her mom took

9   her to the hospital.

10     Q.   After that, when was the next time you saw

11   Ms. Laymon?

12     A.   Later on that evening.

13     Q.   And when did you see her?

14     A.   She came in the bar with her mom, sat down

15   and had something to eat and some drinks.

16     Q.   Was there, during Ms. Laymon's employment,

17   was there a dress code for employees?

18     A.   Yes.   During the day, you had to wear

19   either khaki pants or shorts and a blue polo.

20   Usually after 9:00, they were allowed to wear

21   either a black tank top or T-shirt, and that was

22   completely up to their discretion.

23     Q.   Now, during the time of Ms. Laymon's

24   employment, was there a policy against sexual

Donald Wilmot - trial testimony

1    harassment?

2       A.   Yes, there was.

3       Q.   And can you describe generally what that

4    policy was?

5       A.   Well, if you had an issue with another

6    employee or a manager, it was to bring it to

7    Rick's attention.

8       Q.   And was that policy ever discussed to the

9    employees?

10      A.   Yes.   On a regular basis, when we would

11   have our employment meetings.   Both Ken and Rick

12   were very adamant about that, that that would not

13   be tolerated.

14      Q.   When is your birthday, Mr. Wilmot?

15      A.   September 28.

16      Q.   And were you working on your birthday,

17   September 28, 2005?

18      A.   Yes, I was.

19      Q.   And was there anything special done for

20   you on your birthday?

21      A.   Yeah.   Some of the employees pitched in

22   and bought me a cake and some presents.   They

23   sang happy birthday to me, and I blew out the

24   candles.   In fact, if I'm not mistaken, Shannon

Donald Wilmot - trial testimony

1    also gave me a gift.

2        Q.   And what gift did she give you there?

3        A.   I believe it was a 30-ounce beer mug that

4    said happy birthday on it.

5        Q.   And did the employees sing happy birthday

6    to you?

7        A.   Yes, they did.

8        Q.   And was Ms. Laymon part of that?

9        A.   Yes, she was.

10       Q.   And at some point in time, you said there

11   was a cake presented to you?

12       A.   Yes.

13       Q.   And was Ms. Laymon there for that?

14       A.   Yes.

15       Q.   Now, on that night, do you remember

16   drinking?

17       A.   Yes, I had a few cocktails.

18       Q.   And on that night, do you remember if a

19   waitress named Tessa was working?

20       A.   She was working.

21       Q.   And on that night did you sit on the floor

22   with a rolled-up dollar bill in your mouth and

23   repeatedly tell waitress Tessa to "feed the

24   kitty"?

Donald Wilmot - trial testimony

1          A.   No.   I wouldn't sit or lay on the floor in

2     a bar, anywhere.

3          Q.   And why not?

4          A.   It's a bar floor.   Alcohol is spilled all

5     over it.   It's just disgusting.

6          Q.   Were you dancing on the bar that night

7     with your boxers on?

8          A.   No.

9          Q.   Do you wear boxers, Mr. Wilmot?

10         A.   I wear boxers, boxer briefs, and bikini.

11         Q.   And as an assistant manager, do you have a

12    chance to serve drinks at the bar?

13         A.   Yes, I do.

14         Q.   And do you ever serve shots?

15         A.   Yes.

16         Q.   What are shots?

17         A.   Shot is usually a -- either straight

18    liquor or a mixed drink served with no ice,

19    usually in a, at the Lobby House, depending on

20    the type of alcohol, it's usually in a two-ounce

21    shot glass.   And it's just drank straight.   It's

22    not sipped, it's drank all at once.

23         Q.   And are shots normally served during the

24    time of nightclub hours?

Donald Wilmot - trial testimony

1      A.  Yes.  Mostly.

2      Q.  And do a lot of these shots have goofy

3   names?

4      A.  Yes, they do.

5      Q.  And do some of those names include sexual

6   innuendo?

7      A.  Very many.

8      Q.  And can you give us some examples of names

9   that would -- of shots that would include sex

10  references?

11     A.  Sure.  There's shots called tongue in your

12  panties, screaming orgasm, blowjob shots, sloe

13  comfortable screw.  The list goes on.

14     Q.  Are these shots served at other bars and

15  nightclubs?

16     A.  Yes.

17     Q.  And is there a shot called a blowjob shot?

18     A.  Yes, there is.

19     Q.  And is that served at the Lobby House?

20     A.  Yes.

21     Q.  Is it served at other nightclubs and bars?

22     A.  Yes, it is.

23     Q.  And what is a blowjob shot?

24     A.  I'm not sure exactly what the alcohol in

Donald Wilmot - trial testimony

1    it, but it's chilled alcohol served in a

2    champagne grass, topped with whipped cream.

3        Q.   And Ms. Laymon was a bartender at the

4    Lobby House, as you testified.  Would she have to

5    serve some of these shots that had names with

6    sexual references in it?

7        A.   Yes, she would.

8        Q.   Have you ever served a blowjob shot?

9        A.   Yes, I have.  Twice.

10       Q.   I'm talking about during Ms. Laymon's

11   employment.

12       A.   Yes.  During her employment I have.

13       Q.   And when -- in what circumstance did you

14   serve a blowjob shot?

15       A.   A friend of mine was in there, her name is

16   Renee, and she was having a bachelorette party.

17       Q.   Is that a type of occasion where a blowjob

18   shot would be served?

19       A.   It's very common for bachelorette parties

20   to do blowjob shooters.

21       Q.   And is there a certain way to serve the

22   blowjob shot?

23       A.   Yeah.  Like I said, it's usually poured in

24   a champagne glass, topped with whipped cream, and

Donald Wilmot - trial testimony

1     then a guy sits in the chair, puts the glass

2     between his legs, and the woman, usually the

3     bride, puts her mouth around the glass, tips her

4     head back and drinks the shot without touching

5     the glass with her hands.

6          Q.   And is that done in a joking manner?

7          A.   Yes.

8          Q.   And during Shannon Laymon's employee was

9     there a employee named Christina Sells?

10         A.   Yes.

11         Q.   And who is Christina Sells?

12         A.   She was a waitress.

13         Q.   Did you ever make comments about

14    Ms. Laymon having orgies involving Christina

15    Sells and their boyfriends and their boyfriends'

16    mother?

17         A.   No.   Not at all.

18         Q.   Was there a time when you groped a

19    customer?

20         A.   No.

21         Q.   Was there a time when you stuck your

22    fingers into a customer's vagina and referred to

23    it as stinky?

24         A.   Most definitely not.   That's completely

Donald Wilmot - trial testimony

1     inappropriate.

2          Q.   Is that type of behavior, would that type

3     of behavior of groping a customer be, is that

4     against Lobby House policy?

5          A.   Yes.  It most definitely is.

6          Q.   Were you at the Lobby House on New Year's

7     Eve, December 31, 2005?

8          A.   Yes, I was.

9          Q.   Were you there as a customer or there as

10    an employee?

11         A.   I was there as a customer.

12         Q.   And did the employees at the Lobby House

13    do any celebrating that night?

14         A.   Yes, we did.

15         Q.   Would New Year's Eve be considered a

16    special occasion?

17         A.   Yes.

18         Q.   And what type of celebrating did the

19    employees do at the Lobby House that night?

20         A.   Once we were closed, we all sat around, we

21    danced and had a few cocktails.

22         Q.   And do you remember anyone dancing on the

23    bar that night?

24         A.   No.

Donald Wilmot - trial testimony

1      Q.  Do you remember Ms. Laymon being there

2  that night?

3      A.  Yeah.  She was there.

4      Q.  And was she working?

5      A.  She was.

6      Q.  And what was Ms. Laymon's demeanor that

7  night?

8      A.  She was having fun just like the rest of

9  us, dancing and having cocktails.

10     Q.  And did Ms. Laymon stay after she was done

11  working, do you remember?

12     A.  Yeah.  She did.

13     Q.  And would she be required to stay after

14  she was done with her work assignments?

15     A.  No.  She could have left as soon as her

16  work was done.  She chose to stay and have fun.

17     Q.  Did Ms. Laymon ever appear visually upset

18  to you that night?

19     A.  To me?  No.

20     Q.  Were you ever made aware that Ms. Laymon,

21  during Ms. Laymon's employment, she had filed a

22  complaint with the Delaware Department of Labor?

23     A.  No.

24     Q.  Were you ever made aware during

Donald Wilmot - trial testimony

1    Ms. Laymon's employment that she filed a workers'

2    compensation claim?

3        A.   No.

4        Q.   Did you participate in the decision to

5    terminate Ms. Laymon?

6        A.   I had no put -- input in that decision

7    whatsoever.

8        Q.   Do you think that Ms. Laymon should have

9    been terminated?

10       A.   Yes, I do.

11       Q.   And why do you say that?

12       A.   For the simple fact that she's speaking

13   poorly of the establishment to customers.

14       Q.   And this may sound obvious, but why is

15   that a bad thing to do?

16       A.   Well, if she says bad things about the

17   restaurant, and that person goes and tells

18   another person, it's kind of like a telephone

19   game.   And the Lobby House gets a bad reputation

20   around town and doesn't do any business.   If we

21   don't do any business, we don't make any money.

22       Q.   And do you know what customers -- know

23   who, what customers actually complained about

24   Ms. Laymon?

Donald Wilmot - trial testimony

1      A.   Their names specifically, no.   But there

2   was a group that used to come in every Friday,

3   the gentlemen worked at DelDOT.

4      Q.   And how often did they come in?

5      A.   On a regular basis.

6      Q.   Did Ms. Laymon ever complain to you about

7   comments that you made, during her entire

8   employment at the Lobby House?

9      A.   No, she never did.

10     Q.   Did Ms. Laymon ever complain to you about

11  comments that were made by anyone else at the

12  Lobby House?

13     A.   No.

14     Q.   Did Ms. Laymon ever complain to you about

15  sexual harassment?

16     A.   Nope.

17     Q.   Was Ms. Laymon's boyfriend ever present at

18  the Lobby House when she worked?

19     A.   Yes.   Quite frequently.

20     Q.   And when you say quite frequently, what do

21  you mean?

22     A.   On a regular basis.

23     Q.   And where would he be, normally be seated?

24     A.   Usually he would sit at the bar.

Donald Wilmot - trial testimony

1      Q.   And did he ever stay after the bar closed,

2      and --

3      A.   Occasionally.

4                MR. POLIQUIN:   I have no further

5      questions.

6                MR. PRIMOS:   Can we take a break

7      now?

8                VIDEOGRAPHER:   Going off the record

9      at approximately 2:21 p.m.

10               (Brief discussion off the record)

11               VIDEOGRAPHER:   Going back on the

12     record at approximately 2:25 p.m.

13                     CROSS-EXAMINATION

14     BY MR. PRIMOS:

15     Q.   Good afternoon, Mr. Wilmot.  My name is

16     Noel Primos, and I represent Shannon Laymon in

17     this case.  We met before --

18     A.   Yes, we have.

19     Q.   -- at your deposition, which was about a

20     year ago.  Now, you testified earlier about

21     complaints that you said employees made about

22     Shannon Laymon when she was employed at the Lobby

23     House.  Do you recall that?

24     A.   Yes.

Donald Wilmot - trial testimony

1       Q.   Isn't it true that the employees at the

2    Lobby House, it was fairly common for them to

3    complain about other employees?

4       A.   That's fair to say.

5       Q.   Isn't it true, Mr. Wilmot, that you

6    yourself never actually received complaints from

7    customers about Shannon Laymon?

8       A.   From customers, no.

9       Q.   Mr. Wilmot, there was a period of time,

10   was there not, when you would consume alcoholic

11   beverages at work on a fairly regular basis,

12   right?

13                  MR. POLIQUIN:  Object.  Objection.

14   I think we need a time frame.

15                  MR. PRIMOS:  I've asked him was

16   there a time.

17      Q.   Was there a time?

18                  MR. POLIQUIN:  Well, my objection is

19   going to be to relevancy.  If there this is not

20   during the period that Ms. Laymon was employed, I

21   think it's not relevant.

22   BY MR. PRIMOS:

23      Q.   Okay.  Was there a time when you consumed

24   alcoholic beverages at work on a regular basis?

Donald Wilmot - trial testimony

1    A.    There was a period, yes.

2    Q.    And isn't it true that you, in fact, do

3    not know how many times you've actually been

4    intoxicated at work at the Lobby House?

5    A.    Well, that's true to a degree.

6    Q.    What do you mean to a degree?

7    A.    Well, I'm sure that the -- I would have to

8    say that probably between five and ten times,

9    maybe.

10    Q.    Five and ten times total?

11    A.    Probably, yes.

12    Q.    Total, during the eight years that you've

13    worked at the Lobby House?

14    A.    Not during the eight years, no.  Probably

15    about a year.  About a year's time.

16    Q.    Okay.  I'm not understanding your --

17    A.    It probably consume alcoholic beverages

18    anywhere from five to ten times in a year, while

19    I was on the clock.

20    Q.    Okay.  During the period of time that you

21    have been employed at the Lobby House, you

22    consumed alcoholic -- I mean, I'm sorry, you've

23    become intoxicated approximately five to ten

24    times a year?

Donald Wilmot - trial testimony

1              MR. POLIQUIN:  Object.

2     A.   Probably.

3     Q.   Your answer was probably?

4     A.   Yes.

5     Q.   Have you ever smoked marijuana at work at

6     the Lobby House?

7     A.   No.

8              MR. POLIQUIN:  Objection.

9     Q.   Mr. Wilmot, are you familiar with an

10    employee named Justin who has worked at the Lobby

11    House in the past?

12    A.   We've had several employees named Justin.

13    Q.   Do you remember an employee named Justin

14    who worked at the Lobby House while Shannon

15    Laymon was employed there?

16    A.   Yes.

17    Q.   And isn't it true that he came to work

18    intoxicated on at least one occasion?

19             MR. POLIQUIN:  Objection.

20    A.   Yes, he did.

21    Q.   And isn't it true that he was not

22    terminated?

23    A.   That's correct.  He was taken off the bar

24    as a bartender and demoted to a waiter.  And

Donald Wilmot - trial testimony

1    actually, at the Lobby House it's a privilege to

2    be a bartender.

3        Q.  Mr. Wilmot, I'm going to show you a

4    document that was produced by Lobby House's

5    attorneys in discovery, and this is, I believe

6    what you would refer to as employment policies of

7    the Lobby House.  Are you familiar with this

8    document?

9        A.  Yes.

10       Q.  I'd like you to turn to the sixth page of

11   that document.  And do you see the section

12   entitled substance abuse?

13       A.  I must be on the wrong page.  You said 6?

14       Q.  Sixth page.

15       A.  Yes.

16       Q.  And could you read that, please, for the

17   record, Mr. Wilmot.

18       A.  "We will not tolerate any substance abuse

19   on the property on or off the clock.  Any

20   employee reporting for work under the influence

21   of alcohol or controlled scans will be terminated

22   immediately."

23       Q.  But this individual named Justin, again,

24   he was not terminated, was he?

Donald Wilmot - trial testimony

1          A.   No.   He was not terminated.   This

2     actual -- this actual policy right here, we do

3     have some leniency with it.

4          Q.   Mr. Wilmot, isn't it true that you use

5     profanity at the Lobby House on at least a daily

6     basis?

7          A.   Yes.   All of the employees do amongst each

8     other.

9          Q.   All right.   Isn't it true that you use the

10    F word frequently at the Lobby House?

11         A.   Yes.

12         Q.   Do you recall an employee who was employed

13    during the time that Shannon Laymon was employed

14    named Sarah Geesaman?

15         A.   Yes, I do.

16         Q.   Do you ever recall making a comment to

17    Ms. Geesaman after she had fallen at work?

18         A.   No.

19                   MR. POLIQUIN:   Objection; I think

20    this is a specific incident regarding

21    Ms. Geesaman, and I don't think Ms. Laymon was

22    present for it.   I don't even know if she was

23    working at the time.   So, I'll just note the

24    objection.

Donald Wilmot - trial testimony

1    Q.  You can answer, Mr. Wilmot.

2    A.  I have to say no, because I don't recall

3    Sarah Geesaman ever hurting herself at the Lobby

4    House.

5    Q.  And you don't recall her ever falling?

6    A.  No.

7    Q.  Do you recall an employee who was employed

8    during the period that Ms. Laymon was employed

9    named Amanda Potts?

10    A.  Yes.

11    Q.  Isn't it true that during the period that

12    Ms. Laymon was employed, Ms. Potts was under 21?

13    A.  Yes.

14    Q.  Isn't it true that she was dating one of

15    the management employees named Keith Anibal at

16    the time?

17    A.  Yes, she was.  She still is.

18    Q.  Now, Ms. Potts, did she ever drink

19    alcoholic beverages at the Lobby House during the

20    period that she was under 21 years old?

21    A.  To my knowledge, no.

22    Q.  Did Ms. Potts ever dance on the bar?

23    A.  I don't believe so.

24    Q.  Did she ever strip off her clothes while

Donald Wilmot - trial testimony

1    she was at the Lobby House?

2        A.   No.   I've seen her in her bra, but that's

3    the extent of it.   It's not like she took her

4    pants and her underwear and her bra off and was

5    running around buck naked.

6        Q.   But you've seen her dancing around in her

7    bra?

8        A.   Yes.

9        Q.   When did you see her dancing around in her

10   bra?

11       A.   That was New Year's Eve of 2005.

12       Q.   Did you ever see Ms. Potts dancing around

13   in her underwear?

14       A.   No.

15       Q.   Mr. Wilmot, during the period of time that

16   Ms. Laymon was employed at the Lobby House, was

17   there a Lobby House policy regarding showing

18   tattoos?

19       A.   Yes.

20       Q.   Did Ms. Potts have a tattoo during that

21   period of time?

22       A.   Yes, she did.

23       Q.   And where was it located on her body?

24       A.   I believe it was on her upper left chest.

Donald Wilmot - trial testimony

1 Q. Did you allow Ms. Pots to show that tattoo

2 while she was working?

3 A. No.

4 Q. Did you ever tell any employees at the

5 Lobby House that -- and these would be female

6 employees, that they needed to wear more

7 revealing tops in order to get better tips?

8   MR. POLIQUIN: Objection.

9 A. Abso --

10   MR. POLIQUIN: As far as time frame.

11 A. Absolutely not.

12 Q. And just to clarify the time frame, during

13 the period that Ms. Laymon was employed, did you

14 ever tell employees at the Lobby House, female

15 employees, that they needed to wear more

16 revealing tops in order to get better tips?

17 A. No. I never said that.

18 Q. Mr. Poliquin, during his questioning of

19 you on direct, asked you about a birthday party

20 that was held for you at the Lobby House on your

21 birthday in 2005. Do you recall those questions?

22 A. Yes.

23 Q. Did you become intoxicated at that party?

24 A. Later in the evening, yes.

Donald Wilmot - trial testimony

1      Q.  Later in the evening?

2      A.  Yes.

3      Q.  So during the party you did?

4      A.  No, it wasn't -- first of all there was --

5      it was never a party.  It was a minor

6      celebration.  They sang happy birthday to me and

7      gave me gifts.  And when I say later in the

8      evening, I'm talking late night, like around

9      midnight.

10     Q.  During the period that Shannon Laymon was

11     employed at the Lobby House, was there another

12     female employee there named Christina Sells?

13     A.  Yes.

14     Q.  Is she still employed at the Lobby House?

15     A.  Yes, she is.

16     Q.  Were you aware that while Ms. Laymon was

17     employed there, that Ms. Sells and Ms. Laymon

18     were dating brothers?

19     A.  Yes, I was.

20     Q.  Did you ever make comments to either

21     Ms. Sells or Ms. Laymon about having orgies?

22     A.  No.  Never.

23     Q.  Now, you talked about the subject of

24     blowjob shots.  Correct?

Donald Wilmot - trial testimony

1    A.    Yeah.

2    Q.    And I believe that you testified that

3    there had been occasions when you have allowed a

4    female customer to take blowjob shots out of your

5    crotch?

6    A.    It's very common.  Yes.

7    Q.    Is that the normal way that they're

8    served?

9    A.    Blowjob shots?  Yes.  I'm pretty sure most

10   bars that you go in, it's probably the way it's

11   served.

12   Q.    So, in other words, when Ms. Laymon would

13   have served the blowjob shots, she would have

14   served it to customers while holding it in her

15   crotch?

16   A.    That's up to her discretion.  She doesn't

17   have to do that.  They're definitely not

18   obligated to do that.

19   Q.    But it's your testimony that that's

20   common?

21   A.    Yes.

22   Q.    Did you ever use the F word, and I'm not

23   going to say it in front of the jury, but did you

24   ever use the F word, and you know what I mean,

Donald Wilmot - trial testimony

1     it's the four-letter expletive, in this phrase or

2     a similar phrase:  "If you don't work here, or

3     are F'ing someone who does, get out."

4          A.   I don't believe I did.  If I did, I don't

5     recall doing it.

6          Q.   You talked about the occasion of New

7     Year's Eve of 2005, that would be December 31,

8     2005.  You were intoxicated on that occasion,

9     correct?

10         A.   Yes.

11         Q.   Mr. Wilmot, I'd like to show you a

12    document --

13                    MR. POLIQUIN:  I'm going to object

14    to this.  I think this was already decided this

15    was not coming in, in the pretrial conference.

16                    MR. PRIMOS:  Okay.  I believe the

17    decision was that Mr. Wilmot could be

18    cross-examined about it, but we can bring that up

19    with the judge.

20    BY MR. PRIMOS:

21         Q.   Mr. Wilmot, do you recognize what I've

22    handed you?

23         A.   Yeah.  It's my myspace.

24         Q.   This is a printout from your myspace?

Donald Wilmot - trial testimony

1      A.  Right.

2      Q.  This is your myspace website, basically?

3      A.  Correct.

4      Q.  Okay.  This is a printout from about a

5   year ago, around the time of your deposition, and

6   I'd like you to focus on the first page.  Is

7   the -- the material on the first page that we see

8   here, is it basically the same now as it was in

9   August of 2007?

10          MR. POLIQUIN:  Objection.

11      A.  I honestly can't answer that.  I haven't

12   been on a computer in quite some time.

13      Q.  Okay.  I'd like you to look at what you

14   have listed under Donald Wilmot's interests,

15   under general.  And what do you have listed under

16   your general interests?  If you could just read

17   that for the --

18      A.  I have "gambling" --

19          MR. POLIQUIN:  Objection.

20      A.  I have "gambling, drinking, sex, football,

21   drinking, gambling, last but not least,

22   drinking."

23      Q.  Okay.  Now, look at Donald Wilmot's

24   blurbs.  If you could read the first three

Donald Wilmot - trial testimony

1    sentences under the "about me" section there.

2        A.   "I am a fun-loving guy who loves to drink,

3    have good" --

4                 MR. POLIQUIN:  Object.

5        Q.   If you could slow down a little bit in

6    your reading, Mr. Wilmot.

7        A.   Okay.  "I'm a fun-loving guy who loves to

8    drink, hang with friends and have a good time."

9        Q.   Okay.  I think it says "hang with good

10   friend."

11       A.   "Hang with good friends."

12       Q.   Keep going.

13       A.   "And have a good time.  Known for being an

14   asshole, and I take pride of that.  Been told I

15   remind people of Dr. House.  I'm rude and

16   ignorant, and I don't have a problem with this."

17       Q.   Could you read the next sentence?

18       A.   Sure.  "If you do, then piss off."

19                 MR. PRIMOS:  Can we take a brief

20   break?

21                 VIDEOGRAPHER:  Going off the record

22   at approximately 2:38 p.m.

23                 (Brief discussion off the record)

24                 VIDEOGRAPHER:  Going back on the

Donald Wilmot - trial testimony

1    record at approximately 2:40 p.m.

2    BY MR. PRIMOS:

3        Q.   Mr. Wilmot, you testified earlier that you

4    had seen Ms. Laymon intoxicated at the Lobby

5    House before?

6        A.   Yes.

7        Q.   While she was employed there?

8        A.   Yes.

9        Q.   And this would have been during work

10   hours, correct?

11       A.   Both work hours and on her own time.

12       Q.   Isn't it true that you actually spoke to

13   Ms. Laymon about being intoxicated during work

14   hours?

15       A.   Yes, I did.

16       Q.   And isn't it true that after you spoke to

17   her about it, she never was intoxicated during

18   work again at the Lobby House?

19       A.   I don't believe she was.

20              MR. PRIMOS:   I have no further

21   questions.

22              VIDEOGRAPHER:   Going off the record

23   at approximately 2:41 p.m.

24              (Brief discussion off the record)

Donald Wilmot - trial testimony

1                VIDEOGRAPHER:  Going back on the

2      record at approximately 2:41 p.m.

3                     REDIRECT EXAMINATION

4      BY MR. POLIQUIN:

5           Q.  Mr. Wilmot, you said you had stated you

6      saw Ms. Potts in her bra dancing on New Year's

7      Eve; is that correct?

8           A.  Yes.

9           Q.  During the entire time of Ms. Laymon's

10     employment, have you ever seen Ms. Potts like

11     that before or since?

12          A.  No.

13          Q.  And New Year's Eve is probably -- was a

14     special occasion, I think you testified to?

15          A.  Yes.  It was definitely an isolated

16     incident.

17          Q.  And during the time Ms. Laymon was

18     employed, how many blowjob shots do you remember

19     giving?

20          A.  Myself?  Two.

21          Q.  And would those be at the request of a

22     customer?

23          A.  Yes.

24          Q.  And I'm going to preface this by stating

Wilcox & Fetzer, Ltd.          Registered Professional Reporters          (302) 655-0477

Donald Wilmot - trial testimony

1    that I have already objected to this document

2    coming in, but I'm going to ask you a question on

3    it, pending that objection, ruling on that

4    objection.

5              This myspace page, was this language

6    on myspace at the time Ms. Laymon was employed at

7    the Lobby House?

8        A.   No.

9        Q.   So this page wasn't up at the time --

10   during any time of Ms. Laymon's employment?

11       A.   No.   I don't believe myspace was even

12   existing when she was employed at the Lobby

13   House.

14       Q.   And you don't think your myspace page

15   was --

16       A.   I know for a fact my myspace page was not.

17             MR. POLIQUIN:   No further questions.

18             VIDEOGRAPHER:   Going off the record

19   at approximately 2:43 p.m.

20

21

22

23

24

Donald Wilmot - trial testimony

1                    I N D E X

2    DEPONENT:  DONALD WILMOT              PAGE

3    Examination by Mr. Poliquin            3
     Examination by Mr. Primos             29
4    Examination by Mr. Poliquin           44

5
                    E X H I B I T S
6                                           PAGE

7    (There were no exhibits marked)

8    CERTIFICATE OF REPORTER                47

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Donald Wilmot - trial testimony

1       State of Delaware  )
                           )
2       New Castle County  )

3

4                   CERTIFICATE OF REPORTER

5            I, Julianne LaBadia, Registered Diplomate
        Reporter and Notary Public, do hereby certify that
6       there came before me on August 29, 2008, the
        deponent herein, DONALD WILMOT who was duly sworn by
7       me and thereafter examined by counsel for the
        respective parties; that the questions asked of said
8       deponent and the answers given were taken down by me
        in Stenotype notes and thereafter transcribed by use
9       of computer-aided transcription and computer printer
        under my direction.
10
             I further certify that the foregoing is a true
11      and correct transcript of the testimony given at
        said examination of said witness.
12
             I further certify that reading and signing of
13      the deposition was waived by the deponent and
        counsel.
14
             I further certify that I am not counsel,
15      attorney, or relative of either party, or other wise
        interested in the event of this suit.

16

17

18

19      _____

20                   Julianne LaBadia, RDR, CRR

21                   Certification No. 267-RPR

22                   (Expires January 31, 2011)

23

24

We'll respond within 60 minutes to requests made during regular office hours:

Mon-Sat 9-9

You've contacted: **White Marsh, MD**

You may also contact a Sales Consultant:

- Local(410) 931-7956
- Toll Free(877) 999-9795
- Fax(410) 931-7919