**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| SHANNON A. LAYMON, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C. A. No. 07-129-MPT |
| | : | |
| LOBBY HOUSE, INC., | : | |
| a Delaware corporation, | : | |
| | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM ORDER

**Background**

Plaintiff Shannon Laymon ("Laymon") brought this action on March 2, 2007 against defendant, Lobby House, her former employer alleging two counts under Title VII, hostile environment sexual harassment and retaliation.  Trial was held from September 8, 2008 through September 11, 2008.  The jury returned a verdict on September 12, 2008 in favor of Laymon awarding her compensatory damages of $500 for her hostile environment sexual harassment claim, $1,000 for her retaliation claim and $100,000 in punitive damages.  Lobby House now challenges the verdict, as well as, the award of punitive damages with a motion for judgment as a matter of law ("JMOL") pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 50 and for a new trial under Rule 59.

What occurred during trial is a primary area where the parties are disagree.  Lobby House, in support of it motion, failed to provide the court with the relevant trial record.  Without that record, the conflicting views of the trial evidence are difficult, if not

impossible, to reconcile.

Lobby House is a family restaurant or pub where Laymon was employed as a waitress and bartender from late August 2005 through March 17, 2006, when she was terminated.  She was originally hired by Rick Anibal ("Anibal"), the general manager of the facility.  In its submissions, Lobby House maintains that the evidence showed that Laymon enjoyed working at the restaurant and often spent her free time there;[1] that she appreciated the income that she earned from Lobby House; and that she would frequently drink to the point of intoxication while working there.  Further, Lobby House claims, which Laymon does not refute, that her boyfriend frequented the Lobby House when she worked.

Laymon appeared to have a friendly attitude toward Lobby House and its employees.  She attended a Halloween party at the Lobby House in October 2005.  She also brought Christmas dinner to Don Wilmot, a supervisor and one of the perpetrators of the harassing conduct.[2]  Laymon also attended a party at Wilmot's home in January 2006.

On New Year's Eve 2005, Laymon worked at the Lobby House.  After hours, the employees celebrated the evening.  During that partying, a co-employee, Amanda Potts, began dancing on the bar and disrobing.[3]  Laymon maintains that management

---

[1] Laymon contends that while she enjoyed some aspects of her job, she "detested the constant sexual harassment, including sexually offensive language and conduct both directed at her and more generally present in the environment."

[2] Wilmot was accused of making sexist remarks about women and encouraging the female employees to wear suggestive tops.  Wilmot, along with Anibal and other managers, were accused of promoting sexual behavior by female employees, such as stripping or flashing their breasts.

[3] The parties agree that Potts was dancing topless, and that there were other incidents of crude behavior, as described herein, during the after hours party.

2

encouraged such behavior and that she pled with Potts to get off the bar.

While at work, Laymon admittedly displayed her vertical hood piercing[4] to two co-employees, bartenders Brian Doucette and Mary Anderson.[5]

Laymon testified that she was accosted at work by Wilmot who dragged her into the bathroom and demanded to see her breasts.  She related a sexually inappropriate comment made by Wilmot after another female employee, Sarah Geesaman, fell and spilled ranch dressing on herself.[6]  Both Geesaman and Laymon testified observing body shots[7] and lap dances, which they claimed management encouraged the female employees to perform.  Both testified that Anibal participated in the body shots.  Laymon overheard sexually offensive comments made by Wilmot toward female customers.[8]

Laymon was written up for accusing Lobby House management of stealing money out of her paycheck.  The parties contest whether Laymon was written up for accusing management of stealing money from the bartenders' tips.  The fact that she accused Lobby House of such conduct is not disputed.

On March 3, 2006, Laymon was confronted by Anibal regarding her accusations

---

[4] A vertical hood piercing is a piercing in the clitoral area.

[5] Laymon maintains that she only exposed that piercing after being "repeatedly harassed and pressured by Doucette to do so."  Anderson, a friend of Laymon, testified that Laymon willingly revealed the piercing between her legs.  Anderson also claimed that she would never allow a man to force a woman to engage in such conduct.  However, Anderson further admitted to flashing her breasts while at work.

[6] Geesaman was a witness called by Laymon.  Geesaman, as well as a witness called by the defense, Kristina Sells, confirmed the offensive comment.

[7] Body shots were described as putting alcohol between a female's breasts, in or on her navel, on her pubic area or between her legs and having a male drink or lick the alcohol from that area.  Body shots were also performed by the male employees, which would include having a liquor bottle protrude from their pants and pouring alcohol into a woman's mouth.

[8] Lobby House witnesses, including its management, disputed Laymon and Geesaman's testimony.

to customers and employees that Lobby House was stealing money from her wages. Laymon responded by claiming that Ken Caudill, the owner of the Lobby House, made offensive remarks of a sexual nature about women.  That was the first and only time Laymon reported to Lobby House management any sexually harassing conduct. Laymon testified that she did not complain previously for fear of losing her job.

On March 17, 2006, a number of regular customers of the Lobby House jointly complained about Laymon's bad attitude.[9]  Laymon was fired that same day.  She filed a charge of discrimination on April 5, 2006.

Lobby House filed its motion for JMOL on September 26, 2008.  In its motion, Lobby House argues that the punitive damages award is unreasonable and should be eliminated or, in the alternative, reduced, and that the verdict is not supported by sufficient evidence.  Laymon filed her answering brief on October 9, 2008 followed by Lobby House's reply on October 27, 2008.  This memorandum order addresses Lobby House's motion.

**Judgment as a Matter of Law**

Governed by Fed. R. Civ. P. 50, JMOL is granted only when "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue."[10]  In order to prevail on a renewed motion for JMOL, the moving party "must show that the jury's findings, presumed or express, are not supported by substantial evidence or, if they were, that the legal conclusions implied by the jury's verdict cannot in law be

---

[9] Specifically, Lobby House notes that Laymon would regularly "bad-mouth" it to customers.  Two customers, James Satterfield and Robert Reed, who were part of the group which complained about Laymon's behavior, testified at trial that they would not return to Lobby House if Laymon continued working on Friday nights.

[10] Fed. R. Civ. P. 50(a)(1).

supported by those findings."[11]  In making its assessment, the court must give the non-moving party the benefit of all logical inferences and view the evidence in the light most favorable to it.[12]  The court does not re-weigh the evidence and must not substitute its own judgment for that of the jury.[13]  The court only determines whether the evidence reasonably supports the jury's view.[14]  Judgment as a matter of law is granted "'sparingly' and only in those circumstances in which 'the record is critically deficient of the minimum quantum of evidence in support of the verdict.'"[15] Simply put, the moving party has the difficult burden of showing that no reasonable jury could reach the particular verdict.

Under the standard of review for JMOL, the court is limited to the trial record and nothing else.  In the present instance, Lobby House has not cited to the record at all in its submissions in support of its motion for JMOL.

Under a motion for JMOL, the moving party must contest the evidence which is "on the record."  At the appellate level, the Third Circuit has held that it will not review an appeal from a renewed motion for JMOL without the trial transcript.[16]  Although the court's analysis in the present matter is frustrated by the absence of the trial record, it will address the issues raised in Lobby House's motion.

---

[11] *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1348 (Fed. Cir. 1998).
[12] *Power Integrations, Inc. v. Fairchild Semiconductor Inter., Inc.*, 589 F. Supp. 2d 505, 508 (D. Del. 2008); *Williamson v. Consolidated Rail Corp.*, 926 F.2d 1344 (3d Cir. 1991).
[13] *Price v. Delaware Dept. of Correction*, 40 F. Supp. 2d 544, 550 (D. Del. 1999).
[14] *Dawn Equip. Co. v. Kentucky Farms, Inc.*, 140 F.3d 1009, 1014 (Fed. Cir. 1998).
[15] *Johnson v. Campbell*, 332 F.3d 199, 204 (3d Cir. 2003).
[16] *Veanus v. Northampton County Prison*, 238 Fed. App'x. 753, 754 (3d Cir. 2007); *Miles v. Aramark Correctional Service at Curran Fromhold Correctional Facility*, 236 Fed. App'x. 746 (3d Cir. 2007) (holding that the appeal would be considered even though plaintiff did not provide transcript because district court had ordered plaintiff to stop filing correspondence with the court).

**Preservation of Issues Pre-Verdict**

Laymon initially argues that Lobby House cannot move for a renewed JMOL or a new trial on the jury's award of punitive damages because it failed to preserve these issues at trial through a pre-verdict motion:  "[a] motion under Rule 50(b) is not allowed unless the movant sought relief on similar grounds under Rule 50(a) before the case was submitted to the jury."[17]   Therefore, a Rule 50(a) motion is a necessary prerequisite for a Rule 50(b) motion.[18]   That prerequisite provides the adverse party "an opportunity to cure defects in proof that might otherwise preclude the party from taking the case to the jury."[19]   Furthermore, it is necessary to preserve a litigant's Seventh Amendment right that "no fact tried by a jury shall be re-examined in any Court of the United States."[20]   "If no pre-verdict notice were required, defendants' right to pursue JMOL claims post-verdict would be automatic; this is clearly not the case."[21]

Lobby House maintains that since it sought a pre-verdict JMOL on the grounds of inadequate evidence to support the hostile work environment and retaliation claims, that motion was sufficient to apprise Laymon that it was also contesting the award of punitive damages.  In support of its position, Lobby House relies on *Browning v. President Riverboat Casino-Mo., Inc.*  In *Browning*, although the defendant in a Title VII claim failed to assert in its Rule 50(a) motion that it was entitled to JMOL as to punitive

---

[17] *Exxon Shipping Co. v. Baker*, 128 S.Ct. 2605, 2617 n. 5 (2008).

[18] Fed. R. Civ. P. 50(b) ("If the court does not grant a motion for judgment as a matter of law made under 50(a) . . . the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59.").

[19] *Duro-Last, Inc. v. Custom Seal, Inc.*, 321 F.3d 1098, 1105 (Fed. Cir. 2003).

[20] U.S. Const. Amend. VII; *Duro-Last*, 321 F.3d 1107 ("In view of a litigant's Seventh Amendment rights, it would be constitutionally impermissible for the district court to re-examine the jury's verdict and to enter JMOL on grounds not raised in the pre-verdict JMOL.").

[21] *TruePosition Inc. v. Andrew Corp.*, 568 F. Supp. 2d 500, 513 (D. Del. 2008).

damages, the Eighth Circuit did not consider that omission fatal when the motion was based on insufficient evidence.[22]  However, that analysis is not necessarily accepted in this circuit.  Title VII includes two separate standards for liability:  "one for establishing a right to compensatory damages and another, higher standard . . .  to qualify for a punitive award."[23]  Intentional discrimination alone is not necessarily sufficient to warrant punitive damages.  To impose punitive damages on an employer, there must be "knowledge that it may be acting in violation of federal law."[24]  Because of the differing analyses and the different evidentiary requirements for compensatory and punitive damages, a Rule 50(a) motion which only challenges the sufficiency of evidence, is inadequate to provide notice of an objection to punitive damages.[25]

Moreover, in *TruePosition Inc. v. Andrew Corp.*, the defendant moved at the conclusion of the plaintiff's case-in-chief for a JMOL on "all the claims, for all the accused products, and for damages."[26]  In addition, the defendant propounded several motions for JMOL on the record, but did not specifically move for JMOL on its own claims, such as fraud, as well as, on willful infringement.  It merely indicated that there were other motions that it could raise, without waiving its right to do so.[27]  In response to the defendant's post-verdict motion for JMOL, the plaintiff argued that the defendant

---

[22] 139 F.3d 631, 636 (8th Cir. 1998).

[23] *Kolstad v. American Dental Ass'n.*, 119 S. Ct. 2118, 2124 (1999).

[24] *Id.* at 2124.

[25] *Lafate v. Chase Manhattan Bank*, 123 F. Supp.2d 773, 784 (D. Del. 2000); *see Alexander v. Riga*, 208 F.3d 419, 434 (3d Cir. 2000) (where a discrimination case which addressed punitive damages was remanded on the issue of an employer's vicarious liability for punitive damages because such damages involve a different factual analysis than determining an employer's vicarious liability for compensatory damages).

[26] 568 F. Supp. 2d at 512-13.

[27] Specifically the defendant advised that it had "other detailed motions" which would demonstrate why there was a failure of proof on certain claim terms, including the failure by the plaintiff to meet the court's claim construction.  Defendant, in essence, made a general pre-verdict JMOL.

was barred from challenging the jury's findings in its Rule 50(b) motion on any issue which was not specifically mentioned in the Rule 50(a) motion.  In finding that the defendant was precluded from bringing its JMOL motion on certain claims, the court noted that "Rule 50(a) requires the movant to 'specify the *judgment sought* and the law and the facts that entitle the movant to judgment.'"[28]  When the issues involve different elements of proof, a general Rule 50(a) motion is insufficient and ambiguous because it fails to delineate what claims are being contested.[29]

Notably, Lobby House never objected to either the jury instruction on punitive damages or the inclusion of punitive damages on the special verdict form.

Lobby House can not contest a post-verdict award for punitive damages because there is no evidence that it raised that issue in its pre-verdict Rule 50(a) motion. Therefore, Lobby House's motion for JMOL on punitive damages is denied.

The court will now review the amount of punitive damages awarded.

**Gore/Campbell Punitive Damages Analysis and Remittitur**

The two Supreme Court decisions of *BMW of North America v. Gore*[30] and *State Farm Mutual Automobile Insurance Co. v. Campbell*[31] provide the analysis for determining the reasonableness of punitive damages.  As a basic element of fairness in our constitutional jurisprudence, "a person is to be given fair notice of not only the conduct that will subject him to punishment, but also the severity of the penalty the state may impose."[32]  To ensure that a party is given adequate notice of the magnitude

---

[28] 568 F. Supp. 2d at 512 (emphasis added).
[29] *Id*. at 513.
[30] 517 U.S. 559 (1996).
[31] 538 U.S. 408 (2003).
[32] *Gore*, 517 U.S. at 574.

of the penalty a court may impose, the Court established three-pronged analysis for measuring the appropriateness of the amount of punitive damages:  the degree of reprehensible behavior on the part of the defendant; the disparity between the harm or potential harm suffered by the plaintiff and the punitive damages awarded; and, the difference between the remedy awarded and the civil penalties authorized or imposed in comparable cases.[33]

### Degree of Reprehensible Conduct

The most important element is the degree of reprehensible conduct.[34]  In analyzing this element, *Campbell* applies five factors: whether the harm caused was physical as opposed to economic; whether the tortious conduct evidenced an indifference to or a reckless disregard of the health or safety of others; was the target of the conduct financially vulnerable; did the conduct involve repeated actions or was it an isolated incident; and, was the harm the result of intentional malice, trickery, or deceit, or mere accident.[35]  Laymon argues that those factors weigh in her favor because the jury determined that the conduct of Lobby House was sufficiently reprehensible to authorize an award of punitive damages.  The degree of reprehensibility, however, is also directly relevant to what amount of punitive damages is reasonable.

In analyzing the five factors, the court does not find that the conduct of Lobby House was sufficiently offensive to warrant an award of $100,000 in punitive damages. Although Laymon was economically vulnerable in that she was employed by Lobby

---

[33] *Gore*, 517 U.S. at 575.
[34] *Gore*, 517 U.S. at 575; *see Day v. Woodworth*, 13 How. 363, 371 (1852) (holding that exemplary damages imposed on a defendant should reflect the enormity of the offense).
[35] *Campbell*, 538 U.S. at 419.

House who paid her wages, and the harassing environment complained of was not just an isolated incident and occurred over a brief period of time, there is no evidence of any physical contact or abuse and most of the appalling conduct happened during the 2005 New Year's Eve party.

Furthermore, there is evidence which mitigates the severity of the reprehensible conduct, and indicates that Laymon participated in similar conduct.  Laymon regularly socialized at Lobby House during her off work hours.  She socialized with Wilmot outside of work.  She even exposed her vertical hood piercing to co-employees. Laymon complained of sexual harassment on only one occasion during the entire time of her employment.[36]  There are facts which show that Laymon was terminated after a number of customers complained about her behavior.

Moreover, the compensatory award of only $1,500 acknowledges the limited time that Laymon was exposed to the offensive conduct and the contributory nature of her behavior.  It also suggests the degree of the severity of the discriminatory behavior.

### Disparity between the Harm Done and Punitive Damages Awarded

The second guidepost, the difference between the harm suffered and the punitive damage award, is the heart of the present dispute.  In analyzing this element, the court evaluates the ratio between the amount of punitive damages and the compensatory damages.[37]  No bright line is established as to when the ratio becomes

---

[36] The evidence also suggests that the sexually offensive behavior permeated the working environment, and that management did nothing to discourage such conduct.  Further, there was no evidence which demonstrated that Lobby House had any sexual harassment policy or training in that regard which it provided to its employees.

[37] *See Gore*, 517 U.S. at 580 ("The second and most commonly cited indicum of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff."); *Campbell*, 538 U.S. at 425.

unreasonable, and courts have been reluctant to identify one.[38]  However, "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process."[39]  Thus, the facts and circumstances of the defendant's conduct and the plaintiff's harm are examined.  In the absence of rigid benchmarks, a ratio higher than what has been previously upheld may be reasonable where a "particularly egregious act" results in only small economic damages.  Similarly, a substantial compensatory damage award may not justify even a low ratio.[40]  As a result, prior cases are only instructive, and not a substitute for independent review of proportionality and reasonableness.

Laymon was awarded compensatory damages of $1,000 for her retaliation claim and $500 for her hostile work environment claim for a total of $1,500.  She was also awarded punitive damages of $100,000.  The ratio between the two is approximately 66 2/3:1.[41]  Lobby House maintains that the punitive damages award is unreasonable.  The court agrees.  Laymon's argument that the ratio between compensatory and punitive damages in the present matter is reasonable, is based on nominal awards where ratios greater than 9:1 have been upheld.  Laymon cites a single case, *Kemp v. AT&T*, which allowed a ratio greater than 66 2/3:1.[42]  That case is easily distinguishable from the instant matter.  In *Kemp*, the Eleventh Circuit affirmed a ratio of 2,173:1 based on an award of $115.05 in compensatory damages and $250,000 in punitive damages.  In

---

[38] *Campbell*, 538 U.S. at 425. (declining to establish a bright-line ratio which punitive damages cannot exceed).
[39] *Id.*
[40] *Id.*
[41] 100,000 / 1,500 = 66.666
[42] 393 F.3d 1354 (11th Cir. 2004).

that matter, AT&T was found to have used predatory billing practices by hiding "1-900" number fees within the regular long distance charges.[43]  More than a single-digit ratio was necessary to adequately punish for the past deceitful conduct and prevent similar practices in the future against AT&T, a large, international company with significant assets.[44]  Unlike AT&T, Lobby House is a small local pub or restaurant and bar in Dover, Delaware.  Lobby House undoubtedly employs significantly fewer employees than AT&T.  It is described as a small family-owned business.  The amount of punitive damages appropriate to punish Lobby House in relation to the harm caused, is substantially less than AT&T.

Laymon further agues that in cases of nominal compensatory relief, a much higher ratio has been allowed.  That argument ignores that $1,500 is not a nominal recovery and the cases cited by Laymon, with compensatory damages of one or two dollars, represent situations where larger ratios were necessary to punish past egregious behavior and to deter future similar conduct.  In the only case cited from the Third Circuit, *Styers v. Pennsylvania*, nominal damages of a dollar resulted in an award of $20,000 in punitive damages.[45]  The reasoning therein followed the *Gore/Campbell* analysis, refuted a strict mathematical test, and evaluated the punitive damages based on reasonableness.[46]  Since the cases which allow higher ratios are premised on nominal compensatory damages under ten dollars, Laymon's recovery of $1,500 is outside the rationale of *Styers*.

---

[43]  *Kemp*, 393 F.3d at 1357.
[44]  *Id.* at 1365; *see Gore*, 517 U.S. at 591 (BREYER, J., concurring) (allowing wealth of the defendant to be considered, but not to overshadow the other factors).
[45]  *Styers v. Pennsylvania*, No. 05-2127, 2008 WL 598285 (M.D. Pa. Feb. 29, 2008)._
[46]  *Id.* at *4.

Finally, Laymon contends that attorney's fees should be added to the compensatory damage amount, thereby lowering the ratio to approximately 1.65:1.[47] Laymon relies on two cases from the Third Circuit, *Gallatin Fuels, Inc. v. Westchester Fire Ins. Co.*,[48] and *Willow Inn, Inc. v. Public Service Mut. Ins. Co.*[49]  Both of those matters, however, involve breach of contract and bad faith claims against insurers under 42 Pa. C.S.A. § 8371, and not Title VII.  In *Willow Run*, the insurer refused to pay a property damage claim which was covered by its policy to its insurer for two years after its building was damaged by a tornado.  The court noted that the insured "encountered sustained resistance to its insurance claim rather than cooperation in settling it."[50]  The court noted that punitive damage awards must not be "disproportionately excessive to the degree of reprehensibility of the defendant's conduct" and the "harm . . .  visited upon the plaintiff," but also "must not exceed the state legislature's judgment of the appropriate sanctions for [that] conduct."[51] The court recognized that the insurer's pattern of delay was designed to achieve financial benefit for itself contrary to its obligation to act with the "'utmost good faith' towards its insured."[52]  Since the attorney fees and costs were awarded as part of the § 1873 (bad faith) claim, in deciding that such expenses should be included in the ratio analysis, the court relied upon Pennsylvania case law which analyzed the purpose and application of § 1873.  *Gallatin Fuels* relied on and reaffirmed the *Willow Inn* reasoning to include

---

[47] $59, 037.50 + $1500 = $60,537, when compared to the punitive award, 100,000 / 60,537 = 1.65
[48] 244 Fed. App'x. 424 (3d Cir. 2007).
[49] 399 F.3d 224 (3d Cir. 2005).
[50] *Id.* at 227.
[51] *Id.* at 230.
[52] *Id.* at 233.

13

attorneys fees and costs in the ratio analysis for determining the reasonableness of a punitive damages award for a bad faith claim under § 8371.

The holdings in *Willow Inn* and *Gallatin Fuels* do not address damages in cases of intentional discrimination in employment.  Further, Laymon's argument on the inclusion of attorneys fees and costs are inconsistent with the plain language of 42 U.S.C.A. §1981a(b)(2), which provides that "[c]ompensatory damages awarded under this section *shall not* include backpay, interest on backpay, or *any other* type of relief authorized under section 706(g) of the Civil Rights Act of 1964 [42 U.S.C.A. § 2000e-5(g)]."[53]  42 U.S.C.A. § 2000e-5(g)(2)(B)(I) specifies attorney's fees and costs as another type of relief available to a prevailing party of unlawful intentional discrimination.  Thus, combining attorney's fees and costs with compensatory damages is inconsistent with the statutory definition of compensatory damages under 42 U.S.C. § 1981a(b)(2).

### Comparison of Award to Civil Penalties Authorized

The third principle is the difference between the remedy and the civil penalties authorized or imposed in comparable cases.  42 U.S.C.A. § 1981a provides the statutory civil penalties for Title VII violations, which bases the combined amount of compensatory and punitive damages on the number of employees of the violator.[54]  Those damages may vary between $50,000 and $300,000.[55]  Laymon argues that because the total award of $101,500 for both compensatory and punitive damages is

---

[53] Emphasis added.
[54] 42 U.S.C.A. § 1981a(b)(3).
[55] *Id*. at (b)(3)(A-D) ($50,000 for more than 14 and fewer than 101 employees; $100,000 for more than 100 and fewer than 201 employees; $200,000 for more than 200 and fewer than 501 employees; $300,000 for more than 500 employees)

within that range, the award is valid.  Lobby House fails to provide any evidence regarding the actual number of its employees, and uses the ambiguous terms, such as, "relatively small family owned restaurant" to describe its size.[56]  In the absence of any evidence to the contrary, the award is not inconsistent with the statute.

In applying the *Gore/Campbell* principals to the present case, Laymon offered evidence which suggests that Lobby House intentionally retaliated against her for complaining about sexual harassment.  The evidence further shows that the work environment was, at least, sexually provocative.  The evidence also indicates that management participated in and encouraged the offensive activities.  Balanced against that evidence is testimony that Laymon participated in inappropriate conduct; that she accused Lobby House of stealing from her wages and expressed her complaints to customers; and, that Laymon only complained of sexual harassment after she was confronted by management regarding her negative behavior.  In balancing the *Gore/Campbell* factors, the court believes that reducing the amount of the punitive damages award is warranted, particularly in light of the conduct of both Laymon and Lobby House.  As a result, the court will reduce the jury's punitive damages award from $100,000 to $25,000 which it believes is appropriate to adequately punish Lobby House under the circumstances.

**Motion for JMOL, or in the Alternative, a New Trial**

To reiterate, the standard of review for JMOL requires the moving party to show that the jury's findings are not supported by substantial evidence or, that the legal

---

[56] Though the court suspects that Lobby House falls within § 1981a(b)(3)(A), and had less than 101 employees, no evidence was provided in that regard.

15

conclusions implied by the jury's verdict cannot be supported.[57]  All logical inferences
and conflicts of evidence are construed in favor of the non-moving party, and generally,
the record is to viewed in the light most favorable to it.[58]

A motion for a new trial pursuant to Fed. R. Civ. P. 59(a) does not require the
court to construe the evidence in a light most favorable to the non-moving party.  The
language of Rule 59 means that "[t]he authority to grant a new trial . . is confided almost
entirely to the exercise of discretion on the part of the trial court."[59]  Although the court
has significant discretion whether to grant a new trial, it should not replace the jury's
view of the evidence for its own.[60]  A new trial should only be granted when allowing a
verdict to stand would result in a miscarriage of justice.[61]  Generally, new trials are
granted in the following circumstances: (1) when the jury's verdict is against the clear
weight of the evidence and a new trial is necessary to prevent a miscarriage of justice;
(2) when newly-discovered evidence is found which would likely alter the outcome of the
trial; (3) when improper conduct of either counsel or the court unfairly influenced the
verdict; or (4) when the jury's verdict was facially inconsistent.[62]

**Hostile Environment Sexual Harassment Claim**

In support of its motion, Lobby House attacks the purported hearsay testimony of
Laymon's witness Sarah Geesaman.  Her statements are alleged to be inadmissible

---

[57] *Power Integrations, Inc. v. Fairchild Semiconductor Inter., Inc.*, 589 F. Supp. 2d 505, 508 (D. Del. 2008).
[58] *Id.* at 508.
[59] *Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980).
[60] *Power Integrations*, 589 F. Supp.2d at 508.
[61] *Id.*
[62] *See Zarow-Smith v. N.J. Transit Rail Operations*, 953 F. Supp. 581, 584 (D.N.J. 1997).  Lobby House does not argue or raise any newly-discovered evidence, any claim of improper conduct by counsel or the court, or a facial inconsistent verdict.

hearsay and unduly prejudicial.  The objections, however, voiced by Lobby House are based on Geesaman's affidavit and not her in court testimony.[63]  Further, Lobby House failed to raise admissibility objections at trial, and as a result, has waived such objections for post-trial consideration.[64]  Therefore, the hearsay contentions do not support either a motion for  JMOL or for a new trial.

To make a prima facie case for hostile environment sexual harassment, five elements must be shown:  the plaintiff suffered intentional discrimination because of gender; the harassing conduct was pervasive and regular; the discrimination detrimentally affected the plaintiff; the discrimination would detrimentally affect a reasonable person of the same gender in that position; and *respondeat superior* liability.[65]  The evidence at trial of a generally hostile work environment is sufficient for a determination of liability and for a reasonable jury to conclude such conduct occurred. The evidence presented included:  a crude remark from a supervisor after a female employee fell and became covered with ranch dressing; a male supervisor advising female employees to wear more revealing tops to get better tips; female employees being encouraged to do body shots, perform lap dances, and disrobe and dance topless;  the general manager pouring liquor into the mouths of female employees from the fly of his pants;  a male supervisor asking Laymon to expose her breasts; and, inappropriate sexually demeaning comments being expressed by management, such as,

---

[63] To note again, Lobby House has not provided relevant portions of the record.

[64] *Boston Scientific Scimed, Inc. v. Cordis Corp.*, 434 F. Supp.2d 308, 318 (D. Del. 2006) ("[A] party may not seek a new trial on the basis of objections not raised in the original trial."); *Finch v. Hercules Inc.*, 941 F. Supp. 1395, 1416 (D. Del. 1996) ("Failure to object must be deemed a waiver of his right to assert the new argument post-trial.").

[65] *Weston v. Pennsylvania*, 251 F.3d 420, 426 (3d Cir. 2001); *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 (3d Cir. 1990); 42 U.S.C.A. 2000e-2(a)(1).

17

women are only good for sex.  Such evidence is enough to satisfy the first prong.

The second element is met because the evidence suggests that the sexually harassing conduct was not an isolate occurrence, but occurred more frequently. Laymon was employed by the Lobby House from late August 2005 until March 17, 2006, and she was subject, within that time period, to the incidents enumerated herein   A reasonable jury could determine that those episodes within that limited time span created a pervasive and regular environment of sexual harassment.

Laymon testified that such conduct was subjectively detrimental to her, thus satisfying the third prong.  Further, a reasonable the jury was justified to believe that, in light of such evidence, an objective reasonable woman would also find the environment sexually discriminatory.  Finally, there is no question of *respondeat superior* liability since the offensive conduct involved Lobby House employees or managers.  Thus, Lobby House has not presented sufficient evidence for a JMOL or new trial on the hostile work environment sexual harassment claim.

**Retaliation Claim**

The elements of a prima facie retaliation case are:  the employee engaged in a protected activity; the employer took an adverse employment action after or contemporaneous with the employee's protected activity; and, there is a causal link between the employee's protected activity and the employer's action.[66]  At trial, Laymon showed that she was terminated only nine days after complaining to management about sexual harassment at Lobby House.  The temporal proximity of the complaint with

---

[66] *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 (3d Cir. 2000).

termination is significant circumstantial evidence that Lobby House retaliated against her.  The verdict is sufficiently justified by that evidence.  Therefore, Lobby House's motion for JMOL or a new trial is denied.

IT IS ORDERED, ADJUDGED and DECREED that defendant, Lobby House's motion for JMOL, or in the alternative for a new trial (D.I. 90) is granted in part only on remittitur and the punitive damages award is reduced to $25,000.  The remainder of its arguments are denied.

May 1, 2009                              /s/ Mary Pat Thynge_____
                                         UNITED STATES MAGISTRATE JUDGE